Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
SNELL & WILMER L.L.P.
One Centerpointe Drive, Suite 170
Lake Oswego, OR 97035
Telephone: (503) 624-6800
Facsimile: (503) 624-6888

Andrew M. Jacobs (*pro hac vice*)
ajacobs@swlaw.com
SNELL & WILMER L.L.P.
400 East Van Buren Street, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 382-6000
Facsimile: (602) 382-6070

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC., an Oregon public benefit corporation; THE FIRST UNITARIAN CHURCH OF PORTLAND, OREGON, an Oregon religious nonprofit corporation; SARA D. EDDIE, an individual; OREGON STATE REPRESENTATIVE KARIN A. POWER, an elected official; and OREGON STATE REPRESENTATIVE JANELLE S. BYNUM, an elected official, | Case No. 3:20-cv-01175-JR<br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**EXPEDITED HEARING REQUESTED** |
|           Plaintiffs, | |
|    vs. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FEDERAL PROTECTIVE SERVICE; and UNITED STATES MARSHALS SERVICE | |
|           Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

MOTION................................................................................................................ 1

MEMORANDUM ................................................................................................ 4

FACTS RELEVANT TO DETERMINATION OF THE MOTIONS ........................................... 4

A.    The Federal Government and the Defendant Agencies Would Not Exist
      But for the Constitutional Amendments at Issue in This Litigation—
      Which Were Passed to Prevent the Very Abuses of Liberty the
      Defendants Inflict on Portland Today.......................................................4

B.    The Killing of George Floyd Gives Rise to Protests, Which the
      Administration Denounces as Anarchistic and Hatred of America and
      Resolves to Suppress by Displacing Local Policing with Federal Forces
      in Violation of the Tenth Amendment. ....................................................5

      1.    The Killing of George Floyd Ignites Nationwide Protests. ........................ 5

      2.    The President Labels the Protesters Anarchists, Says They Hate America,
            Demands That Mayors Stop the Protests, and Repeatedly Promises to
            Police Cities Federally If the Protests Continue. ........................................ 5

C.    Consistent with the President's Plan to Suppress Dissenting Speech, and
      the Promise of "Proactive" Arrests, Federal Authorities in Portland Begin
      Operations Attacking Protesters, Which Emanate from the Hatfield
      Courthouse But Far Exceed Fairly Defending It. ....................................8

      1.    Federal Agents Conduct Plenary Policing Operations Away from the
            Federal Facilities They Are Supposedly Defending. ................................... 8

      2.    The Federal Defendants Conduct a Pattern of Policing in Portland to
            Eliminate and Deter Speech.................................................................... 11

            (a)    Attacks on Journalists; City-Wide Drone Ban............................ 11

            (b)    The Violent, Fourth Amendment-Violative Assault on 53-
                   Year-Old Navy Veteran Christopher David. ............................... 12

            (c)    The Unprovoked Shooting and Gassing of Prof. Maureen
                   Healy While She Was Peacefully Protesting in a Group............. 13

            (d)    The Unprovoked Shooting, Gassing, and Pursuit of
                   Amanda Dunham, Ending with Weapons Drawn........................ 13

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

# TABLE OF CONTENTS
### (Continued)

**Page**

|  |  |  |  |
|---|---|---|---|
|  | (e) | The Unprovoked Gassing of a Crowd of Demonstrators, Including Portland Mayor Ted Wheeler. | 14 |
|  | 3. | The Defendants Chill Constitutionally Protected Speech of Americans Wishing to Speak Out for Racial Justice and Black Lives Matter and Against Federal Occupation | 15 |

LEGAL STANDARD ................................................................................................ 16

ARGUMENT ........................................................................................................... 17

I.   PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THEIR
     TENTH AMENDMENT CLAIM AS EVIDENCE SHOWS DEFENDANTS
     ARE CONDUCTING PLENARY POLICING IN PORTLAND. .......................... 17

   A.   The Tenth Amendment Forbids Plenary Policing by the Federal
        Government ........................................................................................... 17

   B.   The Record Demonstrates That the Federal Government Is Attempting to
        Exercise Plenary Police Power, in Violation of the Tenth Amendment, in
        a Manner Far More General and Pervasive Than Occasional Hot Pursuits
        of Identified Persons Violating Federal Law Near the Courthouse. ............ 18

II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE
     MERITS OF THEIR FIRST AMENDMENT CLAIMS, BECAUSE THE
     RECORD REVEALS MANY TYPES OF FIRST AMENDMENT VIOLATIONS
     BY THE FEDERAL DEFENDANTS, AND PROVES THAT THEIR FIRST
     AND FOURTH AMENDMENT VIOLATIONS ARE CHILLING PROTECTED
     SPEECH. ..................................................................................................... 24

   A.   Defendants Have Violated the First Amendment by Unprovoked Attacks
        on Protesters. ......................................................................................... 25

   B.   Defendants Have Violated the First Amendment by Policing Far from the
        Hatfield Courthouse. .............................................................................. 26

   C.   Defendants Have Violated the First Amendment Because They Have
        Abundantly Chilled Speech in Portland by Aggressively Policing in
        Patrols Away from the Courthouse, Randomly Picking Up People in
        Derogation of 40 U.S.C. § 1315 and Attacking Peaceful Protesters Like
        Dunham and David. ................................................................................ 28

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

# TABLE OF CONTENTS
(Continued)

**Page**

D.    The President's Declared Intentions in Executive Order 13933 and Related Public Statements Establish That Operation Legend Is Meant to Quash Speech and to Redirect Speech Away from Dissent and Protest, Making Operation Legend Presumptively Unconstitutional. ................................29

III.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM BY THE CONTINUED VIOLATION OF THEIR CONSTITUTIONAL RIGHTS. .................... 32

IV.   THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS. .................................... 34

V.   THE PUBLIC INTEREST FAVORS ENJOINING CONSTITUTIONAL VIOLATIONS. ..................................................................................................... 34

REQUESTED INJUNCTION ....................................................................................... 34

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Abay v. City of Denver,*
  No. 20-CV-01616-RBJ, 2020 WL 3034161 (D. Colo. June 5, 2020) ............................... 29, 33

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................................................. 16

*Arizona Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ............................................................................................. 34

*Associated Press v. Otter,*
  682 F.3d 821 (9th Cir. 2012) ............................................................................................... 32

*Barron v. City of Baltimore,*
  32 U.S. (7 Pet.) 243 (1833) .................................................................................................. 4

*Bay Area Peace Navy v. U.S.,*
  914 F.2d 1224 (9th Cir. 1990) ........................................................................................ 27, 28

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't,*
  2020 WL 3128299 (W.D. Wash. June 12, 2020) ............................................................. 26, 28

*Bond v. U.S.,*
  572 U.S. 844 (2014) ................................................................................................ 17, 18, 24

*Boos v. Barry,*
  485 U.S. 312 (1988) ............................................................................................................ 25

*Brodheim v. Cry,*
  584 F.3d 1262 (9th Cir. 2009) ............................................................................................. 28

*Buck v. City of Albuquerque,*
  549 F.3d 1269 (10th Cir. 2008) ........................................................................................... 25

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................................................ 17

*Cohen v. California,*
  403 U.S. 15 (1971) .............................................................................................................. 25

*Collins v. Jordan,*
  110 F.3d 1363 (9th Cir. 1996) ........................................................................................ 27, 28

*Cox v. Louisiana,*
  379 U.S. 536 (1965) ............................................................................................................ 25

*DISH Network v. F.C.C.,*
  653 F.3d 771 (9th Cir. 2011) ............................................................................................... 32

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014) ......................................................................................... 32, 33

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

# TABLE OF AUTHORITIES
(Continued)

**Page**

*Edrei v. Maguire*,
892 F.3d 525 (2d Cir. 2018),
*cert. denied*, 139 S. Ct. 2614 (2019) ................................................................ 25, 26

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................ 32

*Flagg Bros. v. Brooks*,
436 U.S. 149 (1978) ................................................................................................ 18

*Gibbons v. Ogden*,
9 Wheat. 1 (1824) .................................................................................................... 17

*Jones v. Parmley*,
465 F.3d 46 (2d Cir. 2006) .............................................................................. 25, 26

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ................................................................ 32, 33, 34

*Long Beach Area Peace Network v. City of Long Beach*,
522 F.3d 1010 (9th Cir. 2008) ............................................................................. 32

*Marbury v. Madison*,
5 U.S. 137, 177 (1803) ...................................................................................... 1, 29

*Matal v. Tam*,
137 S. Ct. 1744 (2017) ..................................................................................... 30, 31

*McCulloch v. Maryland*,
4 Wheat. 316 (1819) ............................................................................................... 17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ................................................................... 32, 33, 34

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
192 F.3d 1283 (9th Cir. 1999) ............................................................................. 28

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ................................................................................ 32

*Mutual Life Ins. Co. v. Hillmon*,
145 U.S. 285 (1892) ................................................................................................ 21

*Nat'l Rifle Ass'n of Am. v. Cuomo*,
350 F. Supp. 3d 94 (N.D.N.Y. 2018) ...................................................... 30, 31, 33

*Nelson v. NASA*,
530 F.3d 865 (9th Cir. 2008),
*rev'd on other grounds*, 562 U.S. 134 (2011) ................................................... 32

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003) ................................................................................. 31

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

# TABLE OF AUTHORITIES
(Continued)

**Page**

*Oregon v. Trump*,
   406 F. Supp. 3d 940 (D. Or. 2019),
   appeal filed, Oct. 4, 2019 ..................................................................... 17, 18, 34

*R.A.V. v. St. Paul*,
   505 U.S. 377 (1992) ........................................................................... 30, 32

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015) ........................................................................... 29, 32

*Ridley v. Massachusetts Bay Transp. Auth.*,
   390 F.3d 65 (1st Cir. 2004) .................................................................... 30

*Sammartano v. First Judicial Dist. Ct.*,
   303 F.3d 959 (9th Cir. 2002) .................................................................. 34

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) .................................................................. 18

*U.S. v. Lopez*,
   514 U.S. 549 (1995) .............................................................................. 17

*U.S. v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) ................................................................ 18

*U.S. v. Pheaster*,
   544 F.2d 353 (9th Cir. 1976) .................................................................. 21

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) .............................................................................. 30

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ................................................................ 28

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .................................................................................. 16

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) .................................................................... 31

**Federal Statutes**

40 U.S.C. § 1315 ................................................................................... passim

40 U.S.C. § 1315(b)(2)(C) ............................................................ 2, 10, 18, 35

40 U.S.C. § 1315(e) ...................................................................................... 18

**Rules**

Fed. R. Civ. P. 65(a) ...................................................................................... 1

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

## <u>TABLE OF AUTHORITIES</u>
(Continued)

**Page**

**Other Authorities**

Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 488 (4th Ed. 2011) ............. 4, 5

John P. Kaminski, *Restoring the Grand Security: The Debate Over a Federal Bill of Rights* 1787-1792, 33 Santa Clara L. Rev. 887, 897 (1993) ...................................................... 4

U.S. Const. Amend XIV, § 5 ................................................................................... 17

U.S. Const. Amend. I ............................................................................... passim

U.S. Const. Amend. IV ............................................................................... passim

U.S. Const. Amend. X ............................................................................... passim

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

## INTRODUCTION

The federal administration's war on disagreement has come to the streets of Portland. After the killing of George Floyd, Americans of all races and regions took to the streets to protest in support of Black Lives Matter and against police brutality. The President soon announced that the protestors "hate" America and are anarchists against whom there must be "retribution." The President demanded that the nation's mayors crack down forthwith. If they did not, the President threatened to police for them—supplanting the States' reserved power to conduct plenary policing in violation of the Tenth Amendment. His Acting Secretary for Homeland Security later consistently announced the agency's Orwellian plan for "proactive" arrests of protestors.

Federal agents in Portland have followed the speech-suppressive design our government's leaders outlined. They police away from federal facilities and more broadly than the Tenth Amendment and federal law permit. They police illegally time and again. They violate the First Amendment by attacking peaceful protestors away from federal facilities and shooting press and photographers. They violate the Fourth Amendment through those attacks, through unprovoked gassing often away from federal facilities, and through intendedly spectacular displays of force.

Fortunately, it is "emphatically the province and duty of" this Court "to say what the law is," a principle established when a different high federal official refused to act legally. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). This Court should enjoin the defendants so that the federal government obeys the Constitution that created and constrains it.

## MOTION

Pursuant to Federal Rule of Civil Procedure 65(a), the Plaintiffs Western States Center, Inc., The First Unitarian Church of Portland, Oregon, Sara Eddie, Oregon State Representative Karin A. Power and Oregon State Representative Janelle S. Bynum ("Plaintiffs") move this Court to enjoin the Defendants the United States Department of Homeland Security, United

Page 1 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

States Customs and Border Protection, the Federal Protective Service, and the United States Marshals Service ("Defendants") from actions contrary to the United States Constitution, in particular the First, Fourth and Tenth Amendments.

Specifically, Plaintiffs move this Court for both a temporary restraining order and a preliminary injunction enjoining defendants, and any persons working in concert with them, from:

(1)     consistent with the Tenth Amendment, engaging in law enforcement activities other than in the immediate defense of federal personnel or property on federal property or its curtilage, except to the extent necessary to remove an imminent threat or to arrest someone violating federal law in a manner compliant with 40 U.S.C. § 1315(b)(2)(C) ("Section 1315");

(2)     consistent with the Fourth Amendment and Section 1315, seizing or arresting individuals within the jurisdiction of this Court without either (a) a warrant, (b) the arresting officer seeing the federal crime allegedly committed or (c) the arresting officer having probable cause to believe that the arrested person committed a federal felony;

(3)     making warrantless arrests in violation of the Fourth Amendment;

(4)     consistent with the First Amendment, the Fourth Amendment, Section 1315 and the orders of any judicial officer of this District Court, physically contacting and approaching protestors, medics, journalists, or other observers of protests at a distance of more than 100 yards from the property line of the Hatfield Courthouse unless the protestor, medic, journalist, or other observers of protests is then presently injuring the structure of the Hatfield Courthouse, or injuring

Page 2 – MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

an officer defending the Hatfield Courthouse at a distance of less than 100 yards from the property line of the Hatfield Courthouse;

(5)     consistent with the First Amendment, Fourth Amendment, Section 1315 and the orders of any judicial officer of this District Court, striking with batons, shooting with projectiles, or pushing to the ground persons within 100 yards of the property line of the Hatfield Courthouse who are not resisting instructions from the officer engaging those persons, unless there has been a prior instruction for a crowd to clear the area containing the person with time sufficient for the crowd to disperse;

(6)     consistent with the First Amendment, Fourth Amendment and Section 1315 and the orders of any judicial officer of this District Court, striking with batons, gassing, shooting with projectiles, or pushing to the ground persons who are not resisting instructions from the officer engaging those persons, more than 100 yards from the property line of the Hatfield Courthouse; and

(7)     consistent with the First and Fourth Amendments and Section 1315 and the orders of any judicial officer of this District Court, pursuing protestors who are not personally engaged in violence toward the Hatfield Courthouse or an officer guarding it beyond the distance of 100 yards from the property line of the Hatfield Courthouse.

In support of their motion, Plaintiffs rely upon the following memorandum, the Declarations of Dana Buhl, Rep. Janelle Bynum, Rep. Karin Power, Sara Eddie, Mayor Ted Wheeler, Samuel Hill, Ryan Malia, Amanda Dunham and Clifford S. Davidson; publicly-accessible information described and cited herein; the Court's file; matters subject to judicial notice; and such further evidence and argument as this Court may entertain.

Page 3 – MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

## MEMORANDUM

## FACTS RELEVANT TO DETERMINATION OF THE MOTIONS

**A.    The Federal Government and the Defendant Agencies Would Not Exist But for the Constitutional Amendments at Issue in This Litigation—Which Were Passed to Prevent the Very Abuses of Liberty the Defendants Inflict on Portland Today.**

It is important to remember that we have a federal government because we have a Bill of Rights – including the First, Fourth, and Tenth Amendments – all of which are relevant to this lawsuit, and are vital to circumscribing any President's and any administration's powers to flout state sovereignty and quash dissent. The absence of a Bill of Rights enjoining federal infringement of individual liberties was "the single most important obstacle to the ratification of the Constitution." John P. Kaminski, *Restoring the Grand Security: The Debate Over a Federal Bill of Rights* 1787-1792, 33 Santa Clara L. Rev. 887, 897 (1993). Because the Constitution's text "contains few provisions concerning individual liberties," several states "were concerned about the absence of an enumeration of rights" and refused to ratify it without the caveat that it would be immediately amended to add a Bill of Rights. Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 488 (4th Ed. 2011); *see also* Kaminski, *supra*, at 906-07 (describing how Patrick Henry "urged the [Virginia] convention to adopt the Constitution conditionally with amendments."). Accordingly, at the first Congress in 1789, James Madison drafted amendments to the Constitution. *See Chemerinsky*, *supra*, at 12, 488. Congress ratified twelve amendments and the states ratified ten. *Id.* at 488. "These amendments became known as the Bill of Rights." *Id.* Since its ratification, the Bill of Rights has been applied to protect individual liberties from intrusion from the federal government. *See Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 250 (1833) ("In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the

Page 4 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

apprehended encroachments of the general government not against those of the local governments."); *Chemerinsky*, *supra*, at 5.

This is not an abstract history lesson. This is what the Tenth, First, and Fourth Amendments are for. As guarantors of the states' rights to police themselves, and of liberties to speak, assemble, and be free from unreasonable arrests and searches, those amendments are important constraints on the federal government. They were a condition placed on agreement to a federal constitution by the great many Founders who feared an oppressive federal regime. The federal litigants in this Court in 2020 would not exist without them.

**B.**     **The Killing of George Floyd Gives Rise to Protests, Which the Administration Denounces as Anarchistic and Hatred of America and Resolves to Suppress by Displacing Local Policing with Federal Forces in Violation of the Tenth Amendment.**

**1.**     **The Killing of George Floyd Ignites Nationwide Protests.**

On May 26, 2020, Minneapolis police officer Derek Chauvin killed George Floyd while three other police officers watched. All four officers were charged with varying degrees of homicide. Almost immediately, the nation was roiled by protests, as Americans of all races, ages, and backgrounds, in all regions of our country, took to the streets in support of the Black Lives Matter movement and against police brutality. Portland likewise experienced protests on a nightly basis, in the thousands of people per night downtown for several consecutive weeks. The crowd size downtown began to taper off, as organizers announced weekly, rather than nightly, protests. That is, until federal agents arrived.

**2.**     **The President Labels the Protesters Anarchists, Says They Hate America, Demands That Mayors Stop the Protests, and Repeatedly Promises to Police Cities Federally If the Protests Continue.**

Only days after Chauvin killed George Floyd, the President decided to use the power of the federal government to quell protests of the killing by using armed force to conduct policing in

Page 5 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

the states. On June 1, 2020, the President warned that he would soon militarize the streets of our nation's cities unless the nation's local officials quashed the protests as he required:

> "Mayors and governors must establish an overwhelming law enforcement presence until the violence has been quelled . . . . If a city or state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."

https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/          (Davidson Ex. 1)

The President's threats to conduct plenary federal law enforcement continued. On June 10, 2020, the President made clear that if Seattle did not evict protesters from a space it let them occupy, his government would conduct general policing in Seattle, without an identifiable federal interest. He did so by directing the Mayor of Seattle through Twitter, in response to the establishment of the Capitol Hill Autonomous Zone, "Take back your city NOW. If you don't do it, I will. This is not a game. These ugly Anarchists must be stooped [sic] IMMEDIATELY. MOVE FAST!"          @realDonaldTrump,          Twitter          (June          11,          2020.), https://twitter.com/realDonaldTrump/status/1271142274416562176 (Davidson Ex. 2.)

Aside from threatening plenary policing, the President also made clear his content-based desire to suppress the continuing protests. On June 21, 2020, the President complained that in Portland, Oregon, demonstrators had "set the American flag on fire." (Davidson Ex. 3.) On June 26, 2020, the President promised "retribution" against the "agitators" on national television. When asked in a public forum on Fox News "what steps is the Administration taking to give us back our streets," the President stated "And at some point, there's going to be retribution because there has to be. These people are vandals, but they're agitators, but they're really — they're terrorists, in a sense." https://www.politico.com/news/2020/06/26/trump-retribution-protesters-statues-340957 (Davidson Ex. 4.)

Page 6 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Also on June 26, the President issued an Executive Order commenting on the protests in which he said that "worse" than violence or imperiling public safety, state and local governments "apparently have lost the will or the desire to stand up to the radical fringe and defend the fundamental truth that America is good, her people are virtuous, and that justice prevails in this country to a far greater extent than anywhere else in the world." Exec. Order No. 13933, 85 FR 40081.

On July 20, the President again expressed his plan to suppress speech he does not like through policing by the defendant agencies. He stated, "These people are not protesters, these people are anarchists. These are people that hate our country and we're not going to let it go forward." The President has thus defined the law enforcement mission of the defendants as causing the cessation of expression by "people that hate our country." https://www.foxnews.com/politics/trump-vows-to-send-federal-agents-dhs-chicago    (accessed July 22, 2020) (Davidson Ex. 5). Significantly, Chad Wolf, the acting Director of the Department of Homeland Security confirmed that his agency's officers "are having to go out and proactively arrest individuals" in Portland. (Davidson Ex. 6.) Compare *Minority Report* (S. Spielberg, director, 2002) (warning of dystopian future in which a Department of Precrime arrests people before they are expected to commit crimes as one at odds with free will and human dignity). Proactive means beforehand.  Even on the very date of this filing, the President threatened: "If they don't secure their city soon, we have no choice – we're going to have to go in and clean it out." (Davidson Ex. 17.)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

### C. Consistent with the President's Plan to Suppress Dissenting Speech, and the Promise of "Proactive" Arrests, Federal Authorities in Portland Begin Operations Attacking Protesters, Which Emanate from the Hatfield Courthouse But Far Exceed Fairly Defending It.

Since arriving in Portland, federal forces began engaging in a program of retributive "policing" that consists of: (1) attempts at asserting a plenary power to police Portland more than 100 yards from the Hatfield courthouse; (2) policing in manners evidencing a design to deter First Amendment protected activity, including attacks on press, Fourth Amendment-violative brutality, gassing persons without cause, and abducting suspected protesters off of Portland streets—even though such protestors were acting peacefully.

### 1. Federal Agents Conduct Plenary Policing Operations Away from the Federal Facilities They Are Supposedly Defending.

By July 11, 2020, federal agents had begun conducting more wide-ranging and general policing than the mere defense of the Hatfield Courthouse's perimeter. That night, federal agents swept through an area of downtown Portland in an operation that was in the nature of pacification. It lacked any apparent link to a federal situs or the curtilage around a federal situs. A group of federal officers began a patrol near a federal site and walked three blocks in one direction, and then executed a turn and walked three blocks in another direction. (Hill Decl. ¶¶3-11 & Exs. 1-11.). This patrol comprised six linear blocks and took 4 minutes of brisk walking. (*See* Hill Decl. ¶11.). During the patrol, the federal agents cleared a city park at Lownsdale Square. (Hill Decl. ¶¶4-6.) They also shot tear gas directly at a person riding a scooter. (Hill Decl. ¶8 & Ex. 7.) There was no federal building then being attacked to which this patrol logically responded. The patrol was not in the nature of "hot pursuit" of a malefactor from a federal situs broadly through Portland. It was simply a forced march of protesters by armed federal agents some number of blocks from a federal situs, not in immediate reaction to any public emergency at a federal situs. (*See* Hill Decl. ¶¶5, 6, 8, 9.) Such marches continue to occur. (Hill Decl. ¶14.)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Ryan Malia, who attended demonstrations spanning the night of July 23 and the morning of July 24, 2020, recounts that federal agents launched smoke grenades and tear gas, as well as pepper balls, toward the west and north. When they did so, they were standing at SW Main Street and 5th Ave.—two blocks from the Hatfield Courthouse. (Malia Decl. ¶4.) The same thing happened one street north, at SW Salmon Street and 5th Ave. (*Id.*) Malia also witnessed the arrest of a peaceful protestor, located west of 4th Ave., holding an American flag and a leaf blower. (Malia Decl. ¶¶6, 7) On July 25, 2020, Malia observed federal agents advance as far as 10th Ave., while firing munitions, tackling protesters and making arrests. (Malia Decl. ¶9.)

Federal agents have also engaged in plenary policing away from the Hatfield Courthouse when they abducted persons outside the jurisdiction of federal law enforcement, including but not limited to Mark Pettibone. Pettibone documented his abduction in a declaration in *Rosenblum v. U.S. Dep't of Homeland Security*, Civ. No. 3:20-cv-01161-MO (D. Or.). Pettibone was not attacking, or on or near, federal property or personnel when abducted. Rather, he was walking home after peacefully protesting. (Davidson Ex. 7 ¶2.) When the Oregon Attorney General raised Pettibone's abduction in her office's request for a Temporary Restraining Order, the Government did not respond by suggesting that there was probable cause to arrest him, nor that his arrest complied with 40 U.S.C. § 1315. (Davidson Decl. ¶9.) Pettibone testified in his declaration that he had seen a video of another Portlander being picked up in a like manner – by individuals in camouflage fatigues, placing them in an unmarked van – and that it was not him. (Davidson Ex. 8 ¶5.)

Consistent with these reports, Ken Cuccinelli, the Deputy Secretary of the defendant Department of Homeland Security, was asked in a July 17 interview with National Public Radio whether federal agents used unmarked vehicles to pick up protesters in U.S. cities, and admitted this, stating, "Well, in Portland, they have." He also admitted that someone taken into custody in

Page 9 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

this manner and questioned was "not the right person, and that person was released," thus confirming that the federal practice has caused and can cause the detention of peaceful protesters, engaged in the exercise of their First Amendment freedoms.

https://www.npr.org/2020/07/17/892393079/dhs-official-on-reports-of-federal-officers-detaining-protesters-in-portland-ore (Davidson Ex. 9.).

This "catch and release" policy, inflicted on at least Pettibone and acknowledged by Deputy Secretary Cuccinelli, on its face exceeds the limits on the Department of Homeland Security's authority to arrest, codified in 40 U.S.C. § 1315(b)(2)(C). That law allows DHS agents to "make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a federal felony." *Id.* That language does not allow a federal dragnet roving across Portland. Rather, it would have permitted the officers to apprehend Pettibone if he in their presence committed a federal offense. But he did not and they did not. Instead, they saw someone on a street, not committing any offense, and questioned him to decide whether he was that person. Such a practice, while effective at deterring First Amendment expression and assembly, does not honor Congress' choice to constrain DHS to arresting people they see committing a federal offense or believe have committed a felony, and does not comply with the Constitution.

There have been many other reports of plenary policing by the federal authorities, outside of the vicinity of the Hatfield Courthouse. Observers report and depict the federal agents engaging in policing away from the situs of the Hatfield Courthouse. By way of example: https://www.nytimes.com/video/us/100000007243995/portland-protests-federal-government.html (accessed July 26, 2020); https://www.nytimes.com/2020/07/25/us/portland-federal-legal-jurisdiction-

Page 10 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

courts.html?action=click&module=Top%20Stories&pgtype=Homepage (accessed July 26, 2020) (Ex. 10); https://twitter.com/hungrybowtie/status/1287314986943930368 (accessed July 26, 2020); https://m.facebook.com/randy.blazak/videos/10159970769049307/ (accessed July 27, 2020).

**2.    The Federal Defendants Conduct a Pattern of Policing in Portland to Eliminate and Deter Speech.**

**(a)    Attacks on Journalists; City-Wide Drone Ban.**

As evidence in a separate lawsuit and from outside that lawsuit makes clear, the federal defendants have a program and practice of injuring journalists in a patent effort to suppress and deter speech. In a separate suit in which Judge Simon issued a temporary restraining order against assaults on journalists, there has been substantial evidence of many discrete instances of federal agents – working within the defendant federal agencies – targeting journalists.

On July 15, 2020, federal agents shot a tear gas canister directly at clearly marked journalist Justin Yau, while he was standing 40 feet from protesters to make clear he was not part of their protest. *Index Newspapers v. City of Portland, et al.*, Civ. No. 3:20-cv-1035-SI, ECF 56, at ¶¶3-6 (Yau Decl.). On July 19, 2020, federal agents assaulted clearly marked photojournalist Jungho Kim. They pushed protesters away from the area in which he was taking pictures. Then, while he was 30 feet from the federal agents and near no one, a federal agent shot him just below his heart with a less lethal projectile munition. Separately, he also saw federal agents firing munitions into a group of press and legal observers. *Index Newspapers v. City of Portland, et al.*, Civ. No. 3:20-cv-1035-SI, ECF 62, at ¶¶5-7 (Kim Decl.). On July 19, 2020, federal agents assaulted Associated Press photojournalist Noah Berger while he was covering protests. Carrying two large professional cameras and two press passes, he was initially shot twice with less lethal munitions. *Index Newspapers v. City of Portland, et al.*, Civ. No. 3:20-cv-1035-SI, ECF 72, at ¶¶1-4 (Berger Decl.).

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

But this group of federal agents was just getting started attacking Berger. As the federal agents "rushed" an area he was photographing, he identified himself as press and retreated from the rushed area, saying he was leaving. While holding his press pass and stating he was with the press, he was struck by one federal agent, then by two others, and was struck many times with batons. Not content to club the photographer, federal agents pepper sprayed his face. (Berger Decl, ¶¶7-9.)

Meanwhile, the DHS Security has issued a temporary flight restriction **over the entire City of Portland** for unmanned aircraft systems effective July 16. This directive's lack of spatial constraint further shows the defendants' design to range freely around Portland, and to prevent citizens from questioning these activities, no matter how far from any federal situs.

**(b)** **The Violent, Fourth Amendment-Violative Assault on 53-Year-Old Navy Veteran Christopher David.**

On July 18, 2020, federal agents violently assaulted Navy veteran Christopher David. David, wearing a Navy sweatshirt and Navy logos in the hopes of disarming the agents enough to speak with them, approached a group of federal agents and stood with his hands empty and at his sides, lacking any weapon and making no movement toward the group of armed officers. https://www.nytimes.com/2020/07/20/us/portland-protests-navy-christopher-david.html (Davidson Ex.11.) David recounted that he asked whether the agents were enlisted and asked why they were not obeying an oath to the Constitution. The video of the assault on David establishes the prima facie violation of the Fourth Amendment that ensued. https://www.nytimes.com/2020/07/20/us/portland-protests-navy-christopher-david.html (Davidson Ex.11.) As their response, one federal agent clubbed David with a baton three times, in the torso and lower body, a second approached and sprayed a chemical agent in his face, and a third clubbed him twice from behind. According to public reports, the federal agents broke David's hand in two places and he required surgery. (*Id.*)

Page 12 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

      **(c)**      **The Unprovoked Shooting and Gassing of Prof. Maureen Healy**
                 **While She Was Peacefully Protesting in a Group.**

On July 21, Professor Maureen Healy, the Chair of the History Department of Lewis and Clark College, and a teacher of European History with a specialization in the rise of fascism in 20th Century Europe, was peacefully protesting when federal agents gassed her and shot her in the head, concussing her. https://pamplinmedia.com/pt/9-news/474921-383910-lewis-and-clark-history-department-chair-shot-at-protest (accessed July 28, 2020) (Davidson Decl. Ex. 12.) Healy was in what she described as "large crowd of ordinary folks," led by "Black Lives Matter voices," that was "singing songs," "chanting," and saying in memory names of Black people killed by police, before observing a moment of silence at the George Floyd mural on SW Yamhill Street. (*Id.*). As Healy wisely stated, "I am knowledgeable about the historical slide by which seemingly vibrant democracies succumbed to authoritarian rule. Militarized federal troops are shooting indiscriminately into crowds of ordinary people in our country. We are on that slide." (*Id.*)

      **(d)**      **The Unprovoked Shooting, Gassing, and Pursuit of Amanda**
                 **Dunham, Ending with Weapons Drawn.**

On July 20, 2020, Amanda Dunham was demonstrating peacefully near the Multnomah County Justice Center – not the Hatfield Courthouse – and thus in a state and not a federal zone of interest to begin with. (Dunham Decl., ¶2) Dunham was protesting in support of the Black Lives Matter movement and against the presence of federal law enforcement in Portland. (*Id.*) She was unarmed and neither caused nor attempted to cause any damage to any property of any kind. (*Id.*) She did not witness any protester behave in a violent or threatening manner. (*Id.*)

That did not stop the federal agents who were in part the object of the protest from attacking the peaceful protesters. (Dunham Decl., ¶¶2-6.) The agents gave no warning, and made no announcement declaring the gathering unlawful. (*Id.* ¶3.) They swarmed into the crowd of demonstrators, shooting rubber bullets and deploying tear gas. (*Id.*) They struck Dunham from

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

behind with three rubber bullets in her back, upper arm, and elbow, causing extreme pain and injuring her elbow. (*Id.* ¶4.) Rather than pursuing anyone in particular, the agents indiscriminately chased off protesters, continuing to shoot rubber bullets and deploying tear gas. (*Id.* ¶5.) The agents followed already dispersed protesters blocks away. (*Id.* ¶6.)

Without ever speaking to Dunham, the federal agents terrorized her. (Dunham Decl. ¶¶7-9.) They chased her two and a half blocks to where her car was parked, at the intersection of 3rd Avenue and Taylor and blocked the intersection. (*Id.* ¶7.) Multiple federal agents trained their weapons on Dunham. (*Id.*) When Dunham turned on her car's running lights without starting the engine, Dunham could see the beams from the laser scopes of the agents' weapons on her dashboard. (*Id.*) Dunham turned her running lights off and was afraid of being shot at or killed, despite having done nothing wrong. Underscoring their lack of probable cause to detain Dunham, the federal agents did not arrest, question, or detain her. Yet they dispersed a peaceful public assembly without warning, chased protesters, and brandished lethal force, without any legitimate law enforcement purpose.

### (e)  The Unprovoked Gassing of a Crowd of Demonstrators, Including Portland Mayor Ted Wheeler.

On July 22, 2020, at 11 p.m., Portland Mayor Ted Wheeler engaged in public assembly with constituents protesting near the Hatfield Courthouse. The crowd in which the Mayor was standing in dialogue with Oregonians about law enforcement and the federal presence was gassed by federal agents for no apparent reason. Thus, like Pettibone, the Mayor did not himself engage in unlawful activity, nor did he see unlawful or disorderly behavior that would have justified the gassing of the crowd in which he stood on July 22, 2020. (*See* Wheeler Decl.)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

3. **The Defendants Chill Constitutionally Protected Speech of Americans Wishing to Speak Out for Racial Justice and Black Lives Matter and Against Federal Occupation.**

Sadly for American constitutionalism, the defendants thrust into Portland by the President are fulfilling his objective of quashing and chilling speech the President deems noxious. Representative Karin Power explained eloquently how the federal forces succeeded in deterring her from engaging in First Amendment-protected protest and assembly:

> I am nine months pregnant and am too fearful for the health of my unborn son to participate in protests downtown. I fear for the well-being of my unborn son and family if I am gassed, sprayed, or severely injured by federal law enforcement— like so many other peaceful protesters. My constituents have recounted fearfully, and in horror, being unexpectedly chased, gassed, sprayed and shot at by federal law enforcement in the course of protesting peacefully.

(Power Decl. ¶5).

The same was true of Representative Janelle Bynum. Rep. Bynum explained that the course of policing by the federal agents in Portland has deterred her from exercising her First Amendment rights, for fear of being targeted or attacked:

> On a personal level, I am afraid to participate in protests downtown. I fear for my safety and for the well-being of my family if I am severely injured by federal law enforcement—like so many other peaceful protesters…. The federal authorities simply pose too great a danger to us.

(Bynum Decl. ¶¶7-9.)

The federal forces quashed the speech of Amanda Dunham, whom they assaulted and chased for peacefully protesting on state property and terrorized by training weapons on her. After that, Dunham was too scared to return to protest over the next many days. (Dunham Decl. ¶10). Sara Eddie is now too fearful to observe protests downtown due to the federal forces' abductions, shootings and gassing. (Eddie Decl. ¶¶5-8).

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

First Unitarian has seen its members' rights to freely exercise their faith chilled, and its own bearing witness to social injustice in the world – a central tenet of Unitarian Universalist practice – has likewise been chilled by the federal policing. (Buhl Decl. ¶¶3-7).

Finally, Navy veteran Christopher David and Professor Maureen Healy have been deterred from exercising their rights to protest, in the way people in undemocratic countries often are, by being maimed or injured by their government. David had to leave the scene of the protest because a federal agent smashed his hand, breaking it. Professor Healy had to leave a protest because she was concussed by an impact munition fired by a federal agent. Neither was arrested or charged with anything. Yet their speech was met with violence sufficient to eject them from the public forum. That chilled protest as surely as a player ejected from a game cannot score.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008). Plaintiffs must establish that irreparable harm is likely, not just possible, to obtain a preliminary injunction. *Id.*

Under the Ninth Circuit's approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker one. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  This Circuit has adopted and applied a version of the sliding scale approach called the "serious questions test" under which a preliminary injunction may issue where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* (citation omitted).

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Here, each factor supports injunctive relief in Plaintiffs' favor under both Plaintiffs' First and Tenth Amendment claims. *See Oregon v. Trump*, 406 F. Supp. 3d 940, 958 (D. Or. 2019) (recognizing that injunctive relief may be awarded under the Tenth Amendment where federal government action undermined the plaintiffs' "exercise of ... sovereign power to create and enforce a legal code").

## ARGUMENT

I. **PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THEIR TENTH AMENDMENT CLAIM AS EVIDENCE SHOWS DEFENDANTS ARE CONDUCTING PLENARY POLICING IN PORTLAND.**

A. **The Tenth Amendment Forbids Plenary Policing by the Federal Government.**

The federal government does not possess a plenary police power; the federal Constitution withholds it. *U.S. v. Lopez*, 514 U.S. 549, 564-66 (1995); *see id.* at 584-85 (Thomas, J., concurring) ("[W]e *always* have rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power"). The Framers withheld that power by declining to enumerate it in the Federal Constitution. *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819); *see Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824) ("The enumeration presupposes something not enumerated.") As a result, and by the Tenth Amendment's operation, plenary police power is reserved solely to the states. *Bond v. U.S.*, 572 U.S. 844, 858 (2014) ("Perhaps the clearest example of traditional state authority is the punishment of local criminal activity."); *Lopez*, 514 U.S. at 567 (characterizing "criminal law enforcement" as an area in which "States historically have been sovereign"). The federal government may intrude into powers historically reserved to the states solely if there is a positive grant of power to it by the Constitution—such as that contained in Section 5 of the Fourteenth Amendment, enacted after the Civil War as part of the Reconstruction Amendments to protect civil rights. *See City of Boerne v. Flores*, 521 U.S. 507, 517 (1997).

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

When a state wishes to challenge federal government intrusion upon state and local law enforcement and lawmaking sovereignty, this Court may adjudicate the dispute. *Oregon v. Trump*, 406 F. Supp 3d 940, 958 (D. Or. 2019), *appeal filed*, Oct. 4, 2019 (collecting authorities).

Likewise, when an individual person or organization suffers injury as a result of federal overreach, or of federal disregard of a structural component of the federal Constitution (such as federalism), that individual may sue in this Court. *Bond*, 564 U.S. at 221-24 (so holding; "if the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object."); *see Sierra Club v. Trump*, 963 F.3d 874, 888-89 (9th Cir. 2020); *U.S. v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

B.     **The Record Demonstrates That the Federal Government Is Attempting to Exercise Plenary Police Power, in Violation of the Tenth Amendment, in a Manner Far More General and Pervasive Than Occasional Hot Pursuits of Identified Persons Violating Federal Law Near the Courthouse.**

This Court should enjoin the defendant federal agencies because they have purported to arrogate to themselves power to conduct plenary policing—a power reserved to the State of Oregon and, by delegation, Oregon's municipalities. By "plenary policing," plaintiffs mean the maintenance of a police force that enforces ordinary criminal law. *See Flagg Bros. v. Brooks*, 436 U.S. 149, 173 n.8 (1978) ("[I]t is clear that the maintenance of a police force is a unique sovereign function" of state and local government.); *Bond*, 572 U.S. at 864 (noting that the federal government's authority to criminalize typically is limited to areas with national impact). Impermissible "plenary policing" is also that which the Department of Homeland Security <u>cannot</u> do without an agreement with local authorities: (1) enforce state or local laws (40 U.S.C. § 1315(e)), (2) act to protect property other than federal property (*id.* [tying law enforcement power to protection of federal property]), or (3) make warrantless arrests for misdemeanors or infractions (40 U.S.C. § 1315(b)(2)(C).). This includes ranging broadly away from the areas of federal

Page 18 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

buildings to engage protesters blocks away from them, who were not then engaging federal buildings or officers at them, and who thus could not possibly be committing federal crimes when sought out by federal patrols for that engagement.

As described below, Federal officials' stated intentions, as well as the defendants' specific actions on the ground in Portland, support a preliminary injunction to stop plenary policing in violation of the Tenth Amendment.

   **(1)**   ***Stated intent to conduct plenary policing.*** The federal government's public statements make plain that the government means to intrude upon Oregon's reserved, plenary police powers, by supplanting local authorities whom the President deems ineffective. Numerous public statements clear the federal scheme to conduct plenary policing:

- "I can't stand back & watch this happen to a great American City, Minneapolis. A total lack of leadership. Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the National Guard & get the job done right....." @realDonaldTrump, Twitter (May 28, 2020), https://twitter.com/realDonaldTrump/status/1266231100172615680 (Davidson Ex. 13);

- "....These THUGS are dishonoring the memory of George Floyd, and I won't let that happen. Just spoke to Governor Tim Walz and told him that the Military is with him all the way. Any difficulty and we will assume control but, when the looting starts, the shooting starts. Thank you!" @realDonaldTrump, Twitter (May 28, 2020), https://twitter.com/realDonaldTrump/status/1266231100780744704 (Davidson Ex. 14);

- "Take back your city NOW. If you don't do it, I will. This is not a game. These ugly Anarchists must be stooped [sic] IMMEDIATELY. MOVE FAST!"

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

@realDonaldTrump,           Twitter        (June        11,        2020),
https://twitter.com/realDonaldTrump/status/1271142274416562176        (Davidson
Ex. 2.);

- "And at some point, there's going to be retribution because there has to be. These people are vandals, but they're agitators, but they're really — they're terrorists, in a sense." https://www.politico.com/news/2020/06/26/trumpretribution-protesters-statues-340957 (Davidson Ex. 4);

-  "These people are not protesters, these people are anarchists. These are people that hate   our   country   and   we're   not   going   to   let   it   go   forward." https://www.foxnews.com/politics/trump-vows-to-send-federal-agents-dhs-chicago (Davidson Ex. 5);

- With respect to Portland: "Attacking federal police officers and law enforcement officers which they have done for 52 nights in a row is a federal crime. And so the department, because we don't have that local support, that local law enforcement support,   we   are   having   to   go   out   and   proactively   arrest   individuals." https://www.newsweek.com/portland-federal-agents-minority-report-1519574 (Davidson Ex. 6);

- "In recent weeks, there has been a radical movement to defund, dismantle, and dissolve our police departments. Extreme politicians have joined this anti-police crusade and relentlessly vilified our law enforcement heroes. To look at it from any standpoint, the effort to shut down policing in their own communities has led to a shocking explosion of shootings, killings, murders, and heinous crimes of violence. This bloodshed must end. This bloodshed will end.

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Today, I'm announcing a surge of federal law enforcement into American communities plagued by violent crime. We'll work every single day to restore public safety, protect our nation's children, and bring violent perpetrators to justice. We've been doing it, and you've been seeing what's happening all around the country. We've just started this process, and, frankly, we have no choice but to get involved." https://www.whitehouse.gov/briefings-statements/remarks-president-trump-operation-legend-combatting-violent-crime-american-cities/ (Davidson Ex. 15.)

Typically, when someone announces that they will do something, and then takes steps to do it, a reasonable factfinder may infer that they are doing or preparing to do that thing. *See* FRE 803(3), Advisory Committee Notes ("The rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285… (1892), allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."); *U.S. v. Pheaster*, 544 F.2d 353, 376 (9th Cir. 1976) (discussing *Hillmon*). This case is no different; the Court should draw that inference here. And this record presents ample direct evidence of unconstitutional policing by federal agents**.**

       **(2)**     ***Record evidence of plenary policing.*** Unfortunately, federal agents have achieved the stated goal of conducting plenary policing, when one examines the record of their patrols far from the Hatfield Courthouse, and pursuits that started away from federal property and led further afield. And while these unconstitutional patrols are conducted by shadowy figures using enormous federal power without identification in contradiction to how local policing works, the testimonial evidence of named Portlanders makes plain these Tenth Amendment violations.

Ryan Malia, who attended demonstrations spanning the night of July 23 and the morning of July 24, 2020, recounts that federal agents smoke grenades and tear gas, as well as pepper balls, toward the west and north. When federal agents did so, they were standing an SW Main Street and

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

5th Ave.—two blocks from the Hatfield Courthouse. (Malia Decl. ¶4.) The same thing happened one street north, at SW Salmon Street and 5th Ave. (*Id.*) Malia also witnessed the arrest of a peaceful protestor, located west of 4th Ave., holding an American flag and a leaf blower. (Malia Decl. ¶¶6, 7.) On July 25, 2020, Malia observed federal agents advance as far as 10th Ave – very far from the federal situs they are supposedly defending, while firing munitions, tackling protesters and making arrests. (Malia Decl. ¶9.)

Amanda Dunham's harrowing testimony also supports this point. On July 20, 2020, Dunham was demonstrating peacefully near the Multnomah County Justice Center – not the Hatfield Courthouse – and thus in a state and not a federal zone of interest to begin with. (Dunham Decl. ¶2.) Dunham was testifying in support of the Black Lives Matter movement and to express her opposition to the presence of federal law enforcement in Portland. (*Id.*) She was unarmed. (*Id.*) She neither caused nor attempted to cause any damage to any property of any kind. (*Id.*) She did not witness any protester behave in a violent or threatening manner. (*Id.*)

That did not stop the federal agents who were in part the object of the protest from attacking the peaceful protesters. (Dunham Decl., ¶¶2-6.) The federal agents gave no warning, and made no announcement purporting to declare the gathering unlawful. (*Id.* ¶3.) The federal agents instead swarmed into the crowd of demonstrators, shooting rubber bullets and deploying tear gas. (*Id.*) During their assault on the protestors, they struck Dunham from behind with three rubber bullets in her back, upper arm, and elbow, causing extreme pain and seriously injuring her elbow. (*Id.* ¶4.) Rather than pursuing anyone in particular, the federal agents indiscriminately chased off protesters, continuing to shoot rubber bullets and deploying tear gas. (*Id.* ¶5.) The agents followed already dispersed protesters blocks away. (*Id.* ¶6.)

Without ever arresting or speaking to Dunham, the federal agents casually terrorized her. (Dunham Decl. ¶¶7-9.) Having chased her two and a half blocks from the Hatfield Courthouse to

Page 22 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

where her car was parked, at the intersection of 3rd Avenue and Taylor, federal agents blocked the intersection where her car was parked. (*Id.* ¶7.) Multiple federal agents trained their weapons on Dunham. (*Id.* ¶7.) When Dunham turned on the running lights without starting her engine, Dunham could see the beams from the laser scopes of their weapons on her dashboard. (*Id.*) Dunham turned her running lights off and was afraid of being shot at or killed, despite causing no damage and doing nothing wrong. Underscoring their lack of probable cause to detain Dunham, the federal agents did not arrest, question, or detain Dunham. They simply dispersed a peaceful public assembly without warning, chased protesters several blocks, and brandished lethal force, without furnishing even a pretextual law enforcement purpose.

Mark Pettibone's account of his abduction—unchallenged by the Government during the TRO hearing in *Rosenblum v. U.S. Dep't of Homeland Sec.*, Civ. No. 3:20-cv-01161-MO (D. Or.)—also evidences plenary policing. Pettibone was not on federal property at the time he was abducted, and was simply walking home after peaceful protest—supplying no cause for his seizure. (Davidson Ex. 7 ¶2.) When the Oregon Attorney General raised Pettibone's abduction in her office's request for a Temporary Restraining Order, the Government did not respond by suggesting that there was actually probable cause to arrest him, nor that his arrest complied with 40 U.S.C. § 1315. (Davidson Decl. ¶9.) Pettibone testified in his declaration that he had seen a video of another Portlander being picked up in a like manner – by individuals in camouflage fatigues, placing them in an unmarked van – and that it was not him. (Davidson Decl. Ex. 8 ¶5.)

Sam Hill describes a brisk forced march by federal agents from Lownsdale Square, at 3rd, all the way to Broadway four blocks away (and out of sight of the Hatfield Courthouse). In the several hours he attended the protests as a photographer, he did not observe violent behavior by the protestors. But he did see federal agents gas and shoot protestors as part of their broad sweep across downtown. (*See generally* Hill Declaration.)

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

This ample testimonial record is well augmented by and consistent with publicly available videos and articles cited above and in the Davidson Declaration.

All of this record evidence demonstrates that plaintiffs have a probability of successfully showing that federal agents in Portland are flouting Tenth Amendment limitations on their power. They are ranging around Portland. They have prohibited drone overflights—not just near the Hatfield Courthouse, but throughout the entire City. (Davidson Ex. 16.) Just as the President and agency heads have been telling us for weeks, defendants intend for their agents to roam about the city and supplant local authorities because, in the administration's view, the local authorities aren't enforcing local criminal laws sufficiently or in a manner to the President's liking.

As explained above, plaintiffs do not have to stand for this or rely on any authority but their own to end this. The Supreme Court in *Bond* emphatically held that ordinary citizens may invoke the Tenth Amendment when injured. 564 U.S. at 221-22. That is because federalism, a structural element of the Federal Constitution, protects individual liberties. Plenary policing by the federal government—rather than by state and local police answerable under the laws of the state of Oregon, and subject to the policing standards plaintiffs Bynum and Power help set—is on its face a cognizable injury. But to make matters worse, the federal agents in Portland are chilling Portlanders from exercising their First Amendment rights, as so many—too many—have attested. (Bynum Decl. ¶¶7-9; Power Decl. ¶5; Buhl Decl. ¶¶4-6; Eddie Decl. ¶6; Dunham Decl. ¶¶8-10.)

## II.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS, BECAUSE THE RECORD REVEALS MANY TYPES OF FIRST AMENDMENT VIOLATIONS BY THE FEDERAL DEFENDANTS, AND PROVES THAT THEIR FIRST AND FOURTH AMENDMENT VIOLATIONS ARE CHILLING PROTECTED SPEECH.

The law here is very bad for the defendant agencies – it establishes with crystal clarity that political expression is a fundamental constitutional liberty, and that our Constitution looks skeptically upon restrictions of speech, even where, as here, police fear disorder will ensue where

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

they do not quash speech. The First Amendment provides that all citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 24 (1971). Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988)."[P]olice may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)). Indeed, "it has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008). There are four compelling, independent reasons that plaintiffs have a strong likelihood of success on the merits of their First Amendment claims, as follows:

### A.    Defendants Have Violated the First Amendment by Unprovoked Attacks on Protesters.

Plaintiffs have a strong likelihood of success because in violation of the First and Amendment, defendants have attacked protesters, who enjoy robust constitutional protections and are patently immune from such assaults. "[O]ur constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society." *Cox*, 379 U.S. at 574. Non-violent protesters have the right to be free from excessive force. *Edrei v. Maguire*, 892 F.3d 525, 540–41 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2614 (2019)). While government officials may stop or disperse a protest when faced with an "immediate threat to public safety, peace, or order," this authority is not without limits. *Id.* at 541. Among other things, officials have an obligation, "absent imminent harm," to inform demonstrators that they must disperse, and may not use unreasonable force. *Id.*

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

For example, police assaulting non-violent protesters by "beating them with ... riot batons, dragging them by their hair and kicking them." *Parmley*, 465 F.3d at 53. Police are also not permitted to gratuitously employ "pain compliance techniques," such as bending protesters' wrists, thumbs, and fingers backwards. *Edrei*, 892 F.3d at 541–42. Pain associated with these techniques is "comparable [to] amounts of force" that courts have considered unreasonable when "used during the arrest of a nonviolent suspect." *Id.* Likewise, the Western District of Washington has recognized that the use of weapons such as tear gas, pepper spray, and projectiles causes burning, intense pain, and/or bruising constitutes excessive force as used against non-violent protesters. *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020).

Defendants are employing all of the above techniques in violation of the First Amendment. As detailed above, they have fired projectiles into a non-violent gathering without any warning to disperse.  (Dunham Decl. ) Their agents have repeatedly clubbed with a baton and pepper-sprayed the face a non-violent protester with his hands empty and at his sides, posing no threat. (https://www.nytimes.com/2020/07/20/us/portland-protests-navy-christopher-david.html        & Davidson Ex. 11.) They are spraying so much tear gas that many protesters wear gas masks as protection.  Non-violent, peaceful demonstrators have been shot with rubber bullets and seriously injured. (*See* Dunham Decl.; Davidson Ex. 12.) Even the preliminary evidence overwhelmingly shows that the federal agents are violating the First Amendment by their gratuitous and excessive use of force against protesters.

> **B.    Defendants Have Violated the First Amendment by Policing Far from the Hatfield Courthouse.**

By policing away from the federal situs they purport to defend, the defendants simultaneously violate the Tenth Amendment, because the federal government is not a community

Page 26 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

police agency, and the First Amendment, because they cannot squelch speech in service of securing an overbroad public space in supposed defense of security – here, the security of the Hatfield Courthouse. Two Ninth Circuit cases are instructive: *Bay Area Peace Navy v. U.S.*, 914 F.2d 1224 (9th Cir. 1990); *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996). In *Peace Navy*, the Ninth Circuit rejected as over extensive a 75-yard safety and security zone around the San Francisco pier during fleet week, where Peace Navy, a group of antiwar demonstrators, typically demonstrated. *Id.* at 1227. The Ninth Circuit rejected the proposed zone of speech restriction because it "burden[ed] substantially more speech than [was] necessary to further the government's legitimate interests." *Id.* at 1128. So it should be here. There is no reason for the Government to send squads of armed DHS agents on patrols as far from the Hatfield Courthouse agents to confront protesters while standing at Main Street and 5th Ave.—two blocks from the Hatfield Courthouse. (Malia Decl. ¶4.). The agents Sam Hill testified conducted a sweep from Lownsdale Square, at 3rd, all the way to Broadway four blocks away (*see* Hill Decl.), were not defending the Hatfield Courthouse. And the agents had no reason to be at Third and Taylor, confronting Amanda Dunham without probable cause that far from the Hatfield Courthouse. Nor should they have advanced as far as 10th Ave., while firing munitions, tackling protesters and making arrests on July 25. (Malia Decl. ¶9.) This is all the promised "proactive" policing, and it is all unconstitutional. As the Ninth Circuit held in *Peace Navy*, the government "is not free to foreclose expressive activity in public areas on mere speculation about danger." *Id.*

*Collins* is likewise instructive. There, the Ninth Circuit held that a citywide ban on demonstrations in the wake of the Rodney King verdict violated the First Amendment. 110 F.3d at 1372 ("The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence."). That is functionally what the federal forces are doing in Portland – citing prior demonstrations, they sweep out broadly to suppress in

Page 27 – MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

an overbroad geographic zone. This, *Peace Navy* and *Collins* teach they cannot do. This Court should restrain the defendants generally to a 100 yard defense perimeter, which encompasses a wider area than that disallowed in Peace Navy, encompasses the full block in front of the courthouse, and allows more than fair distance to defend the actual Hatfield Courthouse.

**C.    Defendants Have Violated the First Amendment Because They Have Abundantly Chilled Speech in Portland by Aggressively Policing in Patrols Away from the Courthouse, Randomly Picking Up People in Derogation of 40 U.S.C. § 1315 and Attacking Peaceful Protesters Like Dunham and David.**

To prevail on a First Amendment claim, plaintiffs must "prove only that the officials' actions would have chilled or silenced 'a person of ordinary firmness from future First Amendment activities,' not that their speech and petitioning were 'actually inhibited or suppressed.'" *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000). Indeed, it "would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in [their] protected activity." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). The mere threat of harm, without further action, can have a chilling effect. *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).

Here, the defendants' use of excessive force has caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest. *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020) (holding that use of less-lethal, crowd control weapons such as tear gas and pepper spray is "excruciating" and chills speech).

The federal agents have used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators. *See supra* at pp. 8-16. They have taken

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

people without any appearance of a legal arrest, instilling fear that demonstrators may be "disappeared" like Pettibone (*See* Davidson Exs. 7, 8; Eddie Decl. ¶6.)

Plaintiffs have witnessed – both in-person and in extensive video coverage – what happens to protesters who, like themselves are unarmed and not causing property damage or otherwise breaking the law. Indeed, both Ms. Eddie and Ms. Dunham report that, as mothers, they are fearful of participating in the demonstrations because they worry they will be "disappeared" or killed. (Eddie Decl. ¶6; Dunham Decl. ¶10.) Representatives Bynum and Power also report being chilled from exercising their First Amendment rights by the fear of attack by federal agents. (Bynum Decl. ¶¶7-10; Power Decl. ¶5). And plaintiff First Unitarian has had its practice of bearing witness to social justice as Free Exercise under the First Amendment, as well as its members' First Amendment rights of assembly and free exercise chilled. (Buhl Decl. ¶¶3-6.)

All this must stop. As the District of Colorado put it well in a case concerning Denver's protests after the death of George Floyd, "peaceful demonstrators' legitimate and credible fear of police retaliation is silencing their political speech—the very speech most highly valued under the First Amendment." 2020 WL 3034161, at *3. To say "what the law is," as *Marbury* commands, this Court must safeguard the amendment that is First for good reason. Without freedom of speech, democracy fails. The evidence is sufficient and the law is clear. This Court should enjoin the defendants as requested.

> **D.    The President's Declared Intentions in Executive Order 13933 and Related Public Statements Establish That Operation Legend Is Meant to Quash Speech and to Redirect Speech Away from Dissent and Protest, Making Operation Legend Presumptively Unconstitutional.**

The First Amendment prohibits the government from restricting expression, as it has here, because of "its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citation omitted). Content-based laws—those that target speech based

on its communicative content—are presumptively unconstitutional. *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992)). Even where restriction or restrictive activity may be facially content neutral, they are considered content-based if they "cannot be 'justified without reference to the content of the regulated speech,' or were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

This President's crackdown on political protest is a paradigmatic violation of *R.A.V.* that is presumptively unconstitutional. His June 26 Executive Order criticized state and local governments, directing the use of force wrapped in the frank judgment that while disorder or violence are bad, the failure to condemn and combat noxious protest is "worse," stating that "they apparently have lost the will or the desire to stand up to the radical fringe and defend the fundamental truth that America is good…." Exec. Order No. 13933, 85 FR 40081. This language makes the defendants a Constitutionally prohibited "truth" squad, deployed to enforce the President's "truth." It is openly hostile towards the protestors' messages and communicates that any speech questioning certain beliefs of the Administration will be quashed. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses.").

The Executive Order's language exceeds the bounds of protected government advocacy because it is directly tied to government action used to "silence or muffle the expression of disfavored viewpoints." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D.N.Y. 2018) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017)). "[T]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007).

The threat to speech and First Amendment rights here is even clearer than that in *NRA v. Cuomo*, where Governor Cuomo's press release encouraged insurance companies and financial institutions to "reevaluate" their relationship with the National Rifle Association. There, the court concluded that the NRA stated a free speech claim, because in the totality of the circumstances the press release and related guidance letters "constituted implicit threats of adverse action against financial institutions and insurers that did not disassociate from the NRA." 350 F. Supp. 3d at 112-18. The language here is stronger and worse. It directly calls out persons with conflicting viewpoints from the Administration's, namely the "radical fringe" or the "left-wing extremists who have . . . explicitly identified themselves with ideologies — such as Marxism — that call for the destruction of the U.S. system of government." Exec. Order 13933, 85 FR 40081.

The Order then not only suggests – *but directs* – that action be taken against these individuals. If government speech that "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to [an] official's request" can give rise to a valid First Amendment claim, then the speech here certainly does. *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003). The President's announcement of official disfavor of the challenged speech necessarily invalidates all subsequent action taken in furtherance of its unconstitutional mandate because the government may not undertake action that "silence[s] or muffle[s] the expression of disfavored viewpoints." *See Tam*, 137 S. Ct. at 1758.

Plaintiffs need only show a likelihood of success, or serious questions going to the merits. The Order's content strongly suggests that actions taken in furtherance of this Order aim to suppress a certain ideology, and violate the First Amendment. The President's July 20 statement

Page 31 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

linking the protesters' ideology to his reaction makes this analysis inescapable. (Davidson Decl. Ex. 5) ("These people are not protesters, these people are anarchists. These are people that hate our country and we're not going to let it go forward.").) This Court should follow *R.A.V.* and *Town of Gilbert* and enter the requested injunction.

## III.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM BY THE CONTINUED VIOLATION OF THEIR CONSTITUTIONAL RIGHTS.

It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Constitutional injuries cannot adequately be remedied with monetary damages. *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd on other grounds*, 562 U.S. 134 (2011); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm.").

In considering a preliminary injunction, the deprivation of First Amendment rights "even for minimal periods of time, unquestionably constitute[s] irreparable injury." *Elrod*, 427 U.S. at 374. The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as "timing is of the essence in politics" and "[a] delay of even a day or two may be intolerable . . . ." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (citing *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008)); *see also Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (adopting the proposition); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (holding that "a 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief'"); *DISH Network v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) (holding that "a First Amendment claim certainly raises the specter of

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

irreparable harm and public interest considerations"); *Melendres*, 695 F.3d at 1002 (holding that the deprivation of First Amendment rights is "well established" to constitute irreparable harm). "The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech . . . ." *Klein*, 584 F.3d at 1208.  Put another way, because plaintiffs can show a likely constitutional, and particularly First Amendment violation, they need not separately show irreparable harm because the violation is the irreparable harm. *Nat'l Rifle Ass'n*, 2019 WL 9042815, at *12 (citing *Harris*, 772 F.3d at 583).

Plaintiffs will be irreparably harmed absent an injunction. The demonstrations are ongoing, and if immediate relief is not granted, plaintiffs' speech will be chilled and their First Amendment rights thus impermissibly curtailed. *See Abay v. City of Denver*, No. 20-CV-01616-RBJ, 2020 WL 3034161, at *4 (D. Colo. June 5, 2020) (enjoining police from employing chemical weapons or projectiles against people engaging in peaceful protests or demonstrations). Eddie testified that the federal agents' violence against protesters and their "catch-and-release" program have made her so fearful of observing peaceful protest that she has stopped participating. (Eddie Decl. ¶¶ 5-8.) Likewise, Dunham was injured by being shot by rubber bullets and terrified after a line of federal agents trained their weapons on her, even though she had behaved peacefully at all times, had not committed any crime, and was not arrested at any point. Fearing that she might not only be arrested, but killed, she discontinued participating in the protests, at least temporarily. (*See* Dunham Decl.) Reps. Bynum and Power have likewise testified that they have been chilled from attending protests.  (Bynum Decl. ¶¶6-9; Power Decl. ¶5)

As in *Abay*, irreparable harm has already occurred in the suppression of speech, and such harm will continue if this relief is denied. *See id.* Defendants will continue to use force, secure in the knowledge that retrospective claims take significant time, effort, and money to pursue. *Abay*,

Page 33 – MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

2020 WL 3034161, at *4. Plaintiffs have therefore amply demonstrated the requisite likelihood of irreparable harm.

## IV.    THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS.

The balance of equities tips sharply in favor of enjoining constitutional violations. *Klein*, 584 F.3d at 1208. [B]y establishing a likelihood that Defendants are engaged in conduct that violates the Constitution, Plaintiffs have necessarily also established that the balance of the equities favor a preliminary injunction. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

## V.    THE    PUBLIC    INTEREST    FAVORS    ENJOINING    CONSTITUTIONAL VIOLATIONS.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. Because plaintiffs have demonstrated that they are likely to succeed on the merits of constitutional claims, this factor favors issuing their requested injunction. *See Oregon v. Trump*, 406 F. Supp. 3d 940, 975 (D. Or. 2019) (injunction enforcing the Tenth Amendment would serve the public interest by thwarting the defendants' encroachment upon powers constitutionally reserved to the states); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("[T]he public interest favors the exercise of First Amendment rights .... we 'have consistently recognized the significant public interest in upholding First Amendment principles.'").

## REQUESTED INJUNCTION

Plaintiffs move this Court for both a temporary restraining order and a preliminary injunction enjoining defendants, and any persons working in concert with them, from:

   1)   consistent with the Tenth Amendment, engaging in law enforcement activities other than in the immediate defense of federal personnel or property on federal

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

property or its curtilage, except to the extent necessary to remove an imminent threat or to arrest someone violating federal law in a manner compliant with 40 U.S.C. § 1315(b)(2)(C) ("Section 1315");

2) consistent with the Fourth Amendment and Section 1315, seizing or arresting individuals within the jurisdiction of this Court without either (a) a warrant, (b) the arresting officer seeing the federal crime allegedly committed or (c) the arresting officer having probable cause to believe that the arrested person committed a federal felony;

3) making warrantless arrests in violation of the Fourth Amendment;

4) consistent with the First Amendment, the Fourth Amendment, Section 1315 and the orders of any judicial officer of this District Court, physically contacting and approaching protestors, medics, journalists, or other observers of protests at a distance of more than 100 yards from the property line of the Hatfield Courthouse unless the protestor, medic, journalist, or other observers of protests is then presently injuring the structure of the Hatfield Courthouse, or injuring an officer defending the Hatfield Courthouse at a distance of less than 100 yards from the property line of the Hatfield Courthouse;

5) consistent with the First Amendment, Fourth Amendment, Section 1315 and the orders of any judicial officer of this District Court, striking with batons, shooting with projectiles, or pushing to the ground persons within 100 yards of the property line of the Hatfield Courthouse who are not resisting instructions from the officer engaging those persons, unless there has been a prior instruction for a crowd to clear the area containing the person with time sufficient for the crowd to disperse;

Page 35 – MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

6) consistent with the First Amendment, Fourth Amendment and Section 1315 and the orders of any judicial officer of this District Court, striking with batons, gassing, shooting with projectiles, or pushing to the ground persons who are not resisting instructions from the officer engaging those persons, more than 100 yards from the property line of the Hatfield Courthouse; and

7) consistent with the First and Fourth Amendments and Section 1315 and the orders of any judicial officer of this District Court, pursuing protestors who are not personally engaged in violence toward the Hatfield Courthouse or an officer guarding it beyond the distance of 100 yards from the property line of the Hatfield Courthouse.

Dated: July 29, 2020      SNELL & WILMER L.L.P.

            By /s/ Clifford S. Davidson
            Clifford S. Davidson, OSB No. 125378
            Andrew M. Jacobs (admitted *pro hac vice*)

            Attorneys for Plaintiffs

Page 36 – MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
4838-1065-4149

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,958 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel. I have relied upon the word-count feature of Microsoft Word in creating this certificate.

Dated: July 29, 2020                          SNELL & WILMER L.L.P.

                                              By /s/ Clifford S. Davidson
                                              Clifford S. Davidson, OSB No. 125378
                                              Andrew M. Jacobs (admitted *pro hac vice*)

                                              Attorneys for Plaintiffs

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800