Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
SNELL & WILMER L.L.P.
One Centerpointe Drive, Suite 170
Lake Oswego, OR 97035
Telephone: (503) 624-6800
Facsimile: (503) 624-6888

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC., an Oregon public benefit corporation; THE FIRST UNITARIAN CHURCH OF PORTLAND, OREGON, an Oregon religious nonprofit corporation; SARA D. EDDIE, an individual; OREGON STATE REPRESENTATIVE KARIN A. POWER, an elected official; and OREGON STATE REPRESENTATIVE JANELLE S. BYNUM, an elected official,<br><br>          Plaintiffs,<br><br>     vs.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FEDERAL PROTECTIVE SERVICE; and UNITED STATES MARSHALS SERVICE<br><br>          Defendants. | Case No. 3:20-cv-01175-JR<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Per Court Order of August 24, 2020.)<br><br>*Filed concurrently with the Declarations of Clifford S. Davidson, Rev. Bill Sinkford, Eric K. Ward, Rep. Janelle Bynum and Sara Eddie* |

# I.

# INTRODUCTION

Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 16) (the "Motion") on July 29, 2020. That same day, Governor Kate Brown announced that she and the Vice President had agreed to a "phased withdrawal" from Portland of federal law enforcement. Defendants assert that the announced phased withdrawal, and media reports indicating a lack of federal officers on the streets of Portland, render the Motion moot.

Nothing could be further from the truth. Since the Governor's July 29 announcement, federal officials have made clear, emphatically and often, that enhanced federal forces remain in Portland and stand ready to reengage—even to the point of threatening "strong offensive force." (*See* Ex. 8 at 2.)

The continuing federal presence, coupled with statements by the President and the acting head of defendant Department of Homeland Security, ensure that the chilling effect that motivated plaintiffs to file this lawsuit continues. In fact, as plaintiffs argued in the Motion, that chill is deliberate. The Executive Order purporting to authorize the challenged federal law enforcement activity states that state and local governments "apparently have lost the will or the desire to stand up to the radical fringe and defend the fundamental trust that America is good, her people are virtuous, and that justice prevails in this country to a far greater extent than anywhere else in the world."[1] Executive Order 13933, 85 FR 40081; *see* ECF No. 16 at 7, 20 ["These are people that hate our country and we're not going to let it go forward."], 29, 30 [President stating that protesters' asserted disrespect of the United States and law enforcement is "worse" than violence], 31.

---

[1] Plaintiffs do not mean to suggest that they disagree with this statement's characterization of the United States. Rather, they cite the statement as evidence of the President's goal of suppressing opposing viewpoints.

And, it appears that augmented federal law enforcement, and the concomitant threat of their further unconstitutional conduct, will not depart until at least November 2020. (Ex. 10.)

But even if the federal forces were to leave tomorrow, the Motion would not be moot. That is because the government cannot sustain its "heavy burden" of showing that it is "absolutely clear" the government cannot repeat its unconstitutional conduct. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Indeed, executive branch officials' statements make clear that they can repeat this conduct and would.

Finally, even if the Court concludes that the Motion is moot, it falls within the well-established exception for matters that are capable of being repeated but that would evade review if they were found to be moot. The continued presence of augmented federal law enforcement officers, coupled with threats that they will reengage whenever commanders or the President see fit, makes it likely that Plaintiffs will be affected again by the unconstitutional conduct they challenge. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Sample v. Johnson*, 771 F.3d 1335, 1341-1342 (9th Cir. 1985), *as amended,* Oct. 22, 1985 (collecting authorities).

## II.

## FACTS RELEVANT TO WHETHER THE MOTION IS MOOT

**A.    The Federal Government Dangles over Portland's Residents the Threat of Further Augmented Federal Law Enforcement Actions**

**1.    July 29, 2020**

On the morning of July 29, 2020, the President threatened to supplant local law enforcement in violation of the Tenth Amendment:

> So, in Portland, they either clean out their city and do the job and get rid of the anarchists and agitators, which is what they are. They're not protesters; they're anarchists and agitators. We have many in jail. Many of them have been put in jail. It's going to be a

long sentence. They either clean out their city and do it right, or we're going to have to do it for them.

(Ex. 1.)[2]

Less than an hour later, the President reiterated his intention to conduct plenary policing in Portland if his conditions are not met and falsely claimed that the city would have been razed to the ground had federal "Law Enforcement" not intervened:[3]



(Ex. 2.)[4]

Later that day, the Governor of the State of Oregon announced that she and the Vice President of the United States had agreed to a "phased withdrawal" of augmented federal forces

---

[2] Available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-072920/.

[3] The President's assertion that Portland, a city of over 650,000 people, would have been destroyed because some of the thousands of protesters were not peaceful, or graffitied the Hatfield Courthouse, is absurd. *See* "Feds, right-wing media paint Portland as 'city under siege.' A tour of town shows otherwise," *available at* https://www.oregonlive.com/portland/2020/07/feds-right-wing-media-paint-portland-as-city-under-siege-a-tour-of-town-shows-otherwise.html.

[4] Available at https://twitter.com/realDonaldTrump/status/1288520300250923014.

from Portland, whereby the Oregon State Police would take over guarding the Hatfield Courthouse. (Ex. 3.)[5]

Also on July 29, in response to media coverage of the Governor's announcement, the President stated that the augmented federal forces will supplant local authorities if the President wishes them to:



(Ex. 4.)[6]

### 2.  July 30, 2020

The next day, on July 30, the President reiterated that the augmented forces would take over policing in Portland if he is dissatisfied with the performance of local police, and that the federal forces would not leave until "Anarchists and Agitators in Portland" are "clear[ed] out" or "arrest[ed]":

---

[5] Available at https://oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=37043.
[6] Available at https://twitter.com/realDonaldTrump/status/1288599151349923840.



(Ex. 5.)[7]

July 30 was the last night the augmented federal law enforcement engaged with protesters, as far as has been publicly observed or disclosed. (Ex. 6.)[8]

### 3. July 31, 2020 to the Present

On July 31, the President continued to announce that the federal government, and not local officials, would have the final word on plenary policing in Portland:



(Ex. 7.)[9]

---

[7] Available at https://twitter.com/realDonaldTrump/status/1288826742539464707.
[8] Available at https://www.dhs.gov/news/2020/07/31/portland-riots-read-out-july-31.
[9] Available at https://twitter.com/realdonaldtrump/status/1289408673324777472.

Page 5 – PL.'S MEMORANDUM RE MOOTNESS

That same day, the President told the leadership of the National Association of Police Organizations, during a meeting in the Cabinet Room of the White House, that "we're going to take very strong offensive force" if local law enforcement is not sufficiently strict in its policing of Portland. (Ex. 8 at 2.)[10] The President further expressed interest in deploying militarized forces in response to protesters:

> Minneapolis would've burned down if I didn't force the National Guard into that. And you saw them form, right? It's a beautiful thing. All of a sudden, you see a line of people. They walked through it like a knife through butter. And that was the end of the problem in Minneapolis. So, you know, we have to do that.

(Ex. 8 at 5.)[11]

On August 4, defendant Department of Homeland Security released a document titled "Myths vs. Facts: Cooperation and Receding Riot Activity in Portland, OREGON." That document clarified that there "has been no reduction in federal presence; federal law enforcement officers remain in Portland at augmented levels. Reports and implications to the contrary are irresponsible and dishonest," and did not offer a timeframe for the augmented forces' withdrawal." (Ex. 9 at 1, 2.)[12] Indeed, on August 7, Oregon Public Broadcasting, citing an unnamed federal law enforcement official, reported that augmented federal forces would remain in Portland through at least Election Day in November 2020. (Ex. 10.)[13]

On August 10, consistent with his comments about taking "very strong offensive force" and about the Minneapolis National Guard cutting through protesters "like a knife through butter,"

---

[10] Available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-national-association-police-organizations-leadership/.

[11] Contrary to the President's assertion, it was the Governor of Minnesota who mobilized the National Guard—the only person with the power to do so absent a declared national emergency or war. https://www.cnn.com/2020/07/01/politics/fact-check-trump-walz-minnesota-national-guard/index.html; *see also* https://minnesotanationalguard.ng.mil/all-in-as-long-as-were-needed/ (noting that the Governor authorized full activation of the Guard).

[12] Available at https://www.dhs.gov/news/2020/08/04/myths-vs-facts-cooperation-and-receding-riot-activity-portland-oregon.

[13] Available at https://www.opb.org/article/2020/08/07/federal-officers-leave-portland-election/.

the President expressed interest in forcibly quelling ongoing Portland protests, some of which were not peaceful:



(Ex. 11)[14]; *see contra* https://www.opb.org/article/2020/08/10/as-nightly-conflicts-draw-headlines-reforms-gradually-advance/ (noting that while some protesters have employed vandalism and fireworks in clashes with police, "thousands of people joined peaceful protests").

### B.     The Government Continues to Chill Plaintiffs' Constitutional Rights

Although much of the problematic federal policing appears to have abated since July 30, the ongoing federal presence and threats to reengage augmented federal law enforcement, in violation of the Tenth and First Amendments, continue to chill plaintiffs' speech. As such, Plaintiffs still have an interest in the outcome of this case and the Motion is not moot.

Plaintiff First Unitarian continues to be unable to encourage and organize the exercise of its religious practice of bearing witness to injustice and protesting against it. The danger of incurring the wrath of federal law enforcement by protesting at Portland Police headquarters—a reasonable place to protest unjust police practices—is too great because the Hatfield Courthouse is right next door. Similarly, City Hall is situated directly across from the Federal Building and a

---

[14] Available at https://twitter.com/realDonaldTrump/status/1292837084152107010.

park built on federal land. The federal presence and threats chill the free exercise of the Church's religion. (Sinkford Decl. ¶¶3-4 [social justice, witness and protest are tenets of Unitarian Universalist faith], 7-9 [describing ongoing chill of Church's First Amendment rights].)

Plaintiff Western States Center is involved in at least two major campaigns: a ballot initiative to overhaul civilian oversight of the Portland Police Bureau, and a petition for the president of the Portland Police Association, Daryl Turner, to resign. (Ward Decl. ¶¶7, 9.) Western States Center would like to organize and promote rallies with respect to the ballot initiative near police headquarters and City Hall because of their obvious significance to police reform, but is unwilling to do so because of the risk that federal forces—ready to act upon the whim of their commanders—pose to the organization's supporters (many of whom are older). (Ward Decl. ¶¶6-8.) Likewise, Western States Center would like to rally in support of Turner's resignation but is chilled from doing so both because of the possibility that the federal officers will resume policing and because Acting Secretary Wolf met with Turner when Wolf visited Portland on July 16. According to public sources, Turner was the only person with whom Wolf met while he was here, leading Western States Center to fear that its rallies would attract federal law enforcement intervention. (Ward Decl. ¶ ¶9, 11.)

Plaintiff Representative Janelle Bynum continues to be chilled from protesting because she fears, based on the statements of federal officials, "that if protesters once again strongly, and in large groups, promote a message of police reform and calls for justice, then militarized federal forces once again will spring into action." (Second Bynum Decl. ¶5.) She views the lurking threat of federal violence, should Portlanders step out of line and protest in favor of police reforms, as a form of coerced silence reminiscent of the Klan's tactics. (Second Bynum Decl. ¶6.) The possibility of resumed federal law enforcement also threatens her work on issues of police reform and standards, including anti-profiling legislation. (Second Bynum Decl. ¶7.)

Plaintiff Sara Eddie continues to be chilled in her activities as a legal observer. Although legal observing downtown continues, she is chilled from observing downtown because of the

Page 8 – PL.'S MEMORANDUM RE MOOTNESS

possibility that federal forces will resume their attacks on protesters, which has included gassing without warning. She continues to be unable to risk that possibility because she has high blood pressure and because she is a caretaker of her 96-year-old grandfather and two children. (Second Eddie Decl. ¶¶6, 7.)

## III.

## ARGUMENT

### A.    Legal Standard

"As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)); *see New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, -- U.S. --, 140 S. Ct. 1525, 1528 (2020) (Alito, J., dissenting) (describing this standard as "well-established"); *Sample*, 771 F.2d at 1338 (noting that a case is moot if there are no longer live issues or the parties lack a legally cognizable interest in the outcome).

Voluntary cessation of challenged conduct does not automatically render a case moot. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Indeed, where, as here, a party asserts that its voluntary actions have mooted a case, that party bears a "heavy burden" of satisfying this Court's "stringent" review; subsequent events must make "absolutely clear that the allegedly wrongful behavior [can]not reasonably be expected to recur." *Id.* The Supreme Court set this high bar because litigants should not be "free to return to [their] old ways," and because there is "a public interest in having the legality of the practices settled." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). Even if a case is moot, the Court must hear that case if the challenged conduct is capable of repetition but would evade review—for example, because of the conduct's brevity. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Sample*, 771 F.3d at 1341-1342 (collecting authorities).

B.  **The Preliminary Injunction Motion Is Not Moot**

1.  **The Fact that Federal Forces Appear Not to Have Chased, Forcibly Marched, Gassed or Seized Protesters Since July 30 Does Not Moot this Case**

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. [I]f it did, the courts would be compelled to leave [t]he defendant free to return to his old ways." *Friends of the Earth*, 528 U.S. 167, 189 (2000) (citations omitted; emphases in original). Accordingly, the Supreme Court articulated a "stringent" standard for determining whether a case is moot because of the defendant's voluntary conduct: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* The Court also has made clear that the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.*

Thirteen years later, the Court applied the *Friends of the Earth* standard in *Already, LLC v. Nike, Inc.*, in the context of a trademark dispute. There, the Court unanimously held that an "unconditional and irrevocable" covenant not to sue or make any demand meant that there was no way Nike ever again could allege trademark infringement against the competitor and therefore that competitor's counterclaim was moot. 568 U.S. 85, 88, 93 (2013). Chief Justice Roberts, writing for the Court, noted: "The case is moot if the court, considering the covenant's language and the plaintiff's anticipated future activities, is satisfied that it is 'absolutely clear' that the allegedly unlawful activity cannot reasonably be expected to recur."

The United States Court of Appeals for Ninth Circuit recently applied this standard in *Campbell v. Facebook*, 951 F.3d 1106 (9th Cir. 2020), and concluded that a lawsuit concerning Facebook's use of data from private messages and other functionality was not moot, even though Facebook voluntarily stopped using data in those ways, because nothing in the record supported a

Page 10 – PL.'S MEMORANDUM RE MOOTNESS

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

finding that the allegedly wrongful behavior could not reasonably have been expected to recur. *Id.* at 1120.

Plaintiffs' Motion is not moot under this "stringent standard" and defendants cannot satisfy their "heavy burden" to show that it is "absolutely clear" the government cannot repeat its unconstitutional conduct. *See Friends of the Earth*, 528 U.S. at 189. Far from demonstrating that the government cannot repeat its unconstitutional conduct, the government instead has made clear that it remains ready, willing, and able to "take very strong offensive force" (Ex. 8 at 2), and that it demands "Kate Brown, Governor of Oregon" "clear out, or in some cases arrest" protesters that the federal government deems "Anarchists and Agitators" (Ex. 5; *see* Ex. 1 at 1 and Exs. 2, 3, 4, 7.) Likewise, the government has reserved to itself the purported right to "clean out" or "clear out" Portland if state and local officials do not do so. (Ex. 1 at 1, Ex. 5.) And, the Executive Branch is bound to follow Executive Order 13933, which states, among other things, that the federal government will crack down when local officials have not done so sufficiently. 85 FR 40081-40082

It is beyond reasonable dispute that Defendants are able to repeat their constitutionally-violative conduct, given (1) the continuing presence of augmented federal law enforcement, (2) the ongoing protests in Portland concerning law enforcement and police reform (which provoked the federal response in the first place), and (3) government threats to use augmented federal law enforcement if, in the government's view, local officials are insufficiently harsh.

Indeed, even a statement to this Court that the augmented forces no longer exist, and that the government has no intention to redeploy them, would not satisfy the government's heavy burden. *See U.S. v. W. T. Grant Co.*, 345 U.S. 629 633 (1953) (in Clayton Act civil enforcement action against alleged "interlocking directorates," it was not enough that "defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them"; the case was not moot).

Snell & Wilmer
One Centerpointe Drive Ste 170
Lake Oswego, Oregon 97035
503.624.6800

Because the government's recent change in force posture is neither "entrenched" nor "permanent"; because its retreat into federal facilities "is not governed by any clear or codified procedures" that would prevent re-engagement with protesters; and because it has not offered an "unambiguous renunciation of its past actions," the Motion is not moot. *Fikre v. Federal Bureau of Investigation*, 904 F.3d 1033, 1037-39 (9th Cir. 2018) (noting that case not moot unless these requirements are met, and holding that challenge to placement on no-fly list not mooted by government's removal of the plaintiff from that list).

## 2. **The Government Is Capable of Repeating the Unconstitutional Policing it Undertook between July 15 and July 30, 2020; Additional Short Bursts of Activity Would Evade Review if This Case Were Moot**

At a minimum, the Court retains jurisdiction under the capable-of-repetition doctrine. Unlike the chokehold victim in *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983), the leading case on the capable-of-repetition doctrine, plaintiffs' concern that defendants again will subject them to unconstitutional conduct is not "speculative." In addition to the explicit threats to reengage in the challenged behavior, plaintiffs' concern is rooted in the fact that federal officials possess the motive, means and opportunity once again to gas and detain plaintiffs if they, their members or their congregants engage in First Amendment-protected conduct.

One look no further than Twitter—which this President has used as "an important tool of governance and executive outreach," *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), *reh'g en banc denied*, 953 F.3d 216 (2d Cir. 2020)—for evidence that it is reasonably likely, and not speculative, that federal law enforcement once again will chill plaintiffs' rights if not enjoined. *See Siskiyou Regional Educ. Project v. Rose*, 87 F. Supp. 2d 1074, 1088 (D. Or. 1999) (holding that case not moot, based on capable-of-repetition doctrine, even though the four-month mining season of 1998 had ended, because conduct could be repeated during four-month mining season in 1999).

### 3. **Plaintiffs Have a Concrete Interest and Redressable Injury**

Plaintiffs' testimony submitted with this Memorandum shows that they still have a concrete interest, "however small," in the outcome of this case. *Chafin*, 568 U.S. at 172. The chill plaintiffs experience, as described in their declarations, is redressable through the injunction proposed in the Motion: an order defining the powers of the augmented federal officers waiting to receive their orders from the President and others who have expressed a willingness to use force in the executive's sole discretion. S*ee Center for Biological Diversity v. Export-Import Bank of the United States*, 894 F.3d 1005, 1011 (9th Cir. 2018) (holding case not moot based on the court's conclusion that it was merely "conjectural" a federal court could grant relief); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("[A] case is not moot if *any* relief may be granted.") Neither the Motion, nor this case, is moot.

## IV.

## CONCLUSION

The Court should find that the Motion for Preliminary Injunction is not moot and consider its merits.

Dated: August 10, 2020                           SNELL & WILMER L.L.P.

By /s/ Clifford S. Davidson
Clifford S. Davidson, OSB No. 125378

Attorneys for Plaintiffs

4812-3579-7447