ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JOSHUA E. GARDNER
Special Counsel
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Case No. 3:20-cv-01175-JR <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

    I.   The Situation in Portland .................................................................................... 1

    II.  Legal Authority to Protect Federal Property ...................................................... 5

STANDARD FOR EMERGENCY RELIEF .................................................................... 7

ARGUMENT ................................................................................................................... 9

    I.   Plaintiffs Have Failed to Show That They Have Standing to Pursue Injunctive Relief Based on Any Injury to Themselves ........................................................... 9

        A.  Plaintiffs Must Show a Certainly Impending Injury In Fact Traceable to the Challenged Conduct of the Defendants .................................................... 9

        B.  Plaintiffs' Vague Claims of Subjective Chill Are Insufficient to Demonstrate Individual or Associational Standing ................................. 14

        C.  Plaintiff Organizations Fail to Establish Standing ................................ 19

    II.  Plaintiffs Are Not Likely to Succeed on the Merits By Alleging Isolated Instances of Harm to Other People .............................................................. 23

        A.  Plaintiffs Have Not Demonstrated Any Tenth Amendment Violation or Injury ........... 23

        B.  Plaintiffs Have Not Demonstrated Any First Amendment Violation or Injury ............ 27

        C.  The Injunction Demanded by Plaintiffs is Unsupported by the Record ........................ 30

    III.   Plaintiffs Cannot Demonstrate Irreparable Harm .......................................... 32

    IV.   Both the Balance of the Equities and the Public Interest Weigh Against Granting an Injunction ...................................................................................... 33

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................................. 8, 32

*Am. Diabetes Ass'n v. United States Dep't of the Army*,
  938 F.3d 1147 (9th Cir. 2019) ............................................................................. 13, 21

*Bay Area Peace Navy v. United States*,
  914 F.2d 1224 (9th Cir. 1990) ............................................................................. 28

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) ............................................................................. 34

*Blair v. Shanahan*,
  38 F.3d 1514 (9th Cir. 1994) ............................................................................. 10

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ............................................................................. 30, 32

*Bond v. United States*,
  572 U.S. 844 (2014)............................................................................. 24

*Bonnette v. California Health & Welfare Agency*,
  704 F.2d 1465 (9th Cir. 1983) ............................................................................. 23, 24

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................................. 8

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................. passim

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................. passim

*Coleman v. Miller*,
  307 U.S. 433 (1939)............................................................................. 14

*Collins v. Jordan*,
  110 F.3d 1363 (9th Cir. 1996) ............................................................................. 29

*Eggar v. City of Livingston*,
  40 F.3d 312 (9th Cir. 1994) ............................................................................. 11

*Feiner v. New York*,
    340 U.S. 315 (1951) .................................................................................................... 34

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) ................................................................................. 27, 28

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ...................................................................................... 8

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................................................ 6, 7

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................................ 27, 34

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................... 13, 20, 21

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .............................................................................. 13, 14, 18, 19

*Index Newspapers, LLC v. City of Portland*,
    No. 3:20-cv-1035-SI, 2020 WL 4220820 (D. Or. July 23, 2020) .................................. 3

*Index Newspapers, LLC v. City of Portland*,
    No. 3:20-cv-1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020) ............................... 3

*Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .................................................................................................... 34

*Jackson v. City of Bremerton*,
    268 F.3d 646 (9th Cir. 2001) ...................................................................................... 27

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ............................................................................ 13, 21, 22

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................................................... 12, 15, 26, 27

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ...................................................................................... 30

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ...................................................................................... 8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................. 9, 16

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
    192 F.3d 1283 (9th Cir. 1999) ................................................. 29

*Menotti v Seattle,*
    409 F.3d 1113 (9th Cir. 2005) ................................................. 29

*Munns v. Kerry,*
    782 F.3d 402 (9th Cir. 2015) ................................................... 12

*Murphy v. Kenops,*
    99 F. Supp. 2d 1255 (D. Or. 1999) .......................................... 11

*Nelsen v. King Cty.,*
    895 F.2d 1248 (9th Cir. 1990) ................................................. 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................. 33

*NLRB v. Express Pub. Co.,*
    312 U.S. 426 (1941) ................................................................. 32

*Olagues v. Russoniello,*
    770 F.2d 791 (9th Cir. 1985) ................................................... 32

*Oregon v. Trump,*
    406 F. Supp. 3d 940 (D. Or. 2019) .......................................... 24

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ........................................................... 11, 18

*Pac. Kidney & Hypertension, LLC v. Kassakian,*
    156 F. Supp. 3d 1219 (D. Or. 2016) .......................................... 7

*Physicians Comm. for Responsible Med. v. EPA,*
    292 F. App'x 543 (9th Cir. 2008) ........................................ 13, 21

*Raines v. Byrd,*
    521 U.S. 811 (1997) ................................................................. 14

*Rendish v. City of Tacoma,*
    123 F.3d 1216 (9th Cir. 1997) ................................................. 32

*Ringgold-Lockhart v. Cty. of Los Angeles,*
    761 F.3d 1057 (9th Cir. 2014) .................................................. 34

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ............................................................. 11, 18

*Rodriguez v. City of San Jose,*
    930 F.3d 1123 (9th Cir. 2019) ...................................... 13, 20, 21

*Rosenblum v. Does 1-10,*
    No. 3:20-cv-1161-MO, 2020 WL 4253209 (D. Or. July 24, 2020)................................. passim

*Smith v. Pac. Props. & Dev. Corp.,*
    358 F.3d 1097 (9th Cir. 2004) .................................................. 13

*Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) .................................................. 21

*State v. U.S. Dep't of State,*
    931 F.3d 499 (6th Cir. 2019) .................................................... 14

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) .................................................................... 9

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) .................................................. 30

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .................................................................. 8

*United Presbyterian Church in the U.S.A. v. Reagan,*
    738 F.2d 1375 (D.C. Cir. 1984) ............................................... 12

*United States v. Christopher,*
    700 F.2d 1253 (9th Cir. 1983) .................................................... 6

*United States v. Griefen,*
    200 F.3d 1256 (9th Cir. 2000) .................................................. 34

*United Steelworkers of Am. v. Milstead,*
    705 F. Supp. 1426 (D. Ariz. 1988) ........................................... 27

*Updike v. Multnomah Cty.,*
    870 F.3d 939 (9th Cir. 2017) .................................................... 10

*Va. House of Delegates v. Bethune-Hill*,
   139 S. Ct. 1945 ........................................................................................................... 14

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .............................................................................................. 10, 22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................... 8, 32

**STATUTES**

18 U.S.C § 111 ............................................................................................................ 5, 34

28 U.S.C. § 566 ................................................................................................................. 7

40 U.S.C. § 1315 ................................................................................................ 5, 6, 24, 26

**RULES**

Fed. R. Civ. P. 65 ...................................................................................................... 30, 31

**REGULATIONS**

28 C.F.R. § 0.111(f) .......................................................................................................... 7

41 C.F.R. § 102-74.390 ..................................................................................................... 6

41 C.F.R. § 102-74.385 ..................................................................................................... 6

**OTHER AUTHORITIES**

Executive Order 13933 ....................................................................................... 22, 29, 30

## INTRODUCTION

Plaintiffs seek to enjoin future federal law enforcement activity that is necessary to protect federal property and federal employees from violent opportunists who have attempted to damage those buildings and harm federal law enforcement officers. Plaintiffs themselves have never been harmed by federal law enforcement, in part because they have declined to join even peaceful daytime protests. They cannot demonstrate standing to pursue equitable relief because they have not demonstrated a single concrete injury that is certainly impending and traceable to the challenged actions of federal law enforcement. Instead, they focus on a few isolated incidents of alleged harm to other protesters, who are connected to this litigation only through declarations or news clippings. Further, Plaintiffs' inchoate legal theories would be unlikely to succeed on the merits, even if such past experiences by third parties were actionable for purposes of prospective injunctive relief. The impropriety of a preliminary injunction is all the more apparent given the decrease in federal enforcement activities since July 30, 2020 and the far fewer protests near federal buildings. For these reasons, Plaintiffs have not shown that they will suffer irreparable harm in the absence of an injunction. And they have not demonstrated that the balance of the equities or the public interests weighs in their favor because the right to protest must yield when the protest becomes a riot that threatens life and public property.

## BACKGROUND

### I.    The Situation in Portland

For over two months, Portland witnessed daily protests in its downtown area. *See* Declaration of Gabriel Russell ("Russell Decl.") ¶ 3, Federal Protective Service (FPS) Regional Director, (attached as Exhibit 1). While the daily daytime protests were largely peaceful, the protests devolved into nightly criminal activity, including vandalism, destruction of property, looting, arson, and assault. *See id.*

Federal buildings and property have been the targets of many of these violent attacks, including the Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement (ICE) Building, and the Edith Green Wendall Wyatt Federal Office Building.  *See* Russell Decl. ¶ 4.  Officers protecting these properties were subjected to threats, thrown rocks, ball bearings fired by wrist rockets, improvised explosives, aerial fireworks, commercial grade mortars, high intensity lasers targeting officers' eyes, thrown full and empty glass bottles, and balloons filled with paint and other substances such as feces.  *Id.*  There were over 180 injuries to federal law enforcement officers during the rioting, including broken bones, hearing damage, eye damage, puncture wounds, lacerations, a dislocated shoulder, sprains, strains, and contusions.  *Id.*

In response to the damage to federal property and assaults on federal law enforcement officers, DHS deployed federal officers to Portland to protect federal buildings and property (Operation Diligent Valor).  Russell Decl. ¶ 5.  From May 27 until July 3, officers were stationed in a defensive posture intended to de-escalate tensions, remaining inside federal buildings and only responding to breach attempts or other serious crimes.  *Id.*  This de-escalation attempt was met with an increasingly violent series of attacks against federal law enforcement officers and property, which culminated in an effort to break into and set fire to the Hatfield Courthouse in the early morning hours of July 3, 2020.  *Id.*

The violence against federal officers and federal property continued to intensify.  Crowds grew from hundreds to thousands, and on some nights there were hundreds of violent opportunists attempting to vandalize federal property and assault federal law enforcement officers.  Russell Decl. ¶ 6.  During most nights between July 4 and July 30, 2020, including the nights that Plaintiffs address (July 11-12, 20-21, 22-23, 23-24, and 25-26), violent opportunists

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 2

attempted to breach the Hatfield Courthouse or the perimeter fencing protecting it, vandalize the Courthouse, or endanger the occupants (including by setting fires).  Russell Decl. ¶ 7.  In response, federal law enforcement officers deployed from within the Courthouse.  *Id.*  The federal officers, from Department of Homeland Security ("DHS") and Department of Justice components, came under attack.  *Id.*  The officers issued warnings to disperse from the federal property extending onto the street, and then they pushed the crowds back several blocks, including by using less-than-lethal crowd control munitions, to create a buffer zone to allow repairs to exterior security fixtures and to put out fires started in the vicinity of the Courthouse. *Id.*  Violent opportunists continued to resist and attempt to assault federal officers while officers pushed them back.  *Id.*  After moving the violent crowds back a few blocks to perform these functions, federal law enforcement officers retreated to the exterior of the Courthouse grounds and into the Courthouse.  *Id.*

On July 23, in *Index Newspapers, LLC v. City of Portland*, No. 3:20-cv-1035-SI, 2020 WL 4220820 (D. Or. July 23, 2020), the court entered an injunction similar to the one sought by Plaintiffs in this case, but specifically covering self-identified members of the press and legal observers.  The court granted that motion, requiring federal defendants to extend special privileges—such as an exemption from lawful orders to disperse—to people who self-identify as members of the press or as legal observers, with such people being identified by anything from a "press pass" to "distinctive clothing" to hats or vests of certain colors.  *Id.* at *10.  The court later granted a preliminary injunction on similar terms.  2020 WL 4883017 (D. Or. Aug. 20, 2020).

In *Rosenblum v. Does 1-10*, No. 3:20-cv-1161-MO, 2020 WL 4253209 (D. Or. July 24, 2020), the Oregon Attorney General sought a temporary restraining order against federal law enforcement officers' allegedly using unmarked cars to seize protesters without the officers

identifying themselves or stating the reason for the seizure.  The Court denied the motion for a

TRO, holding in relevant part that the plaintiff lacked standing to pursue injunctive relief

because there was insufficient evidence of the likelihood of future harm.  *Id.* at *6.

On July 29, 2020, senior DHS officials and the Governor of Oregon met to work out an

agreement regarding the situation in Portland, pursuant to which Oregon State Police would be

responsible for crowd control and law enforcement in the area surrounding the Federal

Courthouse—thus allowing federal law enforcement to limit their presence to the Courthouse

grounds.  Russell Decl. ¶ 8.  Both DHS and the Governor of Oregon announced that plan on July

29, 2020.[1]  After the agreement took effect, violent protests moved away from the Hatfield

Courthouse and other federal buildings to other parts of Portland.  *Id.*  Although the Oregon State

Police withdrew two weeks later, there have been only a few days and nights of protests outside

the Hatfield Courthouse or other federal buildings, and violent protests have on most days

remained in other areas of Portland.  *Id.*

The reduction in violence has allowed for a significantly decreased role for federal law

enforcement officers, who have deployed from the Hatfield Courthouse and other federal

properties to conduct crowd control operations only three times since July 30, 2020.  Russell

Decl. ¶ 9.  There have been only a few incidents of vandalism.  *Id.*  Moreover, unlike for a period

of time during which the Portland Police Bureau was not allowed to police city property adjacent

---

[1] *See* Press Release, Chad R. Wolf, Acting Secretary Wolf's Statement on Oregon Agreeing to Cooperate in Quelling Portland Violence (July 29, 2020), https://www.dhs.gov/news/2020/07/29/acting-secretary-wolfs-statement-oregon-agreeing-cooperate-quelling-portland; Press Release, Kate Brown, Governor Kate Brown Announces Phased Withdrawal of Federal Law Enforcement from Portland (July 29, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=37043.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 4

to the Hatfield Courthouse or coordinate with federal law enforcement, the Portland Police

Bureau is now again doing so.  *Id.*

## II.    Legal Authority to Protect Federal Property

The Federal Protective Service ("FPS"), a component of the DHS, is the federal agency

charged with protecting federal facilities.  *See* Federal Protective Service Operation, at

https://www.dhs.gov/fps-operations.  Congress authorized DHS to "protect the buildings,

grounds, and property that are owned, occupied, or secured by the Federal Government." 40

U.S.C. § 1315(a).  While engaged in their duties, FPS officers are authorized to conduct a wide

range of law enforcement functions:

> (A) enforce Federal laws and regulations for the protection of persons and property;
>
> (B) carry firearms;
>
> (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;[2]
>
> (D) serve warrants and subpoenas issued under the authority of the United States;
>
> (E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and
>
> (F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C. § 1315(b)(2).[3]

Congress also delegated authority to DHS to issue regulations "necessary for the

protection and administration of property owned or occupied by the Federal Government and

---

[2] *See, e.g.*, 18 U.S.C § 111 (assaulting a federal officer).

[3] Additionally, the Secretary of DHS may designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property."  40 U.S.C. § 1315(b)(1).

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 5

persons on the property," which regulations may include "reasonable penalties," including fines and imprisonment for not more than 30 days. 40 U.S.C. § 1315(c), (c)(2). Current regulations cover many activities, including disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. § 102-74.380(d)). *See United States v. Christopher*, 700 F.2d 1253 (9th Cir. 1983) (affirming convictions on charges of being present on federal property after normal work hours in violation of 41 C.F.R. §§ 101–20.302 and 101–20.315).

In exercising its authority to protect federal property, FPS follows DHS policy on the use of force. *See* DHS Policy on the Use of Force (Sept. 7, 2018) (Exhibit 2). Consistent with guidance from the Supreme Court, *see Graham v. Connor*, 490 U.S. 386 (1989), DHS policy authorizes officers to "use only the force that is objectively reasonable in light of the facts and circumstances confronting him or her at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy at 1–2. The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* at 3. DHS components must conduct training on "less-lethal use of force" at least every two years and incorporate decision-making and scenario-based situations. *Id.* at 5. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or chemical agents, before using such devices. *Id.* DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. 3.

DHS has also emphasized to its employees the importance of respecting activities protected by the First Amendment. *See* DHS Memo re: Information Regarding First Amendment

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 6

Protected Activities (May 17, 2019) (Exhibit 3).  "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."  *Id.* at 1.

In addition to DHS's authority to protect federal property, the U.S. Marshals Service, a component of the Department of Justice, provides security inside federal courthouses.  *See* U.S. Marshals Service, Court Security, at www.usmarshals.gov/duties/courts.htm/.  As set forth in 28 U.S.C. § 566(a), "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, . . . as provided by law."  The regulations governing the duties of the Marshals Service further authorize it to provide "assistance in the protection of Federal property and buildings."  28 C.F.R. § 0.111(f).  *See also* 28 U.S.C. § 566(i).

The Marshals Service's actions to protect the federal judiciary are guided by an agency-wide use of force policy.  *See* U.S. Marshals Service, Policy Directive 14.15, Use of Force (Sept. 24, 2018) (Exhibit 4).  Pursuant to that policy, the use of force must be objectively reasonable and Deputy Marshals may use less-than-lethal force only in situations where reasonable force, based upon the totality of the circumstances at the time of the incident, is necessary to, among other things, protect themselves or others from physical harm or make an arrest.  *See id.*  Deputy Marshals are not authorized to use less-than-lethal devices if voice commands or physical control achieve the law enforcement objective.  *See id.*  Further, they must stop using less-than-lethal devices once they are no longer needed to achieve a law enforcement purpose.  *See id.*  And in all events, less-than-lethal weapons may not be used to punish, harass, taunt, or abuse.  *See id.*

## STANDARD FOR EMERGENCY RELIEF

The standard for a temporary restraining order is generally the same as for a preliminary injunction.  *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or.

2016).  A preliminary injunction is "an extraordinary and drastic remedy" that should not be

granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v.

Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  A plaintiff must show that: (1) he is likely to

succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).[4]  "Likelihood of success on the

merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the

court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir.

2018).  Because standing is a prerequisite to jurisdiction, *see Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 157 (2014), a plaintiff's claims on the merits have no likelihood of success if the

plaintiffs cannot establish standing. *Id.* at 158  ("The party invoking federal jurisdiction bears

the burden of establishing" standing and must do so "the same way as any other matter on which

the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at

the successive stages of the litigation.") (internal quotations and citations omitted).

　　Plaintiffs must meet an even higher standard in this case because they seek a mandatory

injunction that would alter the status quo and impose affirmative requirements on how law

enforcement officers carry out their duties.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th

Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should

---

[4] Alternatively, the Ninth Circuit has held that "serious questions going to the merits and a
balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary
injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and
that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,
1135 (9th Cir. 2011) (citation omitted). Even assuming for the sake of this Opposition that that
standard is not superseded and applies in this case, Plaintiffs fail to satisfy it.

deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiffs cannot meet this demanding standard.

## ARGUMENT

I.    **Plaintiffs Have Failed to Show That They Have Standing to Pursue Injunctive Relief Based on Any Injury to Themselves[5]**

A.    **Plaintiffs Must Show a Certainly Impending Injury In Fact Traceable to the Challenged Conduct of the Defendants**

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983). One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). The first requirement of standing is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* at 560. Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court. *Id.* Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.* at 561.

Where, as here, a party seeks prospective equitable relief, the injury in fact must be in the future; there must be "allegations of future injury [that are] particular and concrete." *Steel Co. v.*

---

[5] Because Plaintiffs have failed to demonstrate standing to obtain injunctive relief, there is no Article III case or controversy. Because they have not even shown past injury, there is no live controversy, so it is difficult to speak of it being moot. Nevertheless, the same concerns that inform a mootness inquiry also preclude Plaintiffs from demonstrating irreparable harm. *See infra* Section III.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 9

*Citizens for a Better Environment,* 523 U.S. 83, 109 (1998).  That "threatened injury must be *certainly impending*" and not merely "*possible*."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Accordingly, the injury may not be based on a "speculative chain of possibilities."  *Clapper*, 568 U.S. at 410.

While a plaintiff's allegations that he was injured in the past might support a remedy at law, a plaintiff seeking prospective equitable relief must establish imminent future harm to himself.  *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).  Thus, even when he has suffered a specific past injury, a plaintiff must show a significant likelihood that it will be sustained again in the immediate future.  *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir. 2017).  Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.*, *Updike*, 870 F.3d at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum*, 2020 WL 4253209 at *6.

The facts and reasoning of *Lyons* are instructive.  *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation.  In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened.  The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while
> presumably affording Lyons standing to claim damages . . . does nothing

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 10

to establish a real and immediate threat that he would again be stopped for
a traffic violation, or for any other offense, by an officer or officers who
would illegally choke him into unconsciousness without any provocation
or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past

exposure to illegal conduct does not in itself show a present case or controversy regarding

injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Rizzo v.*

*Goode*, 423 U.S. 362, 372 (1976). *Lyons* concluded that to demonstrate a real and immediate

threat of injury, the plaintiff would have to show either a consistent practice, always followed by

all officers, that violated his rights, or an official policy. *See Lyons*, 461 U.S. at 106 (requiring

that he show "(1) that all police officers in Los Angeles always choke any citizen with whom

they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to

act in such manner"). Even an official policy that simply allowed for the challenged conduct is

insufficient. *Id.* Similarly, a widespread practice that is not common to all law enforcement

officers with whom a plaintiff may come in contact is also insufficient. *Rizzo*, 423 U.S. at 372

(holding that plaintiffs' allegations that police had engaged in widespread unconstitutional

conduct aimed at minority citizens was based on speculative fears as to what an unknown

minority of individual police officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that

plaintiffs lack standing to pursue prospective injunctive relief where they could only speculate as

to whether particular law enforcement practices would occur, even if they had previously been

subjected to them. *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994)

(plaintiff who had been repeatedly convicted without court-appointed counsel lacked standing

because whether she "will commit future crimes in the City, be indigent, plead guilty, and be

sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 11

1999) (plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders").

The standard is not relaxed when plaintiffs themselves have never been directly injured but instead have been "chilled" or avoided activities that they fear will subject them to injury. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Cases that use the concept of a "chilling effect" "involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). The supposed chilling effect will not provide standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015). The fear may not be simply reasonable or "nonparanoid"—it must be a fear of a "certainly impending" harm. *Clapper*, 568 U.S. at 416. In other words, where a plaintiff's request for injunctive relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot circumvent Article III merely by saying that he or she is *afraid* of future harm.

Moreover, a plaintiff cannot simply create an injury by undertaking costly action to avoid harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). When that self-imposed harm is based on an injury that is too speculative, it is not fairly traceable to the defendant's conduct. *Id.* And if such self-harm

is undertaken even when no alleged injury is feared, it is also clearly not traceable to the

defendant's conduct.  *Id.* at 417.

    Organizations can also show standing, through two different paths.  An organization has

"associational standing" to "bring suit on behalf of its members when: (a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert.*

*Comm'n*, 432 U.S. 333, 343 (1977).  An organization also has standing in its own right if it

satisfies the requirements of injury in fact (to the organization), causation, and redressability.

*Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019).  To demonstrate sufficient

injury, the organization must show "(1) frustration of its organizational mission; and (2)

diversion of its resources to combat the particular [injurious behavior] in question."  *Id.* (quoting

*Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)); *Am. Diabetes Ass'n v.*

*United States Dep't of the Army*, 938 F.3d 1147, 1154-55 (9th Cir. 2019) (collecting cases).  It

has standing "only if it was forced to choose between suffering an injury and diverting resources

to counteract the injury."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,

624 F.3d 1083, 1088 n.4 (9th Cir. 2010).  The organization must show more than "simply a

setback to the organization's abstract social interests."  *Havens Realty Corp. v. Coleman*, 455

U.S. 363, 379 (1982).  Organizations must demonstrate the other two elements of standing too.

*Physicians Comm. for Responsible Med. v. EPA*, 292 F. App'x 543, 545 (9th Cir. 2008).

## B.    Plaintiffs' Vague Claims of Subjective Chill Are Insufficient to Demonstrate Individual or Associational Standing

    The five Plaintiffs appear to base their individual standing, and the organizations'

associational standing (to the extent that they intend to assert it), on an almost identical theory

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 13

for each.[6]  The six individuals[7] who provided declarations speaking for those Plaintiffs assert

that they had their First Amendment rights chilled and were prevented from holding or even

attending protests or related activities by the federal government's actions in Portland.

- Sara Eddie, a legal observer, states: "[T]he threat of further violent conduct by federal
  law enforcement downtown prevents me from accepting assignments to downtown
  Portland.  Those threats come in the form of the ongoing presence of federal law
  enforcement . . . .  I cannot afford to be abducted or injured by federal law enforcement.
  In the past, federal law enforcement often provided no warning before gassing protesters.
  I have high blood pressure and I cannot risk being gassed."  Second Eddie Decl., ECF
  No. 34, ¶¶ 6-7.

- Oregon States Representative Janelle Bynum states:  "On a personal level, I am afraid to
  participate in protests downtown.  I fear for my safety and for the well-being of my
  family if I am severely injured by federal law enforcement—like so many other peaceful
  protesters. . . .  Both my eldest daughter and I have been profiled.  I am deathly afraid of
  when and how profiling by federal law enforcement might happen to my boys. . . .  My
  husband and I keep them close to us at all times, and we forego exercising our freedoms
  of speech and assembly.  The federal authorities simply pose [too] great a danger to us."
  Bynum Decl., ECF No. 19, ¶¶ 7, 9.  "That fear and chill has persisted even after the
  Governor announced a 'phased withdrawal' of federal forces on July 29. . . .  I am aware
  from public statements of the President and the Acting Secretary of the Department of
  Homeland Security that the militarized federal presence is still here, waiting.  I interpret
  these statements to mean that if protesters once again strongly, and in large groups,

---

[6] Oregon State Representatives Karin Power and Janelle Bynum also allege that Defendants have
"frustrated [their] right and ability to set state law enforcement policy applicable in Portland and
throughout the state of Oregon," and thereby "diminished [their] ability to establish law
enforcement policy as [their] constituents direct."  F. Am. Compl. ¶ 31 (Rep. Porter), ¶ 34 (Rep.
Bynum).  Their declarations make clear, however, that their real complaint is that the "laws
[they] pass pertaining to policing" do not apply to federal law enforcement.  Power Decl. ¶ 4;
Bynum ¶ 6.  To the extent they seek legislator standing, the alleged injury to their state
legislature's power is "wholly abstract and widely dispersed," and they have not shown that they
are authorized to sue on behalf of their legislature.  *Raines v. Byrd*, 521 U.S. 811, 829 (1997).
*See also State v. U.S. Dep't of State*, 931 F.3d 499, 5107 (6th Cir. 2019) (holding that neither
legislators nor legislature had standing to pursue Tenth Amendment challenge).  Defendants
have also not nullified Plaintiffs' votes or interfered with their institutional role, the outer limit of
legislator standing.  *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954; *Raines*,
521 U.S. at 923 (1997); *Coleman v. Miller*, 307 U.S. 433, 446 (1939).

[7] Plaintiffs also include a declaration from Samuel Hill.  Hill Decl., ECF No. 21.  He states that
he is "married to a congregant of" First Unitarian and he "participate[s] in an affiliate group."
*Id.* ¶ 1.  He does not claim to be a member nor have any of the roles typical of membership, so
First Unitarian cannot assert associational standing on his behalf.  *See Hunt*, 432 U.S. at 344-45.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 14

promote a message of police reform and calls for justice, then militarized federal forces once again will spring into action."  Second Bynum Decl., EFC No. 33, ¶¶ 3-6.

• Oregon State Representative <u>Karin Power</u> states:  "On a personal level, I am nine months pregnant and am too fearful for the health of my unborn son to participate in protests downtown.  I fear for the well-being of my unborn son and family if I am gassed, sprayed, or severely injured by federal law enforcement—like so many other peaceful protesters.  My constituents have recounted fearfully, and in horror, being unexpectedly chased, gassed, sprayed and shot at by federal law enforcement in the course of protesting peacefully."  Power Decl., ECF No. 20, ¶ 5.

• <u>Dana Buhl</u>, Director of Social Justice for the First Unitarian Church of Portland ("First Unitarian"), on its behalf, states:  "The 'shock and awe' approach of federal law enforcement has chilled my Church's, and my fellow congregants', ability to . . . practice a crucial aspect of their faith.  I am aware of this chill based on the fears that congregants have expressed and the reduced or highly modified participation by our congregants in the ongoing protests against white supremacy, unjust police practices and the federal presence in Portland.  Because of the federal presence throughout downtown, I have spoken with congregants who genuinely are afraid of serious injury or reprisal if they physically protest."  He adds that he personally has "stopped declaratively protesting since the federal law enforcement agents arrived in Portland as part of Operation Legend.  I have continued observing and witnessing protests in order to safeguard congregants and others.  But, I am deeply concerned that, if I declaratively protest in addition to witnessing, I will be the target of federal surveillance or, worse, be abducted-all for exercising my deeply-held religious beliefs."  Buhl Decl., ECF No. 18, ¶¶ 4, 6.

• <u>Reverend Dr. William G. Sinkford</u>, on behalf of The First Unitarian Church of Portland, includes the same statement as Buhl.  He adds:  "We cannot, for example, protest in front of police headquarters (next to the Hatfield Courthouse), in front of the Justice Center (next to the Hatfield Courthouse) or in front of City Hall (across the park from the Hatfield Courthouse and the Federal Building) without risking being viewed as the 'Agitators' . . . .'"  Sinkford Decl., ECF No. 31, ¶¶ 7-8.

• <u>Eric Ward</u>, Executive Director of Western States Center, states:  "The ongoing presence of enhanced federal law enforcement, coupled with threats by the President and Acting Secretary Wolf, have chilled, and are chilling, the rights of Western States Center to assemble, to speak and to petition government for redress of grievances. . . .  [T]he presence of federal officers makes us unwilling to put our membership, and rally attendees—including elected officials, whom the federal officers have gassed recently— at risk. . . .  [W]e do not feel comfortable encouraging people to attend any such rally. . . . [M]uch of our membership tends to be older.  Given the risk of federal law enforcement measures, which have included liberal use of tear gas and munitions, we cannot responsibly encourage our membership to attend the events described above so long as the risk of federal intervention remains."  Ward Decl., ECF No. 32, ¶¶ 6-11.

The entirety of Plaintiffs' concerns is a "subjective 'chill'" that is not based on any threat

of specific future harm.  *See Laird*, 408 U.S. at 13.  This is not a case where any of the Plaintiffs

has individually suffered any past injury apart from the alleged chilling effect.  None even clearly states that he or she has attempted to attend a protest where federal law enforcement may be present.[8]  Their fears are entirely vague.[9]  Plaintiffs describe a general fear of the federal law enforcement presence.  While they describe a concern that federal law enforcement officers may injure them, they provide little to no specifics on the situation(s) within which they are concerned that would occur.  Representative Bynum, and both representatives of the First Unitarian Church on behalf of their congregants, leave it at a vague fear of being "injured."  Bynum Decl. ¶ 7; Buhl Decl. ¶ 4 ("congregants . . . afraid of serious injury or reprisal"); Sinkford Decl. ¶ 8 (same).  Such generic allegations of injury are hardly concrete and particularized.  *Lujan*, 504 U.S. at 560.

Several Plaintiffs mention a few more particular possible injuries.  The other two individual Plaintiffs—Eddie and Representative Power—and Ward on behalf of WSC express a fear being exposed to tear gas, and possibly other munitions.  Eddie Decl. ¶ 7 (protesters have been gassed with "no warning"); Power Decl. ¶ 5 (noting that constituents have been "unexpectedly chased, gassed, sprayed and shot"); Ward Decl. ¶ 11 (noting "liberal use of tear gas and munitions").  Setting aside that riot dispersal tactics are generally lawful, *see infra* Section II.B, Plaintiffs cannot state with any assurance that they are likely to be injured by federal officers' use of dispersal mechanism in anything but the most speculative and

---

[8] Buhl states that she has "continued observing and witnessing protests" but does not say whether they are ones near federal officers.  Buhl Decl. ¶ 6.  If she has attended those protests, it cuts against her case as she has not suffered any harm in any of them.  Regardless, as discussed, the only injuries she personally fears (abduction and surveillance) are also entirely speculative.

[9] Plaintiffs' counsel argue that they "have witnessed—both in-person and in extensive video coverage—what happens to protesters who, like themselves are unarmed and not causing property damage or otherwise breaking the law."  Pl. Mot. for Temp. Restraining Order and Preliminary Injunction ("Mot."), ECF No. 16, at 29.  Yet no Plaintiff anywhere says this, much less describes a single concrete instance of any alleged harm he or she has even seen, in any format.  None links their fears to any incident Plaintiffs describe in their brief.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 16

hypothetical terms.  Plaintiffs' alleged future harms are therefore also not traceable to the challenged conduct of Defendants.  *See Clapper*, 568 U.S. at 417 (holding that chilled action due to a generalized fear is not fairly traceable to specific alleged misconduct).

Even more speculative are other alleged future harms.  Two Plaintiffs mention a risk of being abducted by federal law enforcement.  Eddie Decl. ¶ 7; Buhl Decl. ¶ 6.  Again, neither provides any details of this fear such that it could be anything more than hypothetical.  Buhl also states that she is concerned that she will be "the target of federal surveillance" if she participates in the protests.  Buhl Decl. ¶ 6.  But not only does she provide no basis for this fear, it is also not any part of Plaintiffs' allegations of violations of the law; she therefore cannot trace the chilling of her speech to the violations of the law Plaintiffs *do* allege.  *See Clapper*, 568 U.S. at 417 ("[T]he costs that [she has] incurred to avoid surveillance [is] simply the product of [her] fear of surveillance" and "such a fear is insufficient to create standing.").  Similarly, Representative Bynum states that she and her family forgo exercising their "freedoms of speech and assembly" because of her great fear of "profiling," Bynum Decl. ¶ 9, which is also not part of Plaintiffs' allegations, and which is an injury not traceable to any complained-of conduct.

Furthermore, all Plaintiffs (with, perhaps, the exception of Buhl), have another, separate traceability problem.  Whereas they have all stated that they are too scared to attend the protests generally, they have not explained why they have not chosen to attend the protests while the protests are peaceful.  It is uncontested that protests in the same locations as violence occurs at night are wholly peaceful during the day—only once (in the relevant time period) have federal law enforcement dispersed protesters during the day, and these protests have almost never turned violent.  Russell Decl. ¶ 3.  No Plaintiff provides any account for why, when generally nonviolent protests occur during the day, he or she would even want, much less need, to attend

nighttime protests marked by violence.  Because Plaintiffs have chosen to forgo attending even those protests that have been clearly and consistently peaceful, they cannot trace the chilling of their conduct to any activity of federal law enforcement.  *See Clapper*, 568 U.S. at 417.

At bottom, no Plaintiff meets the high standard of showing that a specific, concrete injury is certainly imminent.  Indeed, even if each Plaintiff's fear was based on experienced injuries, that would still be wholly insufficient to receive prospective relief.  *Lyons*, 461 U.S. at 104; *O'Shea*, 414 U.S. at 495-96; *Rizzo*, 423 U.S. at 372.  Yet Plaintiffs are one step further removed.  While in *Lyons* the plaintiff had actually been choked, 461 U.S. at 104, here Plaintiffs have maybe seen news stories about uses of force and claim to be worried that it could happen to them *if* they attended the protests.  It would be as if Lyons had sued to stop chokeholds but had never experienced one because he avoided driving.  If Lyons could not meet Article III's strictures, there is no reason to think a person even one step further removed from the challenged conduct could do so.  Indeed, Plaintiffs are similar to the absent class members in *Rizzo* who lacked standing because they had never encountered one of the "small, unnamed minority of policemen" and only feared what those policemen "might do to them in the future."  423 U.S. at 372.  Plaintiffs have put forward no evidence showing that anyone, much less Plaintiffs, would be certainly subject to the particular injuries that they seek to prevent as unlawful *if* they took particular actions in attending particular protests in particular places.  Riots are quintessentially fluid in nature and difficult to predict.  And, in fact, that the situation here is fluid.  The daytime protests have been almost entirely peaceful, and since July 30, 2020, federal law enforcement have on most days ceased interacting with protesters.[10]

---

[10] Because all of the First Unitarian's and WSC's members lack standing, they do too.  *Hunt*, 432 U.S. at 343.  But even if some member of one of these organizations did have an injury, the

### C.    Plaintiff Organizations Fail to Establish Standing

Plaintiffs WSC and the First Unitarian Church do not specifically address organizational

standing in their motion.  In any event, such an argument would fail.  Plaintiffs allege that

WSC's mission includes "promot[ing] peaceful protest and reconciliation"; it "teaches peace, de-

escalation and reconciliation"; and in past years it has "worked closely" with Portland to

"deescalate conflict between protesters and Portland Police Bureau" and sponsored a "non-

violent" rally in 2018.  F. Am. Compl., ECF No. 14, ¶ 21.  Plaintiffs allege that Defendants'

"overreach into the affairs of local law enforcement has caused WSC to suffer injury" because

when "the Federal Government arrived and began to undertake purported law enforcement

actions on the streets of Portland," that "disrupted WSC's efforts and frustrated its mission," and

"required WSC to divert resources away from other programs in order to address the chaos the

defendants caused when they overstepped the constitutional bounds limiting their authority to

engage in purported law enforcement activities."  *Id.* ¶ 22.  But the only diversion of resources

that Plaintiffs specifically allege is the following:

> "(1) WSC spent funds from its communications retainer to issue statements and
> disseminate information to the public and to WSC's supporters; (2) the executive
> director has spent approximately 70-percent of his time, over the past four days,
> addressing the disruption defendants' police practices have caused; (3) the
> executive director involved two other staff members in his efforts; and (4) WSC
> has had to retain a second communications firm."

*Id.* ¶ 23.

Ward, on behalf of WSC, also states that the "presence of enhanced federal law

enforcement" along with "threats by the President and Acting Secretary Wolf" are "chilling"

---

organization would still not have standing because the lawsuit would require that member's
participation to establish the particular circumstances of why a particular injury fairly traceable
to Defendants' is certainly impending, which is a fact-specific inquiry.  *Id.*

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 19

WSC in exercising its rights "to assemble, to speak and to petition government for redress of grievances." Ward Decl. ¶ 6. He also mentions two specific events that WSC has not held. WSC is endorsing a ballot initiative and would like to plan a rally to promote it near Portland Police Bureau headquarters, but "the presence of federal officers makes [WSC] unwilling to put [its] membership, and rally attendees . . . at risk." *Id.* ¶¶ 7-8. Similarly, WSC is calling for the resignation of Portland Police Association President Daryl Turner" and would like to hold a rally, but "because of the presence of 'enhanced' federal law enforcement officers, combined with publicized threats from the President and Acting DHS Secretary to use those forces against 'Agitators' and 'Anarchists,'" WSC does not feel "comfortable encouraging people to attend any such rally." *Id.* ¶ 9. WSC believes that the purpose of a meeting between Turner and the Acting DHS Secretary "was to reassure Turner that federal law enforcement would" quell calls for police reform, and so would "disrupt protests calling for Turner's resignation." *Id.* ¶ 10.

WSC's alleged injuries are insufficient to confer organizational standing. With regard to diversion of resources, while that can be "broadly alleged," such allegations must still indicate that the organization used those resources to "counteract" specific conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Rodriguez*, 930 F.3d at 1134 (noting that the diversion of resources must be to "combat" the particular injury that has frustrated the organization's goals). Not only does WSC not identify the specific practices it has challenged, but it does not allege that it has even "challenged" them. Instead, it says it "address[ed] the chaos the defendants caused." Chaos is not the challenged conduct. And WSC's allegations about how it "address[ed]" such chaos amount to only vague "communications." But if an organization could create standing simply by talking about something within its general area of interest, the requirement for a concrete injury in fact would dissolve, and standing would require "simply a

setback to the organization's abstract social interests." *Havens*, 455 U.S. 363 at (1982). Further, WSC has not alleged that any diversion of its resources has been in service of "combat[ing] the challenged practices." *Am. Diabetes Ass'n*, 938 F.3d at 1154-55 (collecting cases). *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organization had standing when it diverted resources to educate members and staff on why they should not be deterred by the challenged law from continuing to assist with homeless program for undocumented aliens). To the contrary, Ward made clear that WSC is not counteracting federal law enforcement, or members' fears about it, because they are too old to attend the protests given the potential for a riot. *Id.* ¶ 11. It is thus a mystery what "statements" and "information" were being disseminated to the "public" and WSC members. WSC has failed to show that its diversion of resources was an injury in fact traceable to the challenged conduct of Defendants.

Similarly, the frustration of WSC's ability to hold rallies does not confer standing. In many organizational standing cases, participants were deterred from assisting the organization by the challenged conduct, but the organization demonstrated standing through diverting resources to *fight that deterrence* by educating and empowering those individuals. *See, e.g.*, *Am. Diabetes Ass'n*, 938 F.3d at 1154-55 (collecting cases); *Valle del Sol*, 732 F.3d at 1018. Here, WSC has not attempted to combat the challenged conduct, other than through litigation (which is insufficient). *Rodriguez*, 930 F.3d at 1134 (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). And even if it could demonstrate an injury, WSC cannot demonstrate that any such injury is traceable to the challenged conduct for the same reasons that its members cannot establish traceability for their asserted injuries. *See Physicians Comm. for Responsible Med.*, 292 F. App'x at 545. WSC, like its members, may be subjectively chilled from holding rallies, but that is not based on a specific

threat of harm that is certainly impending if they were to hold the rallies. *See La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 n.4. For example, WSC asserts a "risk" that, if it held a ballot initiative rally, the attendees would be "gassed," Ward Decl. ¶ 8, but that is a vague allegation without context and is not sufficiently traceable to the wrongdoing of Defendants. WSC also does not address why the rally could not be held during the day. Regarding the rally in support of the resignation of Turner, WSC claims that it was deterred because of general statements about federal law enforcement responding to violent opportunists, Ward Decl. ¶ 9, but that further highlights the traceability problem. Ward also speculates about the motivation for a meeting between Turner and the Acting DHS Secretary, and based on that further speculates that federal law enforcement would "disrupt protests calling for Turner's resignation." *Id.* ¶ 10. But WSC provides no evidence for either belief, except the "President's stated hostility toward people who question law enforcement" and the text of Executive Order 13933, *id.,* which, as discussed *infra*, concerns purely criminal conduct. Nor does WSC explain why the rally would need to be held near federal property, nor why federal law enforcement would travel somewhere else to stop it. This chain of speculation is insufficient to confer standing. *Clapper*, 568 U.S. at 410; *Whitmore*, 495 U.S. at 157-60.

The allegations relating to First Unitarian are even more vague than WSC's. First Unitarian alleges that it has a "social justice mission" and "encourage[s] protest against unjust laws and government actions." F. Am. Compl. ¶ 25. It states that since the arrival of an additional federal law enforcement personnel, "congregant participation in the protests has dropped" and its "social justice mission has been harmed." *Id.* First Unitarian "has become hesitant to encourage its congregants to protest . . . because defendants' unconstitutional targeting of peaceful protesters increases both the risk of bodily harm to congregants and the

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 22

likelihood of the church's civil liability who are injured or traumatized in the course of abduction by federal law enforcement." *Id.* ¶ 26. Dr. Sinkford opines that First Unitarian cannot protest near the Hatfield Courthouse and the Federal Building "without risking being viewed as the 'Agitators' that the President has deemed worthy of being 'cleaned out.'" Sinkford Decl. ¶ 8. These statements do not even attempt to demonstrate injury through the diversion of resources. To the extent that First Unitarian is claiming that it, like any of its congregants, is deterred from demonstrating, it has the same problems with asserting merely a subjective chill; vague, speculative injuries (such as a speculative fear of abduction or targeted by federal law enforcement); and a lack of traceability (it does not explain why it has not attempted protests during the day). Accordingly, like WSC, it lacks standing.

## II.    Plaintiffs Are Not Likely to Succeed on the Merits By Alleging Isolated Instances of Harm to Other People

Having failed to provide evidence of a single cognizable injury to themselves that is traceable to federal law enforcement, much less evidence to show that such an injury is certainly impending, Plaintiffs instead turn to pointing to isolated instances of alleged harm to other people unrelated to this lawsuit. This Court has already held that such isolated incidents, even if they involve constitutional violations, are not sufficient to demonstrate certainly impending injury under *Lyons*. *Rosenblum*, 2020 WL 4253209, at *6. Yet Plaintiffs do not even demonstrate how the isolated incidents show constitutional violations.

### A.    Plaintiffs Have Not Demonstrated Any Tenth Amendment Violation or Injury

"The exemption afforded by the tenth amendment is a narrow one. It shields states only from direct interference with their sovereignty." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1471 (9th Cir. 1983) (citation omitted). Plaintiffs' theory under the

Tenth Amendment, by contrast, is exceedingly broad and vague—that federal law enforcement are violating it by engaging in "plenary policing," essentially doing what only state and local police may do. Mot. at 18. Plaintiffs cite no case that suggests that they may challenge the practice of law enforcement generally as violating the Tenth Amendment. Instead, they cite cases challenging federal statutes under the Tenth Amendment. The burden in those cases was high; "Federal legislation does not violate the tenth amendment unless it endangers the states' separate and independent existence." *Bonnette*, 704 F.2d at 1471. They are also irrelevant to Plaintiffs' challenges. Unlike in *Oregon v. Trump*, 406 F. Supp. 3d 940, 970-72 (D. Or. 2019), here there is no facial challenge to a federal statute, much less one based on anti-commandeering principles. The vague harms of law enforcement practice alleged here are also clearly of a different character than those in *Bond v. United States*, 572 U.S. 844, 858 (2014), in which the Supreme Court chose an interpretation of a federal criminal law that did not convert every misuse of a chemical into a federal crime. *Id.* at 857-866.

Plaintiffs put forward three ways federal officers may be engaging in plenary policing: enforcing state or local laws; acting to protect property other than federal property; or making warrantless arrests for misdemeanors or infractions. Mot. at 18. These theories do not challenge the relevant legislation empowering federal law enforcement officers, including 40 U.S.C. § 1315; indeed, Plaintiffs' cite that statute as *not* covering two of those three actions. At most, Plaintiffs have challenged federal officers' implementation of their statutory authority, though not clearly. Yet to the extent the three types of plenary policing are not supported by federal statute, they are more correctly thought of as being *ultra vires* rather than an attempt by federal law to displace state sovereignty. In any event, courts do not lightly find that federal government actions violate the Tenth Amendment or interfere with state sovereignty. *Bonnette*, 704 F.2d at

1471.  Federal law enforcement officers' protection of themselves and federal property neither requires state entities to do anything nor prohibits them from doing anything related to their police powers.

Regardless of Plaintiffs' theories, their alleged "record evidence of plenary policing" also fails to demonstrate as much.  *See* Mot. at 21-23.  Plaintiffs recite pieces of declarations from Ryan Malia, Amanda Dunham, and Samuel Hill, but they do not even analyze those incidents or explain how they constituted "plenary policing."  They allege that federal law enforcement officers pushed crowds back several blocks (up to four, though Plaintiffs incorrectly indicate it was farther) on four separate nights.  Malia Decl., ECF No. 25, ¶¶ 4-6; Dunham Decl., ECF No. 23, ¶¶ 3-6; Hill Decl., ECF No. 21, ¶¶ 2-12 & Ex 11.  They do not explain how this was plenary policing or otherwise improper.  Each of those nights, federal law enforcement officers pushed back violent crowds that had attempted to breach the Hatfield Courthouse or vandalize it, and those crowds had physically resisted and assaulted the federal officers (which are all *federal* crimes).  Russell Decl. ¶ 7.  Plaintiffs also note that Malia witnessed a protester who had been "holding an American flag and a leaf blower" being arrested, but he did not "witness that protester either behave aggressively toward the federal police or attempt to damage property."  Malia Decl. ¶ 7.  In the video Malia linked, the protester refused to move despite repeated commands.  Moreover, protesters used leaf blowers, such as the one held by the person arrested, to blow gas and smoke back at federal officers; in several of the videos Malia posted in the same twitter thread as Malia's referenced video, protesters are using leaf blowers like this, including one protester conspicuously holding an American flag.[11]

---

[11] See videos at https://twitter.com/45thabsurdist/status/1286590300241006592?s=20; https://twitter.com/45thabsurdist/status/1286588978578075648?s=20.

Plaintiffs assert that federal law enforcement officers "terrorized" Dunham when they briefly trained their weapons on her, Mot. at 22-23 (citing Dunham Decl. ¶ 7), but do not explain how her not being arrested was "plenary policing," nor why a protester entering a vehicle (which can be used a deadly weapon) should not warrant a cautious response. Finally, Plaintiffs raise the Pettibone incident from *Rosenblum*, 2020 WL 4253209 at \*2. Setting aside the standing problems with this incident already determined in *Rosenblum*, *id.* at \*6, these allegations fall well short of establishing some kind of actionable Tenth Amendment claim based on improperly expansive federal policing. Plaintiffs have surely not shown that federal officers were attempting to enforce state or local law, rather than to conduct an investigation off of federal property for a federal offense committed against federal officers on federal property, *see* 40 U.S.C. § 1315(b)(2)(E).

Plaintiffs also attempt to impute to Defendants an intent to engage in plenary policing using tweets and comments from the President. *See* Mot. at 19-21. Not only do these comments fail to express an intent to take any specific plenary policing actions (some contemplate using the National Guard under a different set of authorities), only one even concerns Portland.[12] Moreover, that statement, its full context, clearly and exclusively concerns the federal response to attacks on federal officers and federal property, which are federal *felonies*; the authority of federal law enforcement to arrest for such felonies is not disputed.[13]

---

[12] The first two statements concerned using the National Guard in Minneapolis. Davidson Decl., EFC No. 17, Ex. 13, 14. The third is about Seattle. *Id.* Ex. 2. The fourth was about vandals tearing down statues. *Id.* Ex. 4. The fifth and seventh were about Operation Legend, including deploying DHS Homeland Security Investigations officers (who are not involved in this case) to cities other than Portland. *Id.* Ex. 5, 15.

[13] Plaintiffs also include additional tweets and statements in their Supplemental Memorandum in Support of Motion for Preliminary Injunction ("Supp. Mot.), ECF No. 29, which they assert also show an intent to engage in plenary policing. Supp. Mot. at 3. As with the statements in their

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 26

**B.    Plaintiffs Have Not Demonstrated Any First Amendment Violation or Injury**

Plaintiffs also attempt to make First Amendment claims under various theories.  All of their theories are underdeveloped—they never once recite a complete list of the elements of a particular First Amendment claim and simply do not address some critical elements.  Like their Tenth Amendment claim, these claims rest on isolated incidents concerning people who are not Plaintiffs.  But some also seem to rest on assumed violations of the Fourth Amendment—which they never even attempt to explain in their brief (other than a single incident discussed below).

First, Plaintiffs argue that Defendants have violated First Amendment rights (not theirs) by using crowd control devices on non-violent protesters, but the case law they cite is mostly about excessive force.  Mot. at 25-26.  Nowhere in Plaintiffs' motion do they assert that all use of force by federal law enforcement has been or will be unlawful.  And it is clear that use of tear gas and other force against violent crowds, even those that may include non-violent protesters who refuse to move, *is* lawful.  *See, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 816-18 (9th Cir. 2018) (finding use of batons to disperse unruly crowd was not excessive force); *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001) (holding threat and use of chemical irritant to disperse unruly crowd, where they were interfering with arrest, was not unreasonable); *United Steelworkers of Am. v. Milstead*, 705 F. Supp. 1426, 1430, 1437 (D. Ariz. 1988) (holding use of strong tear gas "for outdoor use only" on crowd gathered inside that had been throwing objects was not excessive force, even though innocent people also inside).

Regardless, even Plaintiffs do not dispute that there is no First Amendment protection for protests that have become violent riots.  Mot. at 25.  *See Grayned v. City of Rockford*, 408 U.S.

---

initial motion, Plaintiffs mischaracterize these.  Some relate to National Guard deployment.  *Id.* at 6-7.  Plaintiffs omit context for the President's statements that show he was talking about "hav[ing] the courthouse very well secured."  Second Davidson Decl., ECF No. 30, Ex. 1.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 27

104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as

expression under the First Amendment").  While they assert that federal law enforcement have

used excessive force against "a non-violent gathering without any warning to disperse," this is

based on Dunham's singular experience, Dunham Decl. ¶ 3, which is controverted by testimony

that the crowd that evening was violent and an order to disperse was given, Russell Decl. ¶ 7.[14]

They cite a Facebook post by an individual who was allegedly shot, but that post lacks context

and does not even disclaim that the protests were violent.  Davidson Decl. Ex. 12.  They also cite

a news article about a man who was struck by batons and pepper-sprayed.  Mot. at 12 (citing

Davidson Decl. Ex. 11).  Yet even that article noted that federal law enforcement had emerged

because rioters were tearing down the perimeter fencing at the Hatfield Courthouse.  Davidson

Decl. Ex. 11.  Plaintiffs have not demonstrated, especially based on the paltry record, that this

incident involved excessive force, *see Felarca*, 891 F.3d at 817-18, and Plaintiffs have not even

attempted to show a First Amendment right to approach federal law enforcement in such

circumstances to have a "talk," Davidson Decl. Ex. 11.

Second, Plaintiffs assert that federal law enforcement has "secur[ed] an overbroad public

space in supposed defense of security" of the Hatfield Courthouse by pushing protesters several

blocks.  Mot. at 27.  Plaintiffs cite two cases.[15]  The Ninth Circuit explicitly found that neither of

---

[14] Plaintiffs also describe a few other incidents in their fact section that they never use in their arguments, including one about Mayor Ted Wheeler.  Wheeler Decl., ECF No. 22.  He asserts that federal law enforcement used tear gas at 11 P.M. on July 22 and that he "did not personally observe anything that would have required" it.  *Id.* ¶ 2, 5, 7.  He notes, however, that protesters were throwing things over the fence, *id.* ¶ 5.  Federal law enforcement had to disperse the crowd because they attempted to breach the perimeter and assaulted federal officers, Russell Decl. ¶ 7.

[15] In one, a 75-yard security zone around fleet week was held to be too large because there had been no security threats and protesters would be effectively excluded from reaching their intended audience.  *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227–29 (9th Cir. 1990).  In the other, a citywide ban on demonstrations following the Rodney King verdict was

those cases precluded holding that an order shutting down large portions of downtown Seattle was constitutional, where there were thousands of protesters and a "pattern of chaotic violence" that resulted in a forceful police response.  *Menotti v Seattle,* 409 F.3d 1113, 1128-42 (9th Cir. 2005).  Regardless, these cases are irrelevant because federal law enforcement has not set up a large, permanent security perimeter.  It has instead pushed back crowds temporarily after the crowds have attempted to destroy federal property and become violent, Russell Decl. ¶ 7, which, as discussed, undisputedly did not violate First Amendment rights.

Third, Plaintiffs argue that Defendants have unconstitutionally chilled their speech.  Their standing to assert this claim has already been discussed.  It is notable, however, that in discussing the merits, Plaintiffs cite only half of the standard.  Mot. at 28 (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).  In addition to showing a chill, Plaintiffs must also showing that such deterrence was a "substantial or motivating factor" in Defendants' conduct.  *Mendocino Envtl. Ctr.*, 192 F.3d at 1300.  Plaintiffs do not even attempt to show that federal law enforcement officers' actions in responding to violent riots are somehow aimed at suppressing peaceful speech.

Instead (and fourth), Plaintiffs suggest that Executive Order 13933 and related statements show that Operation Legend "is meant to quash speech."  Mot. at 29.  But DHS deployment in Portland is under Operation Diligent Valor, and is in support of protecting federal buildings—it is different than Operation Legend, which concerns a different mission and only other cities. Russell Decl. ¶ 5.  Plaintiffs criticize Executive Order 13933 because they characterize it as directing action against the "radical fringe" or the "left-wing extremists," which they assert is

---

held unconstitutional where there had been only a few instances of violence and no serious injuries.  *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996).

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 29

punishment for those viewpoints.  Mot. at 30 (citing Exec. Order 13933, 85 FR 40081).  But the

Executive Order specifically addresses "rioters, arsonists, and left-wing extremists" who "carried

out and supported" acts of "sustained assault on the life and property of civilians, law

enforcement officers, government property," and monuments—all criminals who have

committed crimes.  Exec. Order 13933, 85 FR 40081 § 1.  Moreover, the Order argues that it is

*state and local governments* who have given free rein to those mobs *because of their viewpoint*,

and "have lost the ability to distinguish between the lawful exercise of rights to free speech and

assembly and unvarnished vandalism."  *Id.*  And it calls for the prosecution of "any person or

any entity" that commits the specified crimes, regardless of viewpoint.  *Id.* § 2.  There is no basis

for finding that it directs law enforcement against a viewpoint rather than against crimes.

### C.      The Injunction Demanded by Plaintiffs is Unsupported by the Record

While Plaintiffs have not made out a likelihood of success on the merits of any of their

claims, the specific relief demanded by Plaintiffs is also entirely unsupported by their claims.

Injunctive relief "must be tailored to remedy the specific harm alleged."  *Stormans, Inc. v.*

*Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*,

941 F.2d 970, 974 (9th Cir. 1991)).  A preliminary injunction must be designed "to preserve the

status quo ante litem"—that is, "the last uncontested status which preceded the pending

controversy"—"pending a determination of the action on the merits."  *Boardman v. Pac. Seafood*

*Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016).  A preliminary injunction also must "describe in

reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  Yet the

requested terms are vague and unrelated to even Plaintiffs' broadest allegations.

The first, fourth, sixth, and seventh paragraphs of the proposed injunction restrict

Defendants to federal property.  The first paragraph requests that the Court prohibit Defendants

from engaging in law enforcement activities of any kind outside of the immediate vicinity of any federal property, with no limitation to the protests (meaning it would prohibit, *inter alia*, apprehending dangerous criminal aliens elsewhere) or even to the city of Portland. The subsequent paragraphs request that the Court prohibit Defendants from engaging in a variety of ways with any individuals present at the protests who are more than 100 yards from the Federal Courthouse. These requests are not tailored to the harms alleged in this case, nor do these requests secure some status quo. Defendants are not subsuming the functions of the state by operating outside of the Courthouse, and Plaintiffs have not even made a claim that the Defendants are without authority to carry out some federal law enforcement functions outside of federal property. To the extent that these paragraphs rely on the idea that the First Amendment rights of various people at the protests are violated if they are subject to crowd control measures by Defendants despite not themselves being presently engaged in any illegal behavior, they are unsupported by law. Plaintiffs have also not made any specific Fourth Amendment claims and cannot base any relief on such a theory. Moreover, the limitations Plaintiffs propose, such as not approaching or physically contacting protesters unless they are already actively attacking the Courthouse or a federal officer, are clearly unworkable from a law enforcement perspective and will be dangerous to everyone present. Each of these paragraphs is also overbroad and includes various undefined terms that would expose Defendants to a risk of contempt even if some preliminary injunction were proper. *See* Fed. R. Civ. P. 65(d)(1)(C) (the terms do not "describe in reasonable detail … the act or acts restrained or required.").

The second and third paragraphs of the proposed injunction, regarding arrests, have similar problems. They are straightforwardly proposals for a bare "follow-the-law" injunction instructing Defendants not to violate the Fourth Amendment; the Fourth Amendment is not at

issue, and such an injunction is neither appropriate nor necessary. *See, e.g.*, *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941).

### III.    Plaintiffs Cannot Demonstrate Irreparable Harm

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman*, 822 F.3d at 1022. Separate from any Article III standing concerns, where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985).

Plaintiffs do not dispute this standard, but merely believe that they "can show a likely constitutional, and particularly First Amendment violation," because "irreparable harm has already occurred in the suppression of speech, and such harm will continue." Mot. at 33. For all of the foregoing reasons, Plaintiffs have not demonstrated injury. Likelihood of irreparable injury is also prospective, not retrospective; a plaintiff must show that he "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 374. There is no presumption of irreparable injury for a First Amendment retaliation claim. *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("[N]o presumption of irreparable harm arises in a First Amendment retaliation claim.").

Even if Plaintiffs had suffered injury from being deterred from protests, in light of the factual developments discussed *supra*, it is apparent that Plaintiffs face no likelihood of irreparable injury. It is undisputed that, since July 30, Defendants have had to make only

extremely limited responses to lawless activity aimed at federal property, and have only deployed for crowd control three times.  Russell Decl. ¶ 9; Supp. Mot. at 5.  It is Plaintiffs' obligation to present facts showing a likelihood, not merely a remote possibility, that the feared behavior will reoccur.  They have not done so.  Every indicator is that Plaintiffs' chances of encountering Defendants at a violent protest outside of the Hatfield Courthouse have lowered substantially.  And Plaintiffs have presented no evidence to show that the chance of encountering a federal agent at a violent protest is markedly higher now than it would have been in years past, when there were still occasional riots.  Plaintiffs are indeed advancing a theory that the mere presence of federal officers shows a likelihood of irreparable harm because of speculation that individual officers will someday commit sporadic violations of people's rights at future protests and that one of the Plaintiffs will be targeted.  The Supreme Court in *Lyons* expressly rejected the idea that an individual citizen faces a likelihood of irreparable harm just because there is a generalized risk that law enforcement officers may one day act unconstitutionally.  *Lyons*, 461 U.S. at 111 ("[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

## IV.    Both the Balance of the Equities and the Public Interest Weigh Against Granting an Injunction

Plaintiffs have not shown that the public interest or the balance of the equities[16] justifies restricting Defendants' lawful efforts to protect federal property.  While Plaintiffs' First and Tenth Amendment rights are important and worth protection, they have not established any violation of these rights, and the same substantive standards that govern those claims also weigh federal protection of federal property from attack more highly when they conflict.

---

[16] When the government is a party, as here, these last two factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Federal agents have deployed to protect various federal properties, including the Hatfield Federal Courthouse, in response to violent rioting.  Rioters have vandalized and threatened to severely damage those buildings, and they have assaulted the responding federal officers. Governments generally have a comprehensive interest in maintaining public order on their property, *Feiner v. New York*, 340 U.S. 315, 320 (1951), and there is an even more pointed public interest when disorder threatens the integrity of that public property, *United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) ("reasons of health and safety, and []the protection of property . . . . certainly represent significant government interests.").  Congress has recognized such interests, including by making the destruction of federal property and the assault of federal officers felonies punishable by lengthy sentences. 18 U.S.C. §§ 111, 1361. Additionally, there is a fundamental First Amendment right of access to the courts, *see, e.g.*, *Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014), which is jeopardized by the breach and destruction of a federal court building.  The federal government, just as any other property owner, has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated"; for government buildings, those uses are of course public uses that are in the public interest.  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992).

On balance, it is clearly in the public interest to ensure federal officers can disperse violent opportunists near courthouses and federal buildings when those events have turned and may continue to turn violent, and First Amendment law recognizes this.  *See, e.g.*, *Grayned*, 408 U.S. at 116; *Griefen*, 200 F.3d at 1260; *Bell v. Keating*, 697 F.3d 445, 457–58 (7th Cir. 2012) ("[O]therwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage.").  There is also no impediment under the Tenth Amendment to the federal government taking the necessary steps to protect federal property and

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 34

personnel.  Accordingly, both the public interest and the balance of the equities weigh in favor of

denying the injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for a Preliminary Injunction should be

denied.

Dated:  August 24, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

ANDREW I. WARDEN
Senior Trial Counsel

JEFFREY A. HALL
/s/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*