Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
SNELL & WILMER L.L.P.
One Centerpointe Drive, Suite 170
Lake Oswego, OR  97035
Telephone: (503) 624-6800
Facsimile: (503) 624-6888

Andrew M. Jacobs (*pro hac vice*)
ajacobs@swlaw.com
SNELL & WILMER L.L.P.
400 East Van Buren Street, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 382-6000
Facsimile: (602) 382-6070

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC., an Oregon public benefit corporation; THE FIRST UNITARIAN CHURCH OF PORTLAND, OREGON, an Oregon religious nonprofit corporation; SARA D. EDDIE, an individual; OREGON STATE REPRESENTATIVE KARIN A. POWER, an elected official; and OREGON STATE REPRESENTATIVE JANELLE S. BYNUM, an elected official, | Case No. 3:20-cv-01175-JR<br><br>**THIRD DECLARATION OF CLIFFORD S. DAVIDSON** |
| Plaintiffs, | |
| vs. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FEDERAL PROTECTIVE SERVICE; and UNITED STATES MARSHALS SERVICE | |
| Defendants. | |

## <u>THIRD DECLARATION OF CLIFFORD S. DAVIDSON</u>

I, Clifford S. Davidson, declare as follows:

1.      I am an attorney with Snell & Wilmer L.L.P., plaintiffs' counsel of record in this action. I have personal knowledge of the matters stated herein. If called upon to do so, I would testify truthfully as follows. With respect to the exhibits to this declaration that are PDFs of Internet materials, I have reviewed such Internet materials by following the links specified below. The exhibits hereto, which I have printed, or caused to be printed, as PDFs, are substantively identical to the websites referenced below.

2.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of a PDF of a tweet available as of September 7, 2020 at  https://twitter.com/realDonaldTrump/status/1300421406849671168. I have excerpted the Tweet from associated comments and advertisements.

3.      Attached hereto as <u>Exhibit 2</u> is a true and correct copy of an August 31, 2020 letter from Acting Secretary Chad F. Wolf to Portland Mayor Ted Wheeler. The letter is available as of September 7, 2020 at  https://www.dhs.gov/sites/default/files/publications/20_0831_as1_letter-ted-wheeler-portland.pdf.

4.      Attached hereto as <u>Exhibit 3</u> are true and correct copies of pages from the transcript of the August 4, 2020 Deposition of Officer Gabriel Russell taken by the plaintiffs in *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-01035-SI.

5.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of a PDF of a tweet available as of September 7, 2020 at https://twitter.com/realDonaldTrump/status/1300170578134003713. I have excerpted the Tweet from associated comments and advertisements.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on the 8th day of September, 2020 at Portland, Oregon.

                                                /s/ Clifford S. Davidson

Page 1 – THIRD DAVIDSON DECLARATION

4828-3068-3335



**Donald J. Trump** ✔
@realDonaldTrump

Portland is a mess, and it has been for many years. If this joke of a mayor doesn't clean it up, we will go in and do it for them!

6:13 AM · Aug 31, 2020 · Twitter for iPhone

**34.4K** Retweets    **3.8K** Quote Tweets    **185.8K** Likes

**Exhibit 1**
**Page 1 of 1**



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

August 31, 2020

Mayor Ted Wheeler
1221 SW Fourth Avenue, Suite 340
Portland, Oregon 97204

Dear Mayor Wheeler:

I have received your letter addressed to President Trump dated August 28, 2020. The President asked that I respond on his behalf.

You state in your letter that "[t]here is no place for looting, arson, or vandalism in our city." Unfortunately, you have failed to back up that sentiment with any action. In fact, your inaction has fostered an environment that has fueled senseless violence and destruction night after night. For more than three months, Portland has become the epicenter of crime and chaos, with rioters attacking government buildings with the intention of burning them to the ground. As of today, since July 31, 2020, there have been 255 arrests made by local law enforcement and 23 riots and unlawful assemblies declared. Despite this, you have stood by passively, arguing that the nightly violence "will ultimately *burn itself out*." The evidence demonstrates otherwise.

Due to a lack of action throughout the summer, Portland and its law-abiding residents continue to suffer from large-scale looting, arson, and vandalism—even killing. Businesses remain shuttered and Portlanders are held hostage by the daily violence that has gripped the city with no end in sight. This is precisely why President Trump has—and continues to—offer federal law enforcement assistance to Portland. And that is why I, in my capacity as the Acting Secretary of Homeland Security, was not only authorized, but statutorily *obligated*, to protect federal property and persons on that property.

With your letter you included a YouTube video in which your television interviewer attested that "there was more unrest in [Portland] last night. Portland police declared a riot, saying that protestors [*sic*] broke into the Police Association building, the union, and lit it on fire." That same YouTube video contained chilling footage of the arson that was terrorizing your city; and it was perpetrated by rioters, not by peaceful protesters. The chaos, destruction, and suffering in Portland are evils you can stop—and must stop. Consider what happened recently in Wisconsin—where the State of Wisconsin requested and received federal law enforcement assistance and the violence and looting there ended.

I hope you honor your commitment that "[t]hose who commit criminal acts will be apprehended and prosecuted under the law." To that end, I encourage you to work with and disabuse the District Attorney of Multnomah County of his refusal to prosecute individuals who have committed such crimes as: interference with a law enforcement officer, rioting, criminal trespass, second-degree disorderly conduct, escape, or a city ordinance violation. In short, ignoring criminal

**Exhibit 2**
**Page 1 of 2**

Mayor Ted Wheeler
Page 2

behavior is no way to protect the citizens of your community, the same citizens who entrusted you to hold elected office. We hope and expect that fairness and good judgment will prevail in Portland.

Accordingly, I urge you to prioritize public safety and to request federal assistance to restore law and order in Portland. We are standing by to support Portland. At the same time, President Trump has made it abundantly clear that there will come a point when state and local officials fail to protect its citizens from violence, the federal government will have no choice but to protect our American citizens.

DHS remains wholly committed to ensuring the rights of peaceful protesters and conducts all activities in full compliance with the Constitution and federal law. I am proud of our brave and selfless officers and of our federal, state, and local partners.

Sincerely,

Chad F. Wolf
Acting Secretary

**Exhibit 2**
**Page 2 of 2**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


INDEX NEWSPAPERS LLC,

et al.,

       Plaintiffs,

   v.                 No. 3:20-cv-01035-SI

CITY OF PORTLAND, et al.,

       Defendants.



VIDEO DEPOSITION OF GABRIEL RUSSELL

Taken in behalf of Plaintiffs

Tuesday, August 4, 2020



Reported by:   Marilynn Hoover, RPR

Oregon CSR No. 04-0387



Exhibit 3
Page 1 of 17

Page 5

```
 1        TUESDAY, AUGUST 4, 2020; AUBURN, WASHINGTON
 2             THE VIDEOGRAPHER:  We are now on the
 3   record.  Here begins the Zoom videotaped deposition
 4   of Gabriel Russell in the matter of Index Newspapers
 5   LLC versus City of Portland, in the U.S. District
 6   Court, District of Oregon, Portland Division, case
 7   number 3:20-cv-01035-SI.
 8             Today is August 4th, 2020.  The time is
 9   11:13.  This deposition is being taken over Zoom at
10   the request of BraunHagey & Borden LLP.  The
11   videographer is Emily Walter of Magna Legal
12   Services, and the court reporter is Marilynn Hoover
13   of Magna Legal Services.  All counsel will be noted
14   on the stenographic record.
15             Will the court reporter please swear in
16   the witness.
17             THE REPORTER:  The attorneys participating
18   in this deposition acknowledge that I am not
19   physically present in the deposition room and that I
20   will be swearing in the witness and reporting this
21   deposition remotely.  The parties and their counsel
22   consent to this arrangement and waive any objections
23   to this manner of reporting.
24             Please indicate your agreement by stating
25   your name and agreement on the record.
```



Exhibit 3
Page 2 of 17

1        MR. ACHARYA:  This is Athul Acharya for

2   plaintiffs, and I agree.

3        MR. GARDNER:  This is Josh Gardner on

4   behalf of the defendants, and I agree as well.

5        THE REPORTER:  Michelle, please.

6        MS. TONELLI:  Michelle Tonelli for

7   defendants.  I agree as well.

8             GABRIEL RUSSELL,

9   called as a witness, being duly sworn on oath, was

10  examined and did testify as follows:

11       MR. GARDNER:  Ms. Hoover, before we begin:

12  The defendants reserve the right to have the witness

13  read and sign.

14       THE REPORTER:  So noted.

15       MR. GARDNER:  Thank you.

16       THE REPORTER:  You may begin, counsel.

17            EXAMINATION

18  BY MR. ACHARYA:

19       Q.   Good morning, Officer Russell.  How are

20  you today?

21       A.   Good.  How are you?

22       Q.   Doing well.  Is it morning where you are?

23       A.   It is 11:16 a.m., so it's still morning

24  here.

25       Q.   You're -- You're in Portland?



Exhibit 3
Page 3 of 17

1   question.

2           You said you have situations -- seen

3   situations where...

4       A.   Where deploying additional forces resulted

5   in enhanced protection, which was the goal of the

6   operation.

7       Q.   I see.  Is Diligent Valor over?

8       A.   It is not.

9       Q.   So the extra CBP forces are still here?

10          MR. GARDNER:  Objection.  To the extent

11  that you can answer counsel's question without

12  divulging information that is subject to the law

13  enforcement privilege, you may do so.  To the extent

14  you cannot answer his question without divulging

15  such information, I instruct you not to answer.

16          THE WITNESS:  I'm not going to answer that

17  question.

18      Q.   BY MR. ACHARYA:  Are the extra ICE forces

19  still here?

20          MR. GARDNER:  Same objection and same

21  instruction.

22          THE WITNESS:  Same answer.

23      Q.   BY MR. ACHARYA:  When will the extra

24  forces leave?

25          MR. GARDNER:  Same objection, same



Exhibit 3
Page 4 of 17

1    instruction.

2             THE WITNESS:   Same answer.

3        Q.   BY MR. ACHARYA:   All right.   Let's talk

4    about the command structure of your position.

5             Who directly reports to you?

6        A.   The -- I'm the incident commander, the

7    deputy incident commander, and the staff sections

8    directly report to me.

9        Q.   Deputy incident commander, and what was

10   the other thing?

11       A.   Staff sections.

12       Q.   And there are several staff section

13   commanders?

14       A.   Yes, or supervisors --

15             (Reporter request.)

16             THE WITNESS:   Supervisors, people in

17   charge of staff section, not typically referred to

18   as commanders.

19       Q.   BY MR. ACHARYA:   And what does the deputy

20   incident commander do?

21       A.   Supervises the tactical commanders.

22       Q.   Okay.   And the tactical commanders are

23   different from the staff section commanders?

24       A.   I believe I already answered that staff

25   section supervisors are not referred to as



Exhibit 3
Page 5 of 17

Page 48

1          I'm going to put another Donald Trump

2     tweet into the chat.  This is going to be Exhibit 3.

3               (Exhibit 3 marked.)

4      Q.  BY MR. ACHARYA:  And while -- while you've

5     done all that, I'll read it into the record.

6          It says:  "Homeland Security is not

7     leaving Portland until local police complete cleanup

8     of anarchists and agitators."

9          Is it accurate to say that DHS's enhanced

10    presence is not leaving Portland until local police

11    complete cleanup of anarchists and agitators?

12     A.  Give me a second to -- That's -- That's a

13    hypothetical and I don't...

14     Q.  That's not a hypothetical.  That's a

15    question about what -- what Homeland Security is

16    going to do.

17         Are they -- Is DHS's enhanced presence

18    leaving Portland -- is not leaving Portland until

19    local police complete cleanup of anarchists and

20    agitators?  Is that true?

21     A.  I don't know the answer to that.

22     Q.  So you don't know when Homeland Security's

23    enhanced presence will leave?

24     A.  That's correct.

25              MS. TONELLI:  Objection; law enforcement



Exhibit 3
Page 6 of 17

Page 49

1    privilege.  We're -- We're going into -- it's the

2    same idea of when our officers may withdraw.

3                MR. ACHARYA:  Yeah, I think this tweet

4    waives that privilege.

5                MS. TONELLI:  No, because you're asking

6    for more detail.

7                MR. GARDNER:  Yeah, it does not waive any

8    privilege about the details of due law enforcement

9    efforts in Portland.

10               MR. ACHARYA:  That's a -- No, that's the

11   sword and shield situation.  If the --

12               MR. GARDNER:  It's not a sword and shield

13   at all, sir.  We'll have to agree to disagree.

14        Q.   BY MR. ACHARYA:  Let's talk about

15   coordination of forces.

16               How do you coordinate field operations

17   with the Marshals Service?

18        A.   There's a tactical command post at the --

19   at the federal courthouse, where the tactical

20   commanders of DHS and the tactical commanders of the

21   Marshals Service coordinate activities.

22        Q.   Do you -- Are you ever in that tactical

23   command post?

24        A.   I have been, yes, several times.

25        Q.   Are you -- Are you usually in that command



Exhibit 3
Page 7 of 17

Page 62

1                    (Reporter request.)

2            MR. GARDNER:  Yes.  Again, to the extent

3    the witness can answer that question without

4    divulging information that is subject to law

5    enforcement privilege, he may do so; otherwise, I

6    instruct the witness not to answer.

7            THE WITNESS:  I will not answer that.

8        Q.   BY MR. ACHARYA:  Does the Federal

9    Protective Service have the power to declare an

10   unlawful assembly?

11       A.   Yes.

12       Q.   Where does that authority come from?

13       A.   Our law enforcement powers, jurisdiction

14   and authority.

15       Q.   Does the Federal Protective Service have

16   the power to enforce such an order on Southwest

17   Fourth Street in Portland?

18       A.   That depends.

19       Q.   What would that depend on?

20                   (Reporter request.)

21       Q.   BY MR. ACHARYA:  Under what circumstances

22   would FPS have power to enforce an unlawful assembly

23   order on Fourth Street?

24       A.   The FPS jurisdiction and authority allows

25   FPS law enforcement officers to take enforcement



Exhibit 3
Page 8 of 17

Page 63

1    action on and around federal property for the

2    protection of federal property and people on it.

3              So if there was, for example, someone who

4    was off a federal property and they were committing

5    assaults against federal officers, using projectiles

6    or something of that nature, federal officers could

7    take enforcement action.

8        Q.    Understood.  But I'm asking about

9    dispersal orders, which are dispersal orders to

10   unlawful assembly; so we're not talking about any

11   actions against federal officers.

12             Does FPS have authority to enforce a

13   dispersal order against an unlawful assembly on

14   Southwest Fourth Street?

15       A.    On Southwest Fourth Street?

16       Q.    That's one street west of the federal

17   courthouse.

18       A.    Generally, no.

19       Q.    So you've policed protests, many protests?

20       A.    Yes.

21       Q.    Have you personally policed them on the

22   ground?

23       A.    Yes.

24       Q.    Can you tell me when and where?

25       A.    I -- The Federal Protective Service in



1   know, if a protest becomes violent, they have the

2   ability to move protesters -- you know, I don't want

3   to say anywhere they want, but a lot of different

4   areas in the city, while the federal authorities

5   are, you know, required to operate within a

6   reasonable distance of a federal facility.  So that

7   just -- So it necessitates different tactics.

8        Q.   Sure.  Understood.

9             So you're a supervisor.  Are you

10  responsible for making sure that the people that you

11  tactically command don't use excessive force?

12       A.   Yes.

13       Q.   Okay.  Do you see what -- what federal

14  agents did to the guy wearing the navy shirt,

15  Christopher David?

16       A.   Yes.

17       Q.   Did you think that was excessive force?

18            THE WITNESS:  Counsel, should I answer

19  this?

20            MR. GARDNER:  I mean, if you can do so

21  without disclosing information that is subject to

22  the law enforcement privilege or other privileges,

23  you may.  If you need to consult, we can also do

24  that.

25            THE WITNESS:  Can we consult briefly?



Exhibit 3
Page 10 of 17

Page 78

1   asked for the instruction -- which I'd like to

2   remind you once again that you're under oath and

3   that you can't assert the privilege unless the

4   privilege exists, and that your very competent

5   counsel will remind you if there's a possibility of

6   a privileged answer.

7        MR. GARDNER:  And I will remind counsel

8   that, as a law enforcement officer, he is well

9   positioned to know what sort of information

10  implicates the law enforcement privilege.  To the

11  extent he believes the information you are asking

12  for does implicate that privilege, he has every

13  right and responsibility not to disclose that

14  information.

15       MR. ACHARYA:  Of course.  Just --

16       MR. GARDNER:  You seem to be suggesting to

17  him otherwise.

18       MR. ACHARYA:  Let's go back to questions.

19       Q.   BY MR. ACHARYA:  So we were talking about

20  Christopher David, and you saw the video of the

21  federal agents beating him with their batons.

22            Did you think that was excessive force?

23            MR. GARDNER:  Objection; calls for a legal

24  conclusion.

25            THE WITNESS:  I -- I observed some video



Exhibit 3
Page 11 of 17

Page 79

1    of the incident that I believe you're referring to,

2    and a thorough investigation might reveal

3    information that I don't know of, or other video,

4    but the -- but the video that I saw, it did appear

5    to me to be excessive force.

6        Q.    BY MR. ACHARYA:   Okay.   Did you train

7    those officers to do that?

8        A.    The officers involved in that did not --

9    did not work for me, did not answer to me.

10       Q.    Who do they work for?

11       A.    They don't belong -- I don't believe that

12   they belong to the Department of Homeland Security

13   and were not operating under my tactical control or

14   supervision.

15       Q.    Were they part of the United States

16   Marshals Service?

17       A.    I've -- I've been told that.   I don't -- I

18   don't know that for sure, but I've -- I've been told

19   that.

20       Q.    Thank you.   So, as a supervisor, you're

21   responsible for making sure that people you're

22   supervising conduct themselves according to the

23   rules; is that correct?

24       A.    Yes.

25       Q.    Have you read the declarations that we



Exhibit 3
Page 12 of 17

Page 82

1    any matches, but that's just for FPS.

2              I think I explained earlier:  I have

3    tactical control of the DHS forces; I do not have

4    administrative control.  Each component has their

5    own use of -- use of force reporting chain of

6    command.

7         Q.   Are you responsible for the -- Are you

8    responsible for the conduct -- Are you responsible

9    for making sure that the agents assigned to Diligent

10   Valor in Portland conduct themselves according to

11   the rules?

12        A.   Their immediate supervisors are generally

13   responsible for ensuring that any law enforcement

14   officer who witnesses misconduct by another law

15   enforcement officer is responsible -- a federal

16   officer, is responsible to try and stop the behavior

17   and to report the misconduct.

18        Q.   Do you keep logs of which agents are

19   assigned to which duties?

20        A.   For our agency, generally, yes.

21        Q.   Do you keep logs for Diligent Valor?

22        A.   Generally, yes.

23        Q.   Okay.  Do you track agents' locations?

24             MR. GARDNER:  Answer that question with a

25   yes or a no -- that does not call for privileged



Page 83

1    information -- and then we can wait for the next

2    question.

3                THE WITNESS:  It's not -- not -- We don't

4    track their specific location except that as they

5    report it.  So they -- you know, they're going to

6    have an assignment, so to speak, but they move

7    around over the course of, you know, an operational

8    period.  And --

9          Q.    BY MR. ACHARYA:  Do you keep recordings --

10         A.    Go ahead.

11         Q.    Sorry.  Finish your -- Finish your answer.

12         A.    So their -- their movements of, you know,

13   officers and agents that might be reflected in, you

14   know, the log as they call things out on the radio

15   or something.

16         Q.    Okay.  Do you keep recordings of radio

17   transmissions?

18                MR. GARDNER:  Again, you can answer that

19   question with a yes or no.

20                THE WITNESS:  The FPS radio system, there

21   are recordings that are kept.  I can't speak for

22   other components.

23         Q.    BY MR. ACHARYA:  And do you track agents'

24   use of munitions?

25                MR. GARDNER:  I'm sorry.  Can you repeat



1      Q.    In this operation, you have not used tear

2   gas.

3            So do you do anything to help you identify

4   what FPS agents are at a given location at a given

5   date and time?

6            MR. GARDNER:  Objection; vague.  Also, I'm

7   not sure I understand the question; but to the

8   extent it's calling for information that would be

9   subject to the law enforcement privilege, I would

10  instruct you not to answer.

11           Maybe you could rephrase it.

12           MR. ACHARYA:  Sure.

13      Q.   BY MR. ACHARYA:  The question is:  You

14  know, we have about 30 declarations now of uses of

15  force that are unlawful and in violation of the

16  First Amendment.  I think you've said you've read at

17  least the ones submitted in support of the TRO.

18           So my question is:  A lot of those talked

19  about a place, a time, a location.  Do you have

20  information sufficient to know which agents were

21  present at that place, time, and location?

22           MR. GARDNER:  I see.  I understand the

23  question now.

24           Objection.  Mischaracterizes the documents

25  you're referring to.  No further objections.



Page 86

1          Q.   BY MR. ACHARYA:  Please answer.

2          A.   I believe I already answered that, that I

3   believe it's seven incidents that reported to, and

4   we compared those with our -- with our FPS use of

5   force reports, and we did not find a direct

6   correlation between the complaints and FPS use of

7   force.  There may be other agencies involved in the

8   operation, that that used a similar type of analysis

9   and discovered a match.

10         Q.   So CBP and ICE uses of force, do you have

11  any ability to look at those?

12         A.   No.  They have their own computer systems.

13              MR. ACHARYA:  So I'm going to put a

14  declaration into the record here.  This is the

15  declaration of Mathieu Lewis-Rolland, signed on July

16  22nd, 2020, docket number 77.

17              Tell me when you have it open.

18              THE REPORTER:  Marked next in order,

19  counsel?

20              MR. ACHARYA:  Sorry.  Yeah, next in order.

21  So what was that, Exhibit 5?

22              THE REPORTER:  Correct.

23                   (Exhibit 5 marked.)

24              THE WITNESS:  So where -- I have it.  What

25  paragraph are you looking at?



Page 132

1                        REPORTER CERTIFICATE

2

3        I, MARILYNN HOOVER, CSR No. 04-0387 for the

4    State of Oregon, do hereby certify:

5        That prior to being examined, the witness named

6    in the foregoing deposition was duly sworn to

7    testify the truth, the whole truth, and nothing but

8    the truth;

9        That said deposition was taken down by me in

10   shorthand at the time and place therein named, and

11   thereafter reduced by me to typewritten form; and

12   that the same is a true, correct, and complete

13   transcript of the said proceedings.

14       Before completion of the deposition, review of

15   the transcript [X] was [ ] was not requested.  If

16   requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   shall be appended hereto.

19       I further certify that I am not interested in

20   the outcome of the action.

21       Witness my hand this 6th day of August 2020.

22

23   _____

24   MARILYNN HOOVER, RPR

25   CSR No. 04-0387; Exp. 03/31/2023





**Donald J. Trump** ✓ @realDonaldTrump · Aug 30

Ted Wheeler, the wacky Radical Left Do Nothing Democrat Mayor of Portland, who has watched great death and destruction of his City during his tenure, thinks this lawless situation should go on forever. Wrong! Portland will never recover with a fool for a Mayor....

💬 15.4K      ↻ 34.9K      ♡ 126.5K      ⬆

**Donald J. Trump** ✓
@realDonaldTrump

....He tried mixing with the Agitators and Anarchists and they mocked him. He would like to blame me and the Federal Government for going in, but he hasn't seen anything yet. We have only been there with a small group to defend our U.S. Courthouse, because he couldn't do it....

1:36 PM · Aug 30, 2020 · Twitter for iPhone

**16.5K** Retweets    **414** Quote Tweets    **71.5K** Likes

💬          ↻          ♡          ⬆

**Donald J. Trump** ✓ @realDonaldTrump · Aug 30
Replying to @realDonaldTrump

..The people of Portland, like all other cities & parts of our great Country, want Law & Order. The Radical Left Democrat Mayors, like the dummy running Portland, or the guy right now in his basement unwilling to lead or even speak out against crime, will never be able to do it!

💬 8.6K      ↻ 20.2K      ♡ 78.2K      ⬆

**Exhibit 4**
**Page 1 of 1**