JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
JEFFREY A. HALL (DC 1019264)
Counsel, Civil Division
JORDAN VON BOKERN
KERI BERMAN
JASON LYNCH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 353-8679
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC, *et al.*, | Case No. 3:20-cv-01175-JR |
| Plaintiffs, | **DEFENDANTS' MOTION TO STAY THE PRELIMINARY INJUNCTION PENDING APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY** |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MOTION TO STAY THE PRELIMINARY INJUNCTION PENDING
APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY**

Defendants respectfully move this Court under Federal Rule of Appellate Procedure

8(a)(1) to stay the Preliminary Injunction, Dkt. No. 50, pending appeal, and to grant an

immediate administrative stay of the Preliminary Injunction while the Court considers this

Motion.  In support of this Motion, Defendants refer the Court to the attached Memorandum.

Pursuant to Local Rule 7-1, Defendants certify that their counsel have conferred in good faith

with counsel for Plaintiffs but were unable to resolve the issues raised by this motion.

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
Counsel, Civil Division
JORDAN VON BOKERN
KERI BERMAN
JASON LYNCH
Trial Attorneys
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 353-8679
Email: jeffrey.a.hall@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' MOTION FOR STAY PENDING APPEAL

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC, *et al.*, | Case No. 3:20-cv-01175-JR |
| Plaintiffs, | **DEFENDANTS' MOTION TO STAY THE PRELIMINARY INJUNCTION PENDING APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY** |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO STAY THE PRELIMINARY INJUNCTION PENDING APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY**

DEFENDANTS' MOTION FOR STAY PENDING APPEAL

## INTRODUCTION

At the October 30, 2020 hearing on Plaintiffs' motion for a preliminary injunction (Dkt. No. 16), this Court indicated that it would enter a preliminary injunction, and it sought the parties' input on the terms of the injunction.  This Court then entered the preliminary injunction on November 2, 2020.  Dkt. No. 50.  Because Defendants believe that the preliminary injunction is likely to result in irreparable harm (not prevent it), they are preparing an expedited appeal.  By this motion, in accordance with Federal Rule of Appellate Procedure 8(a)(1), Defendants move to stay the preliminary injunction during the appeal and to obtain an immediate administrative stay while the Court considers this motion.

## ARGUMENT

In considering whether to grant a stay pending appeal, the Court must consider four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  All four factors justify a stay of the preliminary injunction.

## I.    DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs lack standing to pursue injunctive relief.

Plaintiffs' claims are based entirely on a "subjective 'chill'" that does not reflect any threat of specific future harm.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).  This is not a case where any of the Plaintiffs has individually suffered any past injury apart from the alleged chilling effect.  Instead, they have all asserted that they have avoided the protests near the Hatfield Federal Courthouse out of fear of encountering federal law enforcement.  It is unclear if any Plaintiff or any member of a Plaintiff organization has ever attended a protest where federal law enforcement were present, but to the

DEFENDANTS' MOTION FOR STAY PENDING APPEAL – 1

extent that any has, none has alleged that he or she has personally suffered any injury as a result of action by federal law enforcement, undercutting any claim that injury is "certainly impending" and not merely "possible." *Clapper*, 568 U.S. at 409.  While Plaintiffs describe a general concern that federal law enforcement officers may injure them, none of them have described with specificity the manner in which any future injury could occur.  Some simply claim that they are afraid of some unspecified "injury."  Bynum Decl. ¶ 7; Buhl Decl. ¶ 4; Sinkford Decl. ¶ 8.  The others express a general fear of being exposed to tear gas, and possibly other crowd control munitions, because they have heard that other protesters have been so exposed.  Eddie Decl. ¶ 7; Power Decl. ¶ 5; Ward Decl. ¶ 11.  Plaintiffs provide no specific details of even a single past incident upon which their fears are based, which in any case would be insufficient to demonstrate future injury.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir. 2017).  Because Plaintiffs also do not articulate any specific circumstance in which they fear future injury occurring, the future injury they fear is not "concrete and particularized."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  And because Plaintiffs do not articulate their feared injury in detail, there is simply no way to determine whether their unwillingness to attend the protests stems from a reasonable fear of certainly impending injury rather than even a reasonable fear, not driven by paranoia, that is nonetheless insufficient to confer standing.  *See Clapper*, 568 U.S. at 416.

Plaintiffs' inability to clearly articulate any specific future injuries also prevents them from meeting the other requirements for standing.  As this Court recognized, it is unclear whether the harm Plaintiffs fear stems from federal law enforcement's riot dispersal tactics generally, even when justified, or whether it is exclusively limited to the violations of the First Amendment they challenge.  Because several of the Plaintiffs have health problems or other

sensitivities, it is also unclear whether they would in fact attend a violent protest even if federal law enforcement acted entirely within Plaintiffs' view of their legal obligations, especially if federal law enforcement had to quickly use crowd control devices on violent rioters that may incidentally affect those Plaintiffs.  Other Plaintiffs have fears that are not even at issue in this lawsuit, or that would not be addressed even by the Court's injunction—such as fears of surveillance, racial profiling, or abduction.  And none of the Plaintiffs can trace their injury to the specific challenged conduct in this case.  *See Clapper*, 568 U.S. at 417.  Given these problems, Plaintiffs have also not demonstrated that even with the injunction, they will attend the protests.  Indeed, all Plaintiffs had the opportunity to participate in consistently peaceful protests during the day but apparently declined.  They accordingly have failed to show that the injunction will redress their concerns.

While Plaintiffs introduced several declarations and other exhibits to demonstrate that various harms had occurred to other protesters, none of the Plaintiffs stated that they were ever aware of the existence of such evidence, much less that it or the underlying incidents described by it informed their fears.  Accordingly, the evidence is wholly irrelevant.  Even if those incidents could suggest that *some* people were subject to certainly impending injury—which, under *Lyons*, is unlikely given that past harm is generally insufficient to confer standing for prospective relief—that would not mean that *Plaintiffs* would necessarily be those people (*i.e.*, that their situations were similar enough).  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  And even if Plaintiffs thereby could demonstrate a certainly impending injury, it does not mean that that injury would be what they actually feared and what actually kept them (and would keep them) from the protests, rather than something else more speculative and insufficient to confer standing.

Additionally, the Court recognized that the preliminary injunction it granted was not intended to prevent any harm that was imminent and certainly impending at the time Plaintiffs' complaint was filed, which is the time at which standing is determined. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). Rather, the Court indicated that the injunction was necessitated by the Court's concerns about potential future protests around Election Day. No briefing occurred on the issue, nor was there any argument on this point or amendment of the complaint. Given the disconnect between Plaintiffs' case, which concerns protests on another issue, and the stated purpose of the injunction, the Court has introduced an additional traceability problem and attempted to redress a harm that is not clearly at issue in Plaintiffs' case.

      **B.**      **Plaintiffs' First Amendment claim is baseless.**

While Plaintiffs suggested several First Amendment theories for their claims, they did not actually flesh out any, and the Court itself, for the first time at argument, went through each factor for First Amendment retaliation. For such a claim, a plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300–01 (9th Cir.1999). Although this Court determined that Plaintiffs were engaged in constitutionally protected activity, the record reflects, based on Defendants' submission, that there was violence on each of the nights for which Plaintiffs presented any evidence. In such situations, "a violent subset of protesters who disrupt civic order will by their actions impair the scope and manner of how law-abiding protesters are able to present their views." *Menotti v Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005). Under such circumstances, federal officers indisputably may issue and enforce dispersal orders against the

general public.  *See United States v. Christopher*, 700 F.2d 1253, 1259-61 (9th Cir. 1983).  The

obligation of protesters in such a situation is to disperse, and the First Amendment does not give

them a right to remain in those areas.  *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116

(1972); *Colten v. Kentucky*, 407 U.S. 104, 106–09 (1972).  Accordingly, Plaintiffs have not

demonstrated any actual or imminent violation of a cognizable First Amendment right—much

less a retaliatory violation.

Regarding whether Defendants' conduct would chill the protesters, the Court noted that

the same problems that Plaintiffs faced under the standing inquiry were also relevant because

their only real injury was a subjective chill.  Nevertheless, the Court found that Plaintiffs had

sufficiently articulated that their speech was chilled.  For the reasons explained above, this is

incorrect.

Regarding retaliatory motivation, the Court noted in the preliminary injunction order that

Plaintiffs' "showing that the federal agents have any retaliatory motive is nonexistent."  Dkt. No.

50 at 2.  Nevertheless, it found that the public statements of the President and Acting DHS

Secretary Wolf did express a retaliatory motivation.  It is notable that even Plaintiffs never made

such an argument—they used the public statements solely for their Tenth Amendment claim,

relying instead on Executive Order 13933 for their First Amendment claim.  The Court thus

should not have relied on those statements to support an injunction based on the First

Amendment claim.  *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our

adversarial system of adjudication, we follow the principle of party presentation.").  Moreover,

although it is not clear from the record which statement the Court found to demonstrate a

retaliatory motive, it is clear that the President's and Secretary Wolf's statements were clearly

aimed at violent opportunists, *not* peaceful protesters.  They certainly do not demonstrate that the

federal law enforcement presence in Portland was intended to do anything other than protect federal buildings and property, much less that individual federal law enforcement officers would implement such a design when it specifically violates their use-of-force policies.

       **C.**    **The preliminary injunction is not justified.**

      Even if Plaintiffs had standing and a First Amendment retaliation claim that was likely to succeed on the merits, that would not justify the specific injunction proposed by the Court. Although Plaintiffs made arguments for geographic limitations on federal law enforcement action based on their Tenth Amendment theory and a theory under First Amendment cases on time, place, and manner restrictions, the Court found that those theories had no merit.  There is no basis in the record to support the idea that "general crowd control measures" were means by which Defendants purportedly engaged in retaliation—indeed, the Court repeatedly noted that a fear of general law enforcement conduct was insufficient to justify relief, and to the extent that Plaintiffs articulated any fear, it was of being specifically targeted.  There is also no factual basis in the record for a one-block Excluded Area being sufficient to allow protection of the Hatfield Courthouse—indeed, the record reflects that violent opportunists have used long-range projectiles and attacked federal law enforcement officers even as officers pushed them back.  As explained below, it is also unclear if the injunction will actually benefit Plaintiffs.  If there is violence, federal law enforcement will likely need to address violent conduct beyond the Excluded Area.  Accordingly, there is no record to support the terms of the injunction entered by the Court.

**II.**    **DEFENDANTS WILL SUFFER IRREPARABLE HARM ABSENT A STAY.**

      Defendants, and especially the federal law enforcement officers who serve those agencies and protect the Hatfield Federal Courthouse, will suffer irreparable harm if the injunction remains in place, as described more fully in the attached Declaration of Gabriel Russell ("Russell

Decl.").  Although the Court, in ruling on the injunction, was sensitive to the fact that an injunction could exacerbate the situation and result in more violence, harming both protesters and federal law enforcement officers, the "geographic solution" adopted by the Court unfortunately leads precisely to such an outcome.  As the Court recognized, the situation around the Courthouse during times of violence is chaotic.  Dkt. No. 50 at 2.  Controlling such violent crowds demands difficult, split-second decisionmaking in the face of uncertainty.  *See, e.g.*, *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("[O]fficers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989))); *see also*, *e.g.*, *Ryburn v. Huff*, 565 U.S. 469, 477 (2012).  Officers must "restore and maintain lawful order while not exacerbating disorder more than necessary." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).  And they must "act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'"  *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).  Those well-recognized difficulties mean that federal law enforcement officers must have the operational flexibility to deal with highly contextualized and fluid situations. Russell Decl. ¶ 16.  The injunction's restriction on federal law enforcement action to a very tight, fixed distance around the Hatfield Courthouse hampers this flexibility and generally increases the risk to officers as well as to nonviolent and even violent protesters.  *Id.*  But there are also many specific ways in which it increases risks.

As the Court recognized, Dkt. No. 50, violent opportunists have comingled with peaceful protesters and used that cover to launch attacks against the Hatfield Courthouse and federal law enforcement officers defending it, including using long-range projectiles like commercial

fireworks ("mortars") and high intensity lasers, Russell Decl. ¶¶ 4-6, 12.  Violent agitators have

in many cases launched these attacks from beyond the single-block Excluded Area around the

Hatfield Courthouse demarcated in the injunction.  *Id.* ¶¶ 6, 12.  Violent agitators have used even

more powerful and dangerous devices from beyond a block and under the cover of crowds,

including deployment of a propane-powered launcher to fire a one-pound lead ball sufficiently

powerful to damage the exterior wall of the Courthouse and multiple crew-operated slingshots to

launch rocks and metal cans of food at officers.  *Id.* ¶ 12.

      Furthermore, limiting federal law enforcement officers to pushing crowds back a short,

fixed distance creates grave dangers for both federal law enforcement officers and protesters.

Officers have experienced the most attacks and most severe injuries when they have attempted to

maintain stationary or fixed positions because they are easy to target for attacks.  *Id.*  Such

dangerous positioning would be the inevitable effect of limiting federal law enforcement

officers' actions outside of the Excluded Area.  Violent opportunists also use static conditions (i)

to reinforce their positions by bringing protesters bearing shields to the front and (ii) to resupply

attackers with projectiles and other weapons, further exacerbating the severity of attacks.  *Id.*

¶¶ 10, 12.  When officers have in the past pushed crowds back only a short distance, violent

opportunists have also quickly reconsolidated and attacked officers or facilities again.  *Id.* ¶ 13.

This results in more deployments and more separate efforts to disperse protesters over a longer

total period of time.  What results is heightened risk of injury to officers and protesters as well as

more frequent and perilous interactions between violent opportunists and federal law

enforcement officers.  *Id.*

The limitations on federal law enforcement officers acting beyond a short, fixed distance also act to impose greater risks to both those officers and protesters.[1]  If not permitted to employ the full range of crowd-control measures beyond the Excluded Area around the Hatfield Courthouse, those officers would have to enter volatile and likely hostile crowds beyond that perimeter in order to arrest wrongdoers (such as those launching mortars at the Hatfield Courthouse).  *Id.* ¶ 14.  Officers could be dramatically outnumbered but still be restricted by the injunction from employing crowd-control measures to disperse an encroaching crowd, even if the crowd is intermixed with violent opportunists who are attacking officers or interfering with arrests.  *Id.*  Instead, officers would be forced to rely on more targeted forms of self-defense, even when an encircling crowd makes identifying the specific individuals attacking officers impossible.  *Id.*  Such close-range, targeted use of force also presents a far greater risk of serious harm to protesters than the general area measures that officers typically employ for general crowd control.  *Id.*  It is also true that the typical crowd control measures used to push crowds back in many perilous situations, such as the use of chemical agents, are safer for protesters than the use of targeted impact munitions, which are not normally required as a general measure to push a crowd back and which result in the majority of injuries to protesters.  *Id.* ¶ 15.

The injunction's limitations will also cause harm well outside of the Excluded Area. Federal law enforcement have resumed coordination with the Portland Police Bureau, Multnomah County Sheriff's Office, and Oregon State Police, which have deployed officers to protect the Multnomah County Justice Center and other areas of Portland.  *Id.* ¶ 12.  Those

---

[1] While the injunction provides, as examples of "lawful activity directed at individual protesters," the use of certain authorities under 40 U.S.C. § 1315, Dkt. No. 50 at 4, those are relevant only to DHS officers using such authority.  The Marshals Service has separate statutory authorities, including those noted in its briefing, Dkt. No. 37 at 7.

DEFENDANTS' MOTION FOR STAY PENDING APPEAL – 9

entities have no restrictions on their ability to disperse violent crowds beyond the Excluded Area, but they nevertheless rely on assistance and support from federal law enforcement stationed at the Hatfield Courthouse. *Id.* Frustrating such cooperation outside of a limited geographic area near the Hatfield Courthouse will also endanger local and state law enforcement. *Id.*

## III.  THE OTHER FACTORS FAVOR A STAY.

Although the Court presumed that Plaintiffs' First Amendment rights meant that the balance of the equities and the public interest favored them, this injunction actually significantly harms some of those very interests while creating severe risks to federal personnel and property. As explained above, the premise is also incorrect, because Plaintiffs have not in fact demonstrated any actual or imminent violation of their First Amendment rights. Even setting that aside, as explained above, those peaceful protesters who want to protest within the Excluded Area—which all parties recognize is protected First Amendment activity as long as the crowd remains peaceful—will be subjected to an even greater risk of harm under the injunction because it perversely forces officers to use more dangerous methods to stop violent agitators in the crowd. Moreover, it is not even clear that those protesters who remain outside the Excluded Area will be at a lower risk of injury than before the injunction. If the violent conditions resume, past experience from this summer's protests indicates that violent opportunists will assemble beyond the Excluded Area, and federal law enforcement officers will likely still need to stop their dangerous, destructive and even potentially deadly conduct. Officers wading into crowds and engaging individual protesters at close range may present an even greater risk to peaceful bystanders. Even under Plaintiffs' version of the facts, based on the declarations they submitted from non-plaintiffs, federal law enforcement did not find it necessary to push protesters back more than three or four blocks. Thus, even in the zone of the few blocks potentially affected by this injunction, violence and the risk of harm may *increase*. And, as explained in detail, the

injunction also creates severe safety risks to federal law enforcement officers.  The law enforcement judgments of DHS and the Marshals Service to deploy crowd control devices outside the Excluded Area to push protesters back several blocks—when, in their on-the-ground judgment, often exercised under exigent circumstances, taking such steps is necessary to protect human life, human safety and federal property, as well as access to a federal courthouse by the law-abiding public seeking to vindicate their First Amendment Petition Clause rights—are surely entitled to deference.

By contrast, the balance of the equities does not counsel in favor of granting to a limited group of protesters a right to avoid any interaction with federal law enforcement officers under the circumstances that the Court has defined in advance, where on the other side of the equitable ledger, there are additional risks of harm to the members of crowds, to federal law enforcement officers, and to federal property.  Equity instead should focus on the overwhelming public interest in safeguarding *all* concerned, along with protecting a federal courthouse from violent attack.  And this is especially true when the protesters in question have offered only speculative fears that cannot support Article III standing.  First Amendment rights are important, but they lie on both sides of this controversy and on both sides of the equitable balancing because protests and violence can obstruct access to a federal courthouse where Petition Clause rights are vindicated.  Protests can chill those seeking to exercise their Petition Clause rights.  Federal law enforcement officers, conscientious in their duties, should be shown significant deference under trying and dangerous circumstances, often arising in the dead of night, in their efforts to keep protesters of all stripes as safe as possible.  Federal officers should also be allowed to keep court personnel and visiting members of the citizenry safe who might opt to avoid visiting the court

DEFENDANTS' MOTION FOR STAY PENDING APPEAL – 11

even in daylight for fear of bodily injury, and they should be allowed to keep themselves and federal property safe.

## CONCLUSION

This Court should stay its preliminary injunction pending appeal.

Dated: November 3, 2020                     Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General

                                            BILLY J. WILLIAMS
                                            United States Attorney

                                            ALEXANDER K. HAAS
                                            Director, Federal Programs Branch

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                            */s/ Jeffrey A. Hall*
                                            JEFFREY A. HALL (DC 1019264)
                                            Counsel, Civil Division
                                            JORDAN VON BOKERN
                                            KERI BERMAN
                                            JASON LYNCH
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division
                                            1100 L Street NW, Rm. 11214
                                            Washington, DC 20005
                                            Tel: (202) 353-8679
                                            Email: jeffrey.a.hall@usdoj.gov

                                            *Attorneys for Defendants*

DEFENDANTS' MOTION FOR STAY PENDING APPEAL – 13