JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
JEFFREY A. HALL (DC 1019264)
Counsel, Civil Division
JORDAN VON BOKERN
KERI BERMAN
JASON LYNCH
Trial Attorneys
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Tel.:    (202) 353-8679
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-01175-JR<br><br>**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

DEFENDANTS' MOTION TO DISMISS

**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6) to dismiss the First Amended Complaint.  In support of this Motion, Defendants refer

the Court to the attached Memorandum.  Pursuant to Local Rule 7-1, Defendants certify that

their counsel have conferred in good faith with counsel for Plaintiffs but were unable to resolve

the issues raised by this motion.

<div style="margin-left:50%">

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
Counsel, Civil Division
JORDAN VON BOKERN
KERI BERMAN
JASON LYNCH
Trial Attorneys
United States Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 353-8679
Email: jeffrey.a.hall@usdoj.gov

*Attorneys for Defendants*

</div>

DEFENDANTS' MOTION TO DISMISS

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| WESTERN STATES CENTER, INC, *et al.*, | Case No. 3:20-cv-01175-JR |
| Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# Table of Contents

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

   I.   The Complaint Fails to Establish that Any Plaintiff Has Standing for Injunctive Relief .... 4

      A.   The Legal Standard for Standing................................................................. 5

      B.   Plaintiffs' Very Limited Alleged Injuries Are Speculative ........................................... 7

      C.   The Allegations of Injuries to Others Do Not Assist Plaintiffs in Establishing Standing .................................................................................................... 9

      D.   Plaintiffs Have Not Established the Existence of a Policy or Officially Sanctioned Patten of Behavior Necessary for Standing ................................................ 12

      E.   The Organizations Do Not Have Their Own Standing............................................... 19

      F.   The Legislators Do Not Have Legislator Standing ................................................... 21

   II.   Plaintiffs Also Lack Standing for Any Declaratory Judgment........................................... 22

   III.   Plaintiffs Have Failed To Adequately Plead Their Claims ............................................... 23

      A.   The Court Has Already Properly Rejected Plaintiffs' Tenth Amendment Theory .... 24

      B.   The Allegations Do Not Support Plaintiffs' First Amendment Claim ....................... 24

      C.   The Allegations Do Not Support Any Substantial Fourth Amendment Claim .......... 28

      D.   Plaintiffs' Other Legal Theories Are Baseless ......................................................... 31

CONCLUSION................................................................................................................... 32

## Table of Authorities

*Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147 (9th Cir. 2019) ....... 19, 20

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ................................................. 6, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 2, 3

*Austin v. Univ. of Oregon*, 925 F.3d 1133 (9th Cir. 2019) ............................................ 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 3

*Blair v. Shanahan*, 38 F.3d 1514 (9th Cir. 1994) ....................................................... 6

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ..................................... 30

*Cervantes v. City of San Diego*, 5 F.3d 1273 (9th Cir. 1993) ......................................... 3

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ....................... 31

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) ................................................ passim

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093 (9th Cir. 2017) ............. 16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................ passim

*Coleman v. Miller*, 307 U.S. 433 (1939) ................................................................... 22

*Colten v. Kentucky*, 407 U.S. 104 (1972) ................................................................. 26

*Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994) ............................................... 6

*Ex parte Lévitt*, 302 U.S. 633 (1937) ..................................................................... 11

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ............................................ 29, 30

*Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) (en banc) ............................ 22

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................ 29

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................... 26

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................. 23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................... 19, 20

*Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006).......... 26

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ....................................... 6

*Index Newspapers LLC v. City of Portland*, No. 3:20-CV-1035-SI, 2020 WL 4883017 (D. Or.

    Aug. 20, 2020) ........................................................................................................................ 11

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) ....................................................... 30

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083 (9th Cir.

    2010) ........................................................................................................................................ 19

*Laird v. Tatum*, 408 U.S. 1 (1972)...................................................................................... 7, 9, 17

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)............................................................ 3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................... 5, 9, 11, 13

*Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010) ........................................................... 6

*McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870 (9th Cir. 2011).................................. 12

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ................................ 27

*Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158 (9th Cir. 2005) ...................................... 22

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ............................................................................... 6, 31

*Physicians Comm. for Responsible Med. v. EPA*, 292 F. App'x 543 (9th Cir. 2008) .................. 19

*Powers v. Ohio*, 499 U.S. 400 (1991) ....................................................................................... 12

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................................ 22

*Rodriguez v. City of San Jose*, 930 F.3d 1123 (9th Cir. 2019) .............................................. 19, 20

*Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209 (D. Or. July 24, 2020) 18,

    31, 32

*S. Oregon Barter Fair v. Jackson Cty., Oregon*, 372 F.3d 1128 (9th Cir. 2004) .......................... 4

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008).......................... 7

*Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632 (9th Cir. 2014) ... 22, 23

*Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097 (9th Cir. 2004) ............................................. 19

*Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152 (9th Cir. 2017) .................. 3

*State ex rel. Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499 (6th Cir. 2019)  22, 32

*United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623 (9th Cir. 2018) .................. 2

*United States v. Guzman-Padilla*, 573 F.3d 865 (9th Cir. 2009) .................................................. 30

*Updike v. Clackamas Cty.*, No. 3:15-CV-00723-SI, 2015 WL 7722410 (D. Or. Nov. 30, 2015) 16

*Updike v. Multnomah Cty.*, 870 F.3d 939 (9th Cir. 2017) ....................................................... 6, 16

*Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019).................................................. 22

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ....................................................... 20

*Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) .......................... 26

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)................................................................................... 3

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................................... 5

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ...................................................................... 29

# INTRODUCTION

This action requests that the Court resolve a hypothetical dispute arising from hypothetical interactions and subsequently hypothetical harms.  In so doing, it seeks to interfere with hypothetical law enforcement activities.  The law does not and should not permit such speculative judicial action.  Plaintiffs are three residents of Portland, Oregon (including two Oregon state representatives) and two organizations with members there.  While the individuals and the organizations allege that they would like to attend ongoing protests in downtown Portland, either to participate or observe, all have avoided attending those protests because of their fear of federal law enforcement, who may be present.  Relying entirely on reports that federal law enforcement protecting the Hatfield Federal Courthouse have injured or arrested other individuals who have attended the chaotic downtown protests, Plaintiffs allege that the federal government's deployment of federal officers has chilled their own participation in the protests, thereby violating their rights.  They bring this suit to obtain onerous injunctive relief against federal law enforcement.  Yet Plaintiffs are not situated any differently than any other individual who is interested in attending those same protests but who has no special basis to obtain the relief Plaintiffs seek.

The operative complaint fails to connect Plaintiffs' unwillingness to attend the protests to any nonspeculative injuries suffered by anyone, and it therefore does not establish Plaintiffs' standing to obtain relief.  It also fails to demonstrate that anyone has standing given the lack of an official policy or officially sanctioned pattern of violations.  Additionally, the complaint's allegations are insufficient to demonstrate that Plaintiffs have any viable legal claims.  The complaint's First Amendment allegations are weaker than what this Court considered for the preliminary injunction motion, and there remains no basis for Plaintiffs' Tenth Amendment

DEFENDANTS' MOTION TO DISMISS – 1

theory.  The theories that Plaintiffs did not advance in their preliminary injunction motion are also insufficiently pleaded or baseless.  Accordingly, the complaint should be dismissed.

## BACKGROUND[1]

Plaintiffs filed this case on July 21, 2020.  Dkt. No. 1.  On July 27, Plaintiffs filed their First Amended Complaint ("F. Am. Compl."), which remains the operative complaint in this case.  Dkt. No. 14.  They shortly thereafter filed a motion for a temporary restraining order and a motion for a preliminary injunction.  Dkt. No. 16.  Plaintiffs withdrew the former after federal law enforcement entered an agreement with Oregon for Oregon State Police to temporarily take over policing around the Hatfield Federal Courthouse at the end of July 2020, and tensions largely abated.  Dkt. No. 28.  The parties briefed the preliminary injunction motion, and the Court held a hearing on it on October 22, 2020.  Dkt. No. 48.  At a second, October 30 hearing, the Court found that Plaintiffs had standing to pursue a preliminary injunction and were entitled one based on their First Amendment claim, but not on their Tenth Amendment claim.  Dkt. No. 49.  The Court entered the preliminary injunction on November 2, 2020.  Dkt. No. 50.  The Court held a status conference the following week, on November 9, 2020, at which it vacated the preliminary injunction as no longer necessary.  Dkt. No. 69.

## LEGAL STANDARD

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018).  In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to

---

[1] This motion treats the Complaint's factual allegations as true for purposes of only the motion to dismiss for failure to state a claim, as this Court must in ruling on it.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

sue. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  For a facial challenge to subject-matter jurisdiction under Rule 12(b)(1), this Court must "accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiffs" and determine "whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1157 (9th Cir. 2017).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and it "asks for more than a sheer possibility that the defendant has acted unlawfully."  *Id. See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019).

For purposes of this motion, Plaintiffs cannot rely on the declarations they submitted after the complaint.  When evaluating a motion to dismiss under Rule 12(b)(6), "[r]eview is limited to the complaint."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (alteration in original) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993)).

## ARGUMENT

In its order addressing Plaintiffs' motion for a preliminary injunction, this Court ruled on Plaintiffs' standing and the likelihood of the success on the merits of their First Amendment claims and their Tenth Amendment claims.  While finding that Plaintiffs had standing and a likelihood of success on the First Amendment claim, this Court did not analyze standing or the merits for each Plaintiff, and it did not articulate which specific pieces of evidence supported

which conclusion.  These preliminary rulings are generally not binding going forward in this

case.  *See S. Oregon Barter Fair v. Jackson Cty., Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004)

(holding that rulings on a preliminary injunction do not constitute law of the case).  The

government also respectfully maintains that the injunction was improperly issued prior to its

vacatur.  In any event, the Court's rulings were premised on a record that included the numerous

declarations that Plaintiffs submitted in support of their motion and other evidence that is not

before the Court for purposes of this motion.  Regardless of whether that record was sufficient

for purposes of the injunction—and the government maintains that it was not—here, Plaintiffs

are bound by their pleading, and their pleading falls well short of establishing standing or

presenting viable claims.  Accordingly, the operative complaint should be dismissed.

## I.     The Complaint Fails to Establish that Any Plaintiff Has Standing for Injunctive Relief

Plaintiffs do not allege that they have attended any protests near the Hatfield Federal

Courthouse or where federal law enforcement officers were present.[2]  Because they are unable to

allege any direct injuries from the actions of federal law enforcement officers, Plaintiffs instead

allege that the actions of the federal government generally resulted in their being chilled from

participating in the protests or attending as observers.  *See, e.g.*, F. Am. Compl. ¶¶ 25, 28, 33,

---

[2] For purposes of the motion for a preliminary injunction, Plaintiffs relied on the Declaration of Dana Buhl (a Director at the First Unitarian Church), which stated that she continued attending undefined protests, Dkt. No. 18, ¶ 6, and the Declaration of Sara Eddie, which stated that she had been acting as a legal observer at protests but then stopped, ECF No. 34, ¶¶ 3, 5, to suggest that possibly some Plaintiffs did attend some protests and witness something.  That was always a dubious proposition that undercut their arguments because neither individual stated that they witnessed anything injurious at all.  In any event, the operative complaint says nothing about Ms. Buhl.  It states that Plaintiff Eddie has "acted as a legal observer at numerous protests in the aftermath of the killing of George Floyd" but that the government's conduct has caused her to "cease her service as a legal observer downtown."  F. Am. Compl. ¶ 28.  This says nothing about her attending any relevant protests, but if she did, again, apparently nothing happened worth noting, undercutting Plaintiffs' claims of certainly impending injury.

DEFENDANTS' MOTION TO DISMISS – 4

119, 135. In determining that Plaintiffs had standing to obtain a preliminary injunction, the Court nevertheless noted that there were concerns because at least some of the injuries they feared were not injuries in fact or were not traceable to the challenged conduct. *See* Tr. of Oct. 30, 2020 Hearing, at 5. For purposes of the preliminary injunction motion, the Court was satisfied because some Plaintiffs had heard of members of their organizations or constituents being allegedly injured—hit with munitions and tear gassed—by federal law enforcement. *See id.*; Tr. of Oct. 22, 2020 Hearing, at 16. Plaintiffs' complaint, however, lacks even those minimal (and, the government maintains, insufficient) allegations. Their feared harms are entirely speculative and insufficient to support standing for *any* claim.

### A.    The Legal Standard for Standing

The law of standing has been discussed extensively in this case. *See, e.g.*, Dkt. No. 37 ("Response") at 9-13. Briefly, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical"; there must be a "causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant; and it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). When a party seeks prospective equitable relief, the injury in fact must be in the future, and that "threatened injury must be *certainly impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs cannot establish entitlement to injunctive relief by pointing to past injury; they must show that they are "realistically threatened by a repetition of [the violation]." *City of Los Angeles v. Lyons,* 461 U.S. 95, 109 (1983). Indeed, even plaintiffs who have suffered the same

injury on many occasions in the past cannot establish a certainly impending injury in the future
based on those past violations. *See, e.g.*, *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir.
2017) (denying injunctive relief to a plaintiff challenging the lack of American Sign Language
interpreters in pretrial detainment and at arraignment, even though he had been booked at the
same correctional facility five times before, because "standing for injunctive relief requires that a
plaintiff show a 'real and immediate threat of repeated injury'" (quoting *O'Shea v. Littleton*, 414
U.S. 488, 496 (1974))); *Blair v. Shanahan*, 38 F.3d 1514, 1517-19 (9th Cir. 1994); *Eggar v. City
of Livingston*, 40 F.3d 312, 316-17 (9th Cir. 1994).  To establish standing to challenge future
injury, plaintiffs must generally show either that the alleged future injury stems directly from a
formal written policy or that there is an invariable, officially sanctioned practice of officers
causing that injury. *See Lyons*, 461 U.S. at 106 (requiring that Lyons show "(1) that all police
officers in Los Angeles always choke any citizen with whom they happen to have an encounter,
. . . or, (2) that the City ordered or authorized police officers to act in such manner"); *Mayfield v.
United States*, 599 F.3d 964, 971 (9th Cir. 2010) ("First, a plaintiff may show that the defendant
had, at the time of the injury, a written policy, and that the injury 'stems from' that policy.
Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned
. . . behavior, violative of the plaintiffs' [federal] rights."  (quoting *Armstrong v. Davis*, 275 F.3d
849, 860–61 (9th Cir. 2001)).

An organization has "associational standing" to "bring suit on behalf of its members
when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it
seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor
the relief requested requires the participation of individual members in the lawsuit."  *Hunt v.
Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

### B.    Plaintiffs' Very Limited Alleged Injuries Are Speculative

Here, where Plaintiffs have no direct past injury and are basing their argument for standing solely on some feared injury chilling their conduct, they must clearly allege what harm it is that they fear.  That is because "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper*, 568 U.S. at 418 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).  The harm that Plaintiffs fear must itself be sufficient to establish standing by satisfying all of the requirements, including that it is certainly impending.  *Id.* at 416.  Plenty of "reasonable" and "nonparanoid" fears are insufficient to confer standing, and Plaintiffs cannot circumvent that problem by saying that they are chilled from risking the injury.  *Id.*  If Plaintiffs do not clearly articulate what harm they fear, there is no way to test it—if a vague allegation is enough, their subjective fear becomes dispositive.  Yet it is Plaintiffs' burden to establish standing, even on a motion to dismiss.  *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008).

Plaintiffs allege only a few specific feared injuries.  Plaintiff Sara Eddie alleges that "Defendants' overreaching police activities . . . have caused [her] to cease her service as a legal observer downtown," but the only specific harm she notes is a fear of being one of the "abductions of peaceful protestors off the streets," and she "does not want to risk being 'disappeared.'"  F. Am. Compl. ¶ 28.  Representative Karin Power does not specify any particular harm she fears at all—she simply alleges that Defendants' "First Amendment-suppressive activities" have "chilled and prevented" her right to protest and "frustrated her right and ability to set state law enforcement policy applicable in Portland."  *Id.* ¶¶ 31-32. Representative Janelle Bynum alleges identical harms, but she also alleges that she "fears terribly for [her family's] safety while federal law enforcement are present" because federal law

DEFENDANTS' MOTION TO DISMISS – 7

enforcement is "not subject to Oregon's anti-profiling legislation and other policing policies" and she has four black children, two of whom are male.  *Id.* ¶¶ 33-35.  Plaintiff Western States Center alleges no harms to any of its members at all to support associational standing.[3]  Plaintiff First Unitarian Church alleges that congregant participation in the protests has dropped because "defendants began policing the streets of Portland, and throwing suspected protestors into unmarked vehicles even when peaceful," and it "has become hesitant to encourage its congregants to protest . . . because defendants' unconstitutional targeting of peaceful protestors increases both the risk of bodily harm to congregants and the likelihood of the church's civil liability to congregants who are injured or traumatized in the course of abduction by federal law enforcement."  *Id.* ¶¶ 25-26.

The feared harms allegedly keeping Plaintiffs away from the protests are even more speculative than those addressed in Plaintiffs' motion for a preliminary injunction, *see* Response at 15-18, and the only specific fears are racial profiling and "abduction."  Plaintiffs have no racial profiling claim.  If fear of racial profiling keeps Representative Bynum from protests, she cannot trace her injury to conduct being challenged and therefore has no standing.  *See* Response at 17 (citing *Clapper*, 568 U.S. at 417).  Plaintiffs' use of the term "abduction" is vague.  Although the complaint characterizes what happened to Mr. Pettibone as an abduction, F. Am. Compl. ¶ 64, Plaintiff Eddie's fear of being "disappeared" suggests that she and others fear something entirely different than a temporary investigatory detention by federal law

---

[3] Because all of the First Unitarian's and Western State Center's members lack standing, they do, too.  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But even if some member of one of these organizations did have an injury, the organization would still not have standing because the lawsuit would require that member's participation to establish the particular circumstances of why a particular injury fairly traceable to the government is certainly impending, which is a fact-specific inquiry.  *See id.*

enforcement.  Regardless, even if Plaintiffs do merely mean a brief investigatory detention (as with Mr. Pettibone), as demonstrated below, any threat of such detention is speculative.  And to the extent this is referring to legal detentions, those clearly cannot provide standing because they are not traceable to a challenged harm.  *See* Tr. of Oct. 22, 2020 Hearing, at 8-9.

The remaining reasons for Plaintiffs staying away, including "overreaching police activities" and "First Amendment-suppressive activities," are not *injuries*, much less "concrete and particularized" enough to qualify as injuries in fact.  *Lujan*, 504 U.S. at 560.  Indeed, the two specific examples Plaintiffs do note suggest that these generalized allegations encompass even more speculative injuries.  Similarly, Plaintiffs appear to object to the mere presence of federal law enforcement officers near them, F. Am. Compl. ¶ 13, or their conducting "police" functions like the investigation of federal crimes that are entirely lawful; if those activities are subjectively chilling Plaintiffs (and the allegations suggest that they are), then they also have no standing.  *Clapper*, 568 U.S. at 417; *Laird*, 408 U.S. at 13–14.  Moreover, Plaintiffs do *not* allege that they *would* attend specific protests if not for a specific feared injury that would occur if they did attend.  Yet such specificity, rather than vague hopes to attend a protest, is precisely what is required to demonstrate standing.  *Lujan*, 504 U.S. at 563-64.

### C.    The Allegations of Injuries to Others Do Not Assist Plaintiffs in Establishing Standing

For the reasons discussed, the inquiry should end with Plaintiffs' own limited allegations of feared injuries because those are the source of any alleged chilling effect.  Yet, even if Plaintiffs could justify considering other injuries that other people have allegedly experienced as part of any chill, that would still not provide them standing.

There are substantial problems generally with Plaintiffs relying on the past experiences of others to demonstrate even past injury (which would in any case do nothing to demonstrate

future injury).  *See* Response at 18.  Plaintiffs have not explained why their situation is at all similar to the other individuals whose alleged injuries they recount.  Indeed, some of the situations around those injuries are obviously distinct.  For instance, Plaintiffs recite the experiences of four journalists to suggest that federal law enforcement officers have targeted journalists.  F. Am. Compl. ¶¶ 74-78, 80.  Even assuming that that is what the allegations show, Plaintiffs have no explanation for how that is relevant to protesters or observers like them.  The relevance of the experiences of other protesters are similarly left entirely to speculation.

Many of the allegations provide no context—so there is no way to tell whether Plaintiffs would stand in those other protesters' shoes if they attended the protests, though the details provided raise serious doubts.  For instance, Plaintiffs describe how Christopher David was allegedly beaten after he "approached a group of federal agents" to ask them whether they "were enlisted" and "why they were not obeying an oath to the Constitution."  *Id.* ¶ 83.  Plaintiffs provide no other details surrounding the encounter, including whether it was at night, whether there was an ongoing riot, whether federal officers were being threatened by others, etc.  They give no reason to expect that they would try to do something similar.  Even for Maureen Healy, who was personally "peacefully protesting when federal agents gassed her and shot her," *id.* ¶ 86, the immediate context of federal officers' use of force is not provided.  And Plaintiff Eddie and members of the First Unitarian Church merely want to observe, *id.* ¶¶ 25, 28, but the complaint does not allege that any particular "observers" suffered any injuries at all.  For only two incidents is the time provided, and both were late at night.  *Id.* ¶¶ 58, 98.  It is unclear when the other incidents occurred and whether Plaintiffs would attend protests at those times, if they did attend protests.  If Plaintiffs would attend protests at other times or situations or act differently than those who have been injured, they have additional problems tracing their injury

to the government conduct that they challenge.  Response at 17-18 (citing *Clapper*, 568 U.S. at 417).

As the complaint stands right now, the injuries recited therein are no more relevant to Plaintiffs than they are to any person who may be vaguely interested in attending protests, even just to take a look.  If they have standing to sue, almost anyone near Portland does.  *See Lujan*, 504 U.S. at 575 ("[A] private individual . . .  must show that he . . . is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."  (quoting *Ex parte Lévitt*, 302 U.S. 633, 634 (1937)).  Plaintiffs have no more standing to obtain injunctive relief than any resident of Los Angeles who drives had standing to challenge chokeholds after hearing what happened to the plaintiff in *Lyons*.

There are additional concerns with relying on the past injuries alleged in this particular case.  Many of the third parties whose alleged injuries Plaintiffs rely upon have already filed suit to obtain their own relief for those injuries.  As the complaint itself notes, F. Am. Compl. ¶¶ 74-78, 80, the allegations regarding the four journalists are based on declarations filed in *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-1035-SI, in which at least one of the journalists is a named plaintiff.  The court in that case has entered a preliminary injunction specifically requested by those journalists to protect their rights.  *See Index Newspapers*, No. 3:20-CV-1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020).  Also, several of the other named individuals who the complaint alleges were harmed by federal law enforcement—Mark Pettibone, Christopher David, and Maureen Healy, F. Am. Compl. ¶¶ 64, 83, 86—have jointly filed their own lawsuit.  *Pettibone v. Trump*, No. 3:20-cv-01464-YY.  Plaintiffs obviously have no standing to vindicate those third parties' rights, especially because those who have sued have

demonstrated an ability to "assert their own rights."  *McCollum v. Cal. Dep't of Corr. & Rehab.*,

647 F.3d 870, 879 (9th Cir. 2011) (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)).  Yet

that is in effect what Plaintiffs are doing if they are attempting to obtain any relief premised on

remedying the past injuries, which are already being remedied through other litigation by those

who allegedly suffered them.  If, however, Plaintiffs instead have unique feared injuries, it is

unclear how those other individuals' different experiences are relevant.

### D.      Plaintiffs Have Not Established the Existence of a Policy or Officially Sanctioned Patten of Behavior Necessary for Standing

Even looking at the injuries alleged—which do not necessarily relate to the injuries that

Plaintiffs fear—Plaintiffs have not demonstrated any official policy or invariable pattern that

would establish standing.[4]

#### 1.      There Is No Formal Policy

Plaintiffs have not alleged the existence of a formal policy, much less a "written" one, as

would be required.  *Mayfield*, 599 F.3d at 971.  Written policies that establish standing do not

just touch on the relevant subject; they concern the very harms at issue, which are "directly

traceable" to that written policy.  *Armstrong*, 275 F.3d at 861.  In *Lyons*, the plaintiff alleged that

the city had a policy of allowing chokeholds in some situations short of a deadly threat but not

specifically when there was no provocation or resisting arrest—as was the case when Lyons was

---

[4] In ruling on the motion for a preliminary injunction, this Court did not make a specific finding on the existence of a policy or officially sanctioned pattern of behavior.  It did note the existence of presidential statements and indicated that it was not "at liberty to just sort of wave them away"; "taking them into account," it indicated that Plaintiffs satisfied "the requirement of a substantial risk of future harm" for purposes of their motion.  Tr. of Oct. 30, 2020 Hearing at 6. The government respectfully maintains its disagreement with that conclusion, but in any event it presents the standard that governs here, which must be applied to allegations that differ from the record in the earlier motion.

allegedly subjected to a chokehold. *Lyons*, 461 U.S. at 106. The Supreme Court concluded that the policy made the complained-of conduct no less speculative. *Id.*

## 2. There Is No Official Sanction of Any Pattern of Behavior

Plaintiffs have also not demonstrated an invariable or "officially sanctioned" pattern of conduct violative of Plaintiffs' federal rights. *Mayfield*, 599 F.3d at 971. Not only have Plaintiffs failed to establish that there is a consistent pattern, as discussed below, but it is also clear that there is no official sanction to any such alleged pattern. Official sanction must be explicit and concern the specific pattern of challenged conduct; indeed, courts have largely not found an officially sanctioned practice absent some officially acknowledged policy, and it is not clear that there is much distinction in practice. *See, e.g.*, *Mayfield*, 599 F.3d at 971 (finding that the Foreign Intelligence Surveillance Act constituted both a written policy and official sanction for the gathering of intelligence against the plaintiff, allegedly constituting a Fourth Amendment violation); *Armstrong*, 275 F.3d 861-63.

This Court, in ruling on standing for the preliminary injunction, relied on statements by the President and Acting DHS Secretary Chad Wolf. Tr. of Oct. 30, 2020 Hearing, at 6. But the record before the Court included a number of statements by the President and Acting Secretary Wolf that are not in the complaint, including statements made *after* the operative complaint was filed, meaning they cannot form any part of it. *See* Dkt. Nos. 17 (Declaration of Clifford S. Davidson); 30 (Second Declaration of Clifford S. Davidson). Standing must be determined based on the allegations in the complaint at the time it was filed. *Lujan*, 504 U.S. at 569 n.4.

The only statements that could relate to any specific conduct were statements by Acting Deputy Secretary of Homeland Security Ken Cuccinelli in an interview with NPR, not quoted

but only incorporated by reference in the complaint, F. Am. Compl. ¶ 15[5], and the statement

from Acting DHS Secretary Wolf that "his agency's officers 'are having to go out and

proactively arrest individuals' in Portland," quoted but not sourced in the complaint, *id.* ¶ 56.  In

the former, Mr. Cuccinelli spoke of only being familiar with "one instance" of federal officers

detaining someone using an unmarked van, and while he indicated that people who are "violent"

and "destroy property" will continue to be detained, he did not indicate that federal officers

would continue to use unmarked vans.  In the latter statement, Plaintiffs provide no context as to

what specific practices are being discussed.  These hardly provide official sanction to the

"abductions" or "disappearances" that Plaintiffs seek to challenge.

Plaintiffs also quote some additional statements from the President about Portland.  First,

the complaint quotes the President stating that certain "people are not protesters" but

"anarchists."  F. Am. Compl. ¶¶ 55.  This statement appears in a news article incorporated by

reference in the complaint.[6]  That article notes, above the President's statement, that

demonstrations "ha[d] become more chaotic in recent weeks" and that "[p]rotesters outside the

city's U.S. courthouse set a fire in the building's entryway early Monday before being tear-

gassed by federal agents."  Thus, it is clear from the language of, and the context surrounding,

the President's statements that the protesters that he is calling "anarchists" are the violent rioters,

who are criminals.  Both that article and another quoted and cited in the complaint, *id.* ¶ 15,[7] also

quote the President as saying, apparently in reference to federal law enforcement:  "They've

been there three days and they really have done a fantastic job in a very short amount of time,"

---

[5] https://www.npr.org/2020/07/17/892393079/dhs-official-on-reports-of-federal-officers-detaining-protesters-in-portland-ore
[6] https://www.foxnews.com/politics/trump-vows-to-send-federal-agents-dhs-chicago
[7] https://www.chicagotribune.com/news/criminal-justice/ct-chicago-police-dhs-deployment-20200720-dftu5ychwbcxtg4ltarh5qnwma-story.html

with the first article adding, "They grab them, lots of people in jail."  It is unclear what the immediate context for this statement is because it was made on July 20, 2020, and federal law enforcement had been in Portland far longer than three days.  In any event, the only possible law enforcement practice that the statement could concern would be arrests, not the "abductions" Plaintiffs are concerned about.  The arrests were of criminals who were not "disappeared" but processed through the criminal justice system.

The remaining statements do not relate to activities in Portland.[8]  Indeed, Plaintiffs quote the President as announcing a "surge of federal law enforcement," but the full statement (incorporated in the complaint by reference) shows that the Attorney General stated that he wanted to "clearly make a distinction" between what was happening in Portland ("the DHS mission . . . to protect federal property and our law enforcement officers") and what the President was announcing (a mission "to protect the public from violent crime on the streets" in *other cities*).  *Id.* ¶ 15[9].  The other statements largely predated any significant federal presence in Portland and expressed the President's frustration with general lawlessness in other cities.  They included a statement that the President was considering using the military to quell violence, a warning that the City of Seattle should not permit an autonomous zone, a statement that at some point there would be "retribution" for "agitators" who are "vandals" (*i.e.*, retributive justice for

---

[8] Plaintiffs also note that the President criticized flag burning in Portland, *id.* ¶ 52, but it was before the deployment to Portland and he did not indicate that there would be any law enforcement response.

[9] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-operation-legend-combatting-violent-crime-american-cities/

DEFENDANTS' MOTION TO DISMISS – 15

criminals), and a statement that federal law enforcement would protect monuments (including in Washington, D.C.). *Id.* ¶ 50[10], 51[11], 53[12], 54[13].

### 3.    There Is No Pattern of Harm

Plaintiffs have also not established a pattern for any harms. The harm required must be consistent and likely to recur on a frequent basis. *See Updike v. Clackamas Cty.*, No. 3:15-CV-00723-SI, 2015 WL 7722410, at *9 (D. Or. Nov. 30, 2015) (noting that in *Armstrong*, there was standing because some inmates had yearly, recurrent hearings). *Cf. Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1104-05 (9th Cir. 2017) (noting that where the violations were different, there was no "pattern of officially sanctioned . . . [illegal] behavior"). At the same time, *Lyons* suggests that where there is no official policy, the practice must be so consistent that violations *always* occur in the relevant situation. *Lyons*, 461 U.S. at 106. *See also Armstrong*, 275 F.3d at 867. Indeed, even the plaintiff's allegation in *Lyons* that the police "routinely" applied chokeholds when not threatened by the use of deadly force fell short of showing the necessary pattern of using chokeholds without any provocation at all. 461 U.S. at 105. And, of course, even repeated violations that do not flow from a policy do not establish the kind of practice necessary for standing. See *Updike*, 870 F.3d at 948.

The allegations suggest only a few types of injuries allegedly experienced by others. First, the complaint alleges that federal officers have conducted "patrols" away from federal property, including on July 11 and 20, F. Am. Compl. ¶¶ 58, 90-94, and possibly two other nights, *see id.* ¶ 63 (incorporating by reference an article, video, and social media posts). There

---

[10] https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/
[11] https://twitter.com/realDonaldTrump/status/1271142274416562176
[12] https://www.politico.com/news/2020/06/26/trumppretribution-protesters-statues-340957
[13] https://www.whitehouse.gov/briefingsstatements/remarks-president-trump-south-dakotas-2020-mount-rushmore-fireworks-celebrationkeystone-south-dakota/

is, however, no serious argument that federal officers merely being present on city streets violates Plaintiffs' rights or is even outside their legal authority, and any concern that those officers *might* do something is pure speculation.  *See Clapper*, 568 U.S. at 417; *Laird*, 408 U.S. at 13–14.  A "policing" action that Plaintiffs may have intended to capture is federal officers' lawful dispersal of crowds to protect the Hatfield Federal Courthouse.  But there is no established pattern to the dispersals alleged.  On July 11, the complaint alleges only that "federal agents cleared a city park at Lownsdale Square."  F. Am. Compl. ¶ 61.  On July 20, the complaint alleges that federal officers moved crowds at the Courthouse back "several blocks" without declaring an unlawful assembly (at least that Amanda Dunham heard).  *Id.* ¶¶ 92-97.  An article incorporated by reference in the complaint states that federal officers also dispersed crowds two blocks on July 24, 2020 but that they clearly declared an unlawful assembly before doing so.[14]  These heterogeneous incidents do not establish a pattern of dispersals.[15]

Second, Plaintiffs note various times that federal officers used force against different individuals—but, as with the dispersals, there is no consistent pattern.  Maureen Healy and Amanda Dunham were allegedly hit with impact munitions and subjected to tear gas, each during a night in which she protested peacefully, though only Ms. Dunham noted that the crowd was peaceful.  *Id.* ¶¶ 86, 90, 93.  Mayor Ted Wheeler was allegedly subjected to tear gas, but not

---

[14] https://www.nytimes.com/2020/07/25/us/portland-federal-legal-jurisdiction-courts.html
[15] The dispersals here might generally be relevant if Plaintiffs were challenging a time, place, and manner restriction that directly prevented their expression.  But Plaintiffs' claimed harm is that federal law enforcement officers' conduct has "chilled" the exercise of their First Amendment rights, F. Am. Compl. ¶ 119, not that they are prevented from exercising any rights by some restriction.  It is unclear how the two or three temporary dispersals of up to two blocks as alleged in the complaint—rather than the alleged uses of force by federal law enforcement— could create a sufficient chill such that Plaintiffs would completely avoid protesting at all, and no Plaintiff has claimed it has.  Accordingly, it is not clear that dispersals, as opposed to uses of force, are at all relevant.

impact munitions, while speaking with Oregonians near the Courthouse, and he pointedly omits saying whether there was unlawful or disorderly behavior, only that none justified the tear gas in his opinion. *Id.* ¶¶ 98-100. During the "patrol" of July 11, there is no allegation that anyone was hurt, only that federal officers shot a tear gas canister at someone who was on a scooter (and the complaint does not say that the scooter rider was hit or was a protester). *Id.* ¶ 61. Christopher David was allegedly beaten after approaching federal officers. *Id.* ¶¶ 83-85. And the journalists who were allegedly shot were acting as journalists, not protesters or observers. Accordingly, there is no consistent pattern. Plaintiffs only manage to allege that, after weeks of violent protests, only a handful of protesters were subjected to force on a few occasions, and none were involved in multiple incidents. The alleged conduct simply does not comprise the specific pattern of conduct necessary to demonstrate certainly impending injury.

Third, Plaintiffs allege that federal officers have a "program of abducting persons outside the jurisdiction of federal law enforcement," meaning without a warrant and without being on or attacking federal property. *Id.* ¶¶ 64-67. Yet Plaintiffs cite only one specific example—Mark Pettibone—and allege that "he had seen a video of another Portlander being picked up in a like manner." *Id.* ¶ 68. As noted earlier, Mr. Pettibone has brought his own claims. Additionally, as Plaintiffs themselves note, *id.* ¶ 64, this Court already ruled on these claims when the Oregon Attorney General brought them and found that there was no standing to bring them. *Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209, at *6 (D. Or. July 24, 2020) (noting that the state "presented no evidence of any official orders or policies and has presented no evidence that these allegedly illegal seizures are a widespread practice"). There is no reason to revisit that conclusion.

**E.      The Organizations Do Not Have Their Own Standing**

The two Plaintiff organizations also do not have standing on their own.  Defendants fully

briefed the requirements of organizational standing and why the Plaintiff organizations lacked it

based on the record for Plaintiffs' motion for a preliminary injunction.  Response at 13, 19-23.

Throughout the hearing on the preliminary injunction, Plaintiffs did not press organizational

standing, and the Court does not appear to have ruled on it.  Plaintiffs' demonstration of standing

is even weaker on this motion to dismiss because the allegations in the complaint do not include

any discussion of events that Western States Center refused to hold based on speculative fears of

federal law enforcement.  *See* Ward Decl., Dkt. No. 32, ¶¶ 6-11.

An organization has standing in its own right if it satisfies the requirements of injury in

fact (to the organization), causation, and redressability.  *Rodriguez v. City of San Jose*, 930 F.3d

1123, 1134 (9th Cir. 2019).  To demonstrate sufficient injury, the organization must show "(1)

frustration of its organizational mission; and (2) diversion of its resources to combat the

particular [injurious behavior] in question."  *Id.* (quoting *Smith v. Pac. Props. & Dev. Corp.*, 358

F.3d 1097, 1105 (9th Cir. 2004)); *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938

F.3d 1147, 1154-55 (9th Cir. 2019) (collecting cases).  It has standing "only if it was forced to

choose between suffering an injury and diverting resources to counteract the injury."  *La*

*Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 n.4 (9th

Cir. 2010).  The organization must show more than "simply a setback to the organization's

abstract social interests."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Organizations must demonstrate the other two elements of standing too.  *Physicians Comm. for*

*Responsible Med. v. EPA*, 292 F. App'x 543, 545 (9th Cir. 2008).

Western States Center's primary allegation is that the presence of federal law enforcement "disrupted WSC's efforts and frustrated its mission," and "required WSC to divert resources away from other programs in order to address the chaos the defendants caused when they overstepped the constitutional bounds limiting their authority to engage in purported law enforcement activities." F. Am. Compl. ¶ 22. But the only diversion of resources that Western States Center specifically alleges is that it "spent funds from its communications retainer to issue statements and disseminate information to the public and to WSC's supporters," that staff focused time on these efforts, and that it "had to retain a second communications firm." *Id.* ¶ 23. While a diversion of resources can be "broadly alleged," such allegations must still indicate that the organization used those resources to "counteract" specific conduct. *Havens*, 455 U.S. at 379; *Rodriguez*, 930 F.3d at 1134 (noting that the diversion of resources must be to "combat" the particular injury that has frustrated the organization's goals); *Am. Diabetes Ass'n*, 938 F.3d at 1154-55 (collecting cases); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organization had standing when it diverted resources to educate members and staff on why they should not be deterred by the challenged law from continuing to assist with homeless program for undocumented aliens). But Western States Center does not allege that it has "challenged" any practices at all.

Instead, Western States Center indicates that it "address[ed] the chaos the defendants caused." Chaos is not the challenged conduct (indeed, it was the primary harm the government sought to quell through the lawful dispersal of riotous crowds). And allegations about how Western States Center "address[ed]" such chaos amount to only vague "communications." If an organization could create standing simply by talking about something within its general area of interest, the requirement for a concrete injury in fact would dissolve and standing would require

"simply a setback to the organization's abstract social interests."  *Havens*, 455 U.S. at 379.  It is also a mystery even what "statements" and "information" were being disseminated to the "public" and Western States Center's members.  Western States Center has accordingly failed to show that its diversion of resources was an injury in fact traceable to the challenged conduct of the federal government.

The allegations relating to First Unitarian Church are even more vague.  First Unitarian alleges that it has a "social justice mission" and "encourage[s] protest against unjust laws and government actions."  F. Am. Compl. ¶ 25.  It states that since the arrival of additional federal law enforcement personnel, "congregant participation in the protests has dropped" and its "social justice mission has been harmed."  *Id.*  First Unitarian "has become hesitant to encourage its congregants to protest . . . because defendants' unconstitutional targeting of peaceful protestors increases both the risk of bodily harm to congregants and the likelihood of the church's civil liability to congregants who are injured or traumatized in the course of abduction by federal law enforcement."  *Id.* ¶ 26.  These statements do not even attempt to demonstrate injury through the diversion of resources.  To the extent that First Unitarian is claiming that it corporately, like any of its congregants, is deterred from attending protests, it has the same problems with asserting merely a subjective chill; vague, speculative injuries (such as a speculative fear of abduction or being targeted by federal law enforcement); and a lack of traceability.  Accordingly, it lacks standing.

### F.    The Legislators Do Not Have Legislator Standing

Oregon State Representatives Karin Power and Janelle Bynum also rely on a theory of harm to their "constitutional role [as] Oregon's legislators."  F. Am. Compl. ¶ 143.  *See id.* ¶ 139 ("Representatives Bynum and Power have additional First and Tenth Amendment injuries

specific to their governmental roles.")  The government already explained why these Plaintiffs lack standing to assert any harms to any legislative functions.  Response at 14 n.6.  Plaintiffs did not address these arguments in their briefing or at argument on the motion for a preliminary injunction.  *See* Dkt. No. 38 at 21-22.  The alleged injury to their state legislature's power is "wholly abstract and widely dispersed," and they have not shown that they are authorized to sue on behalf of their legislature.  *Raines v. Byrd*, 521 U.S. 811, 829 (1997).  *See also State ex rel. Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507-14 (6th Cir. 2019) (holding that neither legislators nor legislature had standing to pursue Tenth Amendment challenge). Defendants have also not nullified Plaintiffs' votes or interfered with their institutional role, the outer limit of legislator standing.  *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019); *Raines*, 521 U.S. at 923; *Coleman v. Miller*, 307 U.S. 433, 446 (1939).

## II.    Plaintiffs Also Lack Standing for Any Declaratory Judgment

Plaintiffs also cannot pursue a declaratory judgment.  A request for a declaratory judgment is not a standalone claim; a declaratory judgment is merely a remedy.  *See Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014) (noting the declaratory judgment statute "does not create new substantive rights, but merely expands the remedies available in federal courts").  The Declaratory Judgment Act does not by itself confer federal subject-matter jurisdiction.  *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005).  For a plaintiff to have an entitlement to declaratory relief, the plaintiff must "must first present an actual case or controversy within the meaning of Article III."  *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998) (en banc).

Here, as demonstrated above, Plaintiffs have not shown that a case or controversy exists with respect to their claims for prospective relief.  As the Ninth Circuit has recognized, the utility

of a declaratory judgment is fairly narrowly cabined; it is designed principally to allow a potential defendant "to file preemptive litigation to determine whether they have any legal obligations to their potential adversaries." *Shell Gulf of Mexico*, 771 F.3d at 635. There is nothing like that here. And because Plaintiffs cannot obtain injunctive relief, a declaratory judgment would do nothing to redress their injuries, so they may therefore not obtain either. *See Mayfield*, 599 F.3d at 972-73.

## III.    Plaintiffs Have Failed To Adequately Plead Their Claims

While Plaintiffs have alleged past injuries to other people, their legal claims must be for contemplated future violations of their own rights. Plaintiffs are not entitled to a declarative judgment of whether federal officers violated other people's rights on specific occasions in the past unless that proves relevant to such relief for Plaintiffs—which it largely does not. Indeed, even if Plaintiffs themselves had suffered the injuries and sought damages, those past harms would not provide standing for prospective claims, *Lyons*, 461 U.S. at 109, and qualified immunity could still prevent Plaintiffs from obtaining a ruling on the merits of such past claims for damages, *see generally Harlow v. Fitzgerald*, 457 U.S. 800 (1982). At the same time, if Plaintiffs cannot clearly demonstrate past injury and advance a legal theory that demonstrates a violation of their rights, that further undermines any basis for an entitlement to injunctive relief because there is no violation of their rights to recur. In this situation, where Plaintiffs rely on future injuries mirroring past ones, it is necessary, but not sufficient, that Plaintiffs also demonstrate past injuries and demonstrate that such injuries would violate their rights. Plaintiffs cannot do so.

A.     **The Court Has Already Properly Rejected Plaintiffs' Tenth Amendment Theory**

Plaintiffs advance a Tenth Amendment claim on its own and in combination with their First Amendment and Fourth Amendment theories (other than their free exercise theory). Plaintiffs' Tenth Amendment theories were discussed extensively during the briefing on Plaintiffs' motion for a preliminary injunction and at the hearings on the same.  *See, e.g.*, Response at 23-26.  Even on the record for that motion, the Court concluded that such a claim was "highly unlikely" to succeed on the merits because there was nothing that even "approaches" what has been "found to be a Tenth Amendment concern even in other cases."  Tr. of Oct. 30, 2020 Hearing, at 4-5; Dkt. No. 50 at 1.  Given that the allegations in the complaint do not include several of the declarations involving what Plaintiffs asserted to be "plenary policing" on the motion for a preliminary injunction, Plaintiffs' claims are even weaker on this motion.  For the same reasons that the Court found no likelihood of success on the merits on Plaintiffs' motion, the Court should find that Plaintiffs have failed to state a claim on this motion.

B.     **The Allegations Do Not Support Plaintiffs' First Amendment Claim**

Plaintiffs next allege that the government sought to "deter," "silence, cancel, and thwart speech and assembly while it occurs, in violation of the First Amendment," and that this has "chilled each of the plaintiffs from exercising their First Amendment rights, by inducing them not to participate, or not to fully participate, in the protests."  F. Am. Compl. ¶¶ 115-19.  These First Amendment theories were also discussed extensively during the briefing on Plaintiffs' motion for a preliminary injunction and at the hearings on the same.  *See, e.g.*, Response at 27-30.  In ruling on Plaintiffs' motion, the Court considered Plaintiffs' claim to be one for retaliation, which it found likely to succeed on the merits because Plaintiffs had shown engagement in likely constitutionally protected activity, chill, and a likelihood that the protected

activity was "a substantial or motivating factor in defendants' conduct." Tr. of Oct. 30, 2020 Hearing, at 7-8. On the last point, the Court noted that in "tweets" and public statements, "taken at face value, the kind of speech being engaged in here is, as it turns out, stated to be an executive branch concern, . . . making the protected activity . . . a substantial motivating factor in defendants' conduct." *Id.* at 8. *See* Dkt. No. 50 at 2 (concluding federal agents "operate under the burden of statements from the President (and for Border Patrol agents, Acting Secretary Wolf) expressing precisely such a [retaliatory] motivation"). Plaintiffs themselves did not press this argument in their motion for a preliminary injunction but argued only that the Executive Order and statements about Operation Legend (which some of the statements were about, though it had nothing to do with Portland) showed animus. For reasons the government noted at the hearing, Tr. of Oct. 22, 2020 Hearing at 39-40, and at its first opportunity after the Court's ruling, Dkt. No. 64 at 8, the evidence in Plaintiffs' motion fell short of establishing a likelihood of success on the merits because any disapproval the statements express is clearly directed at criminals (including vandals and rioters). In any event, the complaint's allegations differ from the record on the preliminary injunction motion and fail to present a viable retaliation claim.

With regard to the first factor (whether the expression was protected), even if the individuals Plaintiffs describe in their complaint were peacefully protesting, that does not mean such expression was protected at the relevant time. Plaintiffs themselves note that "some [protesters] have resorted to vandalism" and that police have alleged that "some of the protestors have committed acts of violence." F. Am. Compl. ¶ 43. Several of the articles Plaintiffs incorporate by reference in the complaint also note that protesters were violent, including that they had set a fire in the Hatfield Courthouse's entryway and had assaulted federal officers with fireworks and water bottles. *See id.* ¶¶ 55, 63. For none of the incidents alleged do Plaintiffs

state that the crowd of protesters was not engaging in criminal activity or vandalism—the closest

is Mayor Wheeler stating the he did not see any "unlawful or disorderly behavior that would

have justified the gassing of the crowd" in his opinion, not that he saw none at all.  *Id.* ¶ 100.

Indeed, for only some of the incidents do Plaintiffs even allege that the crowd was not *violent*.

*Compare id.* ¶ 91 (noting that Dunham "did not witness any protestor behave in a violent or

threatening manner") *with id.* ¶¶ 83-85 (not describing the situation around Christopher David).

And Plaintiffs note only one occasion on which someone did not hear any "announcement

purporting to declare the gathering unlawful."  *Id.* ¶ 92.

Where there is violence, crime, or disorder in a crowd, participants have no protected

right to remain and express themselves.  *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104,

116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression

under the First Amendment"); *Colten v. Kentucky*, 407 U.S. 104, 106–09 (1972) (noting that

there is "no constitutional right to observe the issuance of a traffic ticket or to engage the issuing

officer in conversation" after being ordered to disperse); *Menotti v Seattle*, 409 F.3d 1113, 1155

(9th Cir. 2005) ("It may be that a violent subset of protestors who disrupt civic order will by their

actions impair the scope and manner of how law-abiding protestors are able to present their

views."); *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)

(noting that if "the demonstration as a whole . . . is substantially infected with violence or

obstruction the police may act to control it as a unit" and if "any demonstrator or bystander

refuses to obey" or order to disperse, he may be arrested even if he was not previously "violent

or obstructive"); *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *12 (D.

Or. Nov. 8, 2006) ("Plaintiff had no protected First Amendment [right] to enter the street in

violation of a lawful order to disperse."). Plaintiffs have accordingly not demonstrated that their conduct was actually protected at the time federal officers allegedly used force against protesters.

With regard to the third factor (whether protected expression was a substantial motivating factor in the governments' conduct), the Court never articulated which statements demonstrated such retaliatory animus. As already noted, the record before the Court included a number of statements outside of the complaint. The statements in the complaint simply do not show that the President or Acting DHS Secretary Wolf were concerned with policing protected expression, or even that they were discussing peaceful protesters. For instance, the complaint alleges that the President stated that certain "people are not protesters" but "anarchists." F. Am. Compl. ¶ 55. Yet, as noted above, it is clear from both the language of and the context surrounding the President's statements that the protesters he is calling "anarchists" are the violent rioters, who are criminals. It is the same case with the alleged statement by the President about "agitators," which is clearly in reference to "vandals"—criminals—from even the quoted portion in the complaint. *Id.* ¶ 53. And in a statement incorporated by reference in the complaint, *id.* ¶ 50, the President specifically drew a distinction between criminals and peaceful protesters and stated that he is "an ally of all peaceful protesters."[16]

Moreover, even if there were ambiguous statements, that would not suffice to allege that the particular government actions at issue—the conduct of individual law enforcement officers— was motivated or directed by animus. Plaintiffs must show that the specific conduct they challenge was motivated by speech. *See Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). Plaintiffs do not allege that any officer believed that the President's statements directed them to exercise unlawful or unnecessary force, or that any

---

[16] https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/

officer even knew of those statements.  Indeed, as this Court found, "[t]he showing that the federal agents have any retaliatory motive is nonexistent."  Dkt. No. 50, at 2.  And, given that Plaintiffs do not generally challenge the federal government's ability to defend the Hatfield Courthouse, their allegations cannot establish that the conduct they do challenge—the specific steps taken to defend the Courthouse within the discretion of federal law enforcement officers on the ground—was motivated in any part by retaliatory animus toward speech.

Plaintiffs also advanced a nascent theory premised on time, place, and manner restrictions that this Court did not discuss in resolving the motion for a preliminary injunction.  As already explained by the government, Plaintiffs' theory is foreclosed by a case that specifically undercuts the cases they relied upon.  Response at 28-29 & n.15.  Plaintiffs' allegations are also insufficient to allow for the necessary analysis under such a theory, especially for only temporary dispersals. *See Menotti*, 409 F.3d at 1128 (requiring analyzing whether the restrictions "were content neutral, were narrowly tailored to serve a significant governmental interest, and left open ample alternative means of communication").  There is accordingly no reason to consider such a theory.

Because Plaintiffs fail to present plausible allegations of First Amendment retaliation sufficient to demonstrate entitlement to relief, this Court should dismiss Plaintiffs' First Amendment claims.

### C.    The Allegations Do Not Support Any Substantial Fourth Amendment Claim

Plaintiffs allege that various uses of force by federal law enforcement and the "abduction" of Mr. Pettibone violate the Fourth Amendment.  F. Am. Compl. ¶ 126.  These appear to constitute claims of excessive force and unlawful seizure.  Both have substantial deficiencies.

DEFENDANTS' MOTION TO DISMISS – 28

As discussed, Plaintiffs present no basis to presume that they will, at some time in the future, experience a Fourth Amendment violation.  Past exposure to alleged Fourth Amendment violations provides no basis to establish a speculative claim for prospective relief regarding future interactions with law enforcement.  *See supra* Sections I.A-D; *Lyons*, 461 U.S. at 106 (seeking an injunction against excessive force).  Yet the vast majority of caselaw on the Fourth Amendment arises not from civil actions seeking to enjoin future activity but from retrospective actions for damages, and even there the analysis is affected by qualified immunity.  *See, e.g.*, Response at 27 (compiling cases); *Felarca v. Birgeneau*, 891 F.3d 809, 817-18 (9th Cir. 2018) (compiling cases).  Such cases, rather than providing a basis for this case to proceed, reinforce its impropriety.

Even if Plaintiffs could transform their retrospective allegations into a prospective claim, excessive force claims require a showing that the "use of force" was "objectively unreasonable under the circumstances."  *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018).  They require "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  The reasonableness of police use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396-97).

Plaintiffs have not pleaded sufficient facts to establish that the uses of force in the past incidents they describe were objectively unreasonable.  Indeed, in determining the government's

interest in the use of force—one side of the balancing test—the "most important" factor is the "immediate threat to the safety of the officers or others" posed by those against whom force is used; a situation in which officers are "greatly outnumbered and verbally and physically provoked" is "far more threatening" than a few obstinate protesters. *Felarca*, 891 F.3d at 817. But, as explained, Plaintiffs provide little or no information about the potential threats facing federal law enforcement officers. What little information that exists suggests that there were substantial threats to safety. Officers have a "'safety interest in controlling' a mass of people," *Felarca*, 891 F.3d at 817 (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)), and that interest is only heightened when a group refuses to disperse after warnings, even more so when individuals attempt to interfere with officers' attempts to maintain order, *Jackson*, 268 F.3d at 653. In such situations, with crowds far smaller than here, the types of force allegedly employed here have been found reasonable. Use of a chemical irritant is justified when a large group refuses to disperse and individuals attempt to interfere with officers' attempts to maintain order. *See id.* Similarly, use of physical force is reasonable when individuals actively resist dispersing, even when they are generally nonviolent. *Felarca*, 891 F.3d at 818.

With regard to an unlawful seizure claim, Plaintiffs present solely the case of Mr. Pettibone. Even the validity of his claim is not clear because the allegations pointedly do not deny that he committed a federal crime the evening he was detained or that a federal officer would not have had reasonable suspicion or probable cause to detain him—the complaint alleges that he was not arrested on federal property and had been protesting peacefully, but does not say, for instance, whether he had trespassed on federal property at some point that evening or committed a nonviolent crime like vandalism. F. Am. Compl. ¶¶ 65-66. It is thus unclear whether his detention, even if it was an arrest, violated his rights. *See Blankenhorn v. City of*

*Orange*, 485 F.3d 463, 470–71 (9th Cir. 2007).  The complaint also provides no information

about his detention, so it is not clear that it should be characterized as an arrest.  *See United*

*States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

In any event, this Court already determined that litigating Mr. Pettibone's detention is

pointless because there are no other examples of potentially unlawful arrests.  *Rosenblum*, 2020

WL 4253209, at *6.  The complaint simply asserts that "others" have been "arrested in violation

of the Fourth Amendment," but it notes only one other *possible* example—that of another

protesters being "picked up in a like manner" to Mr. Pettibone, the "manner" being the only

thing in common.  F. Am. Compl. ¶¶ 68, 70.  The complaint does not even assert that that

incident happened, only that Mr. Pettibone said he saw a video of it in his declaration in the other

case.  *Id.* ¶ 70.  There is no description of the circumstances at all, much less information

sufficient to infer that there was no reasonable suspicion or probable cause.  These conclusory

allegations about past conduct cannot survive this motion or allow prospective relief.  *See Iqbal*,

556 U.S. at 678-79; *O'Shea*, 414 U.S. at 496 (refusing to "strain to read inappropriate meaning

into the conclusory allegations of th[e] complaint" to establish future injury).

### D.     Plaintiffs' Other Legal Theories Are Baseless

Plaintiffs' complaint has two other theories, neither of which have any grounding in law.

First, Plaintiffs assert that the government has violated the First Unitarian Church's First

Amendment free exercise rights by chilling its "pursuit of its religious mission and faith, and the

exercise of that faith by First Unitarian's congregants in Portland" by deterring them from

attending protests.  F. Am. Compl. ¶ 135.  Yet it is well established that government action "that

is neutral and of general applicability need not be justified by a compelling governmental interest

even if the [action] has the incidental effect of burdening a particular religious practice." *Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  There is an

exception if the government specifically targets religious beliefs or practice.  *Id.* at 532-34.  But

here there is no suggestion at all, in any part of the complaint, that the federal government

targeted the First Unitarian Church or any of its congregants or anyone because of their religious

beliefs or practice, or that it would attempt to deter protests in the future because of their

potential religious purpose.  There is accordingly no special right of the First Unitarian Church to

protest that is not held by protesters generally.

Second, the complaint alleges that "Representatives Bynum and Power have additional

First and Tenth Amendment injuries specific to their governmental roles" and that the federal

government's actions are "very specifically in derogation of the constitutional role of Oregon's

legislators."  F. Am. Compl. ¶¶ 139, 143.  Because, as already discussed, legislators generally do

not have standing (and this suit is no exception), there is little chance for legislators to ever

litigate whether they have special rights.  The complaint provides no hint of what special rights

legislators may have under the First Amendment, and to the extent there is a Tenth Amendment

claim, it is clearly a claim held by the state rather than the institutions of the state or members.

*See State*, 931 F.3d at 514.  The State of Oregon already brought some of these same claims on

behalf of its citizens and did not prevail.  *Rosenblum*, 2020 WL 4253209, at *3-5.  There is no

basis in law for Plaintiffs to assert a claim for harm to the state representatives' roles.

## **CONCLUSION**

For the foregoing reasons, the First Amended Complaint should be dismissed.

Dated: December 4, 2020                    Respectfully submitted,

                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           BILLY J. WILLIAMS
                                           United States Attorney

                                           ALEXANDER K. HAAS
                                           Director, Federal Programs Branch

                                           BRIGHAM J. BOWEN
                                           Assistant Branch Director

                                           */s/ Jeffrey A. Hall*
                                           JEFFREY A. HALL (DC 1019264)
                                           Counsel, Civil Division
                                           JORDAN VON BOKERN
                                           KERI BERMAN
                                           JASON LYNCH
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division
                                           950 Pennsylvania Ave. NW
                                           Washington, DC 20530
                                           Tel: (202) 353-8679
                                           Email: jeffrey.a.hall@usdoj.gov

                                           *Attorneys for Defendants*